**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

| | |
|---|---|
| HOLOTRACK VENTURES CORP., HOLOTRACK AG, JR BETEILIGUNGS HOLDING AG, MIRALCO HOLDING AG, and PB INVEST SCHWEIZ AG, | |
| Plaintiffs, | Case No. 2:17-CV-14390 |
| vs. | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| JOHN TEXTOR, RENE EICHENBERGER, FRANK PATTERSON, and PULSE EVOLUTION CORPORATION, | |
| Defendants. | |

Holotrack Ventures Corp. ("HVC"), Holotrack AG ("Holotrack"), JR Beteiligungs Holding AG ("JR Holding"), Miralco Holding AG ("Miralco"), and PB Invest Schweiz AG ("PB Invest," collectively with the other plaintiffs as the "Plaintiffs"), by and through their attorneys, bring this Complaint against John Textor ("Mr. Textor"), Rene Eichenberger ("Mr. Eichenberger"), Frank Patterson ("Mr. Patterson"), and Pulse Evolution Corporation ("Pulse," collectively with the other defendants as the "Defendants"), and allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

<u>NATURE OF THE ACTION</u>

1.      This action is brought to remedy the Defendants' unlawful conduct in fraudulently inducing the Plaintiffs into investing and loaning millions of dollars into the Defendants' sham visual effects production company, Pulse, the cash proceeds of which Messrs. Textor and Eichenberger embezzled in order to fund their lavish lifestyles and the lifestyles of their friends and family.

2.      Therefore, the Plaintiffs respectfully seek remedies against the Defendants including monetary relief, damages, an accounting, and other relief specified herein.

## THE PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff HVC is a corporation, formerly known as Highlight Ventures Corporation, organized and existing under the laws of Delaware with its principal place of business in Switzerland.

4.      Plaintiff Holotrack is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

5.      Plaintiff JR Holding is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

6.      Plaintiff Miralco is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

7.      Plaintiff PB Invest is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

8.      Defendant Pulse is a corporation, organized and existing under the laws of Nevada with its principal place of business in Florida.

9.      Defendant John Textor is a citizen of Florida.

10.     Defendant Rene Eichenberger is a citizen of Switzerland.

11.     Defendant Frank Patterson is a citizen of Georgia (United States).

12.     This Court has jurisdiction over the subject matter of Counts I and II of this action (violations of the Securities Exchange Act of 1934 (the "Exchange Act")), pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and has supplemental jurisdiction over the subject matter of the remaining Counts of this action pursuant to 28 U.S.C. § 1367.

13.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000 and the action is between citizens of different States and in which citizens or subjects of a foreign state are additional parties. Specifically, as described above, the Plaintiffs are citizens of Delaware and Switzerland, and the Defendants are citizens of Nevada, Florida, Switzerland, and Georgia (United States).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as a substantial part of the acts, events, or omissions that effectuated the frauds giving rise to the claims pleaded herein occurred in this District, and Defendants Pulse and Mr. Textor maintain their respective principal place of business and residence in this District.

## RELEVANT FACTS APPLICABLE TO ALL CLAIMS

15.     Following the 2012 collapse of Mr. Textor's previous production company, Digital Domain, and facing multiple lawsuits accusing him of defrauding Digital Domain investors out of approximately $100 million and effectuating a Ponzi scheme to enrich himself, Mr. Textor founded Pulse with Messrs. Eichenberger and Patterson.

16.     Pulse is a company that purports to produce virtual reality entertainment productions using computer animation and visual effects.

17.     In *actual* reality, Pulse was created and/or managed as a sham entity to personally enrich Messrs. Textor and Eichenberger, and over the course of Messrs. Textor and Eichenberger's respective tenures as chairman and vice-chairman of Pulse's board of directors, the only visual effects Pulse produced was causing tens of millions of dollars of the Plaintiffs' and others' investments in Pulse to not-so-magically disappear.

18.     Since its founding, Messrs. Textor and Eichenberger fraudulently induced investors

and lenders to deposit funds into Pulse's corporate accounts, which they then embezzled into their own personal accounts.

19.     Messrs. Textor and Eichenberger's were able to effectuate this fraudulent scheme by creating the illusion that Pulse operated as a legitimate virtual entertainment business, when in fact, it operated as a de facto Ponzi scheme.

20.     Pulse chiefly solicited investments and borrowed money from the Plaintiffs and others, promising that those funds would go towards Pulse's business operations, but then used those funds to pay themselves personally and replace old debt with new debt in order to keep the sham enterprise going.

21.     If Pulse had operated with a legitimate business model, it would have eventually generated some sort of operations-based revenues, let alone profits, and Messrs. Textor and Eichenberger would not have had to constantly seek out new investments and loans to supposedly pay its employees and "stay in business."

22.     However, Pulse was designed to operate and/or did in fact operate as Messrs. Textor and Eichenberger's personal piggy bank.

23.     Pulse has never completed or publicly exhibited any feature-length virtual entertainment production, has never generated any revenues or earnings from its operations, has never paid any dividends to its shareholders, and has never owned any cognizable assets.

24.     Instead, Pulse functioned as the corporate façade and mere instrumentality of its founders, Messrs. Textor and Eichenberger, and Pulse's corporate identity was primarily used to further Messrs. Textor and Eichenberger's personal interests in enriching themselves and funding their lavish lifestyles.

25.     Through this fraudulent scheme, conducted through the use of interstate mails and

wires and as described in greater detail herein, Messrs. Textor and Eichenberger's fraudulently induced investors and lenders, including the Plaintiffs, to invest in and lend Pulse tens of millions of dollars based on false and misleading statements and omissions of material fact, after which Messrs. Textor and Eichenberger used their domination and control of Pulse to convert those entrusted and earmarked funds for their own personal use.

26.     At all relevant times, Pulse's stock was listed and traded on the OTC markets in the United States.

***Messrs. Textor and Eichenberger Set Up and Utilized Pulse's Corporate Form to Fraudulently and Unlawfully Enrich Themselves to the Plaintiffs' Detriment***

27.     Messrs. Textor and Eichenberger created and/or managed Pulse with the intention of effectuating numerous illegal and bad faith practices (the "Bad Faith Practices"), specifically including without limitation:

a.  Using Pulse's corporate form to perpetuate a fraudulent scheme in which Messrs. Textor and Eichenberger induced investors and lenders, including the Plaintiffs, to deposit cash into Pulse's corporate bank accounts based on false and misleading pretenses, which funds Messrs. Textor and Eichenberger then embezzled into their own personal bank accounts through their domination and control of Pulse and abuse of Pulse's corporate form;

b.  Using Pulse's corporate form to effectuate a de facto Ponzi scheme in which Messrs. Textor and Eichenberger fraudulently solicited cash investments and debt on behalf of Pulse that were primarily used to pay off existing creditors (including those personal creditors of Messrs. Textor and Eichenberger's whose debts were unrelated to Pulse or Pulse's business) and not to fund Pulse's business operations, thus furthering the illusion that Pulse was generating legitimate cash flow and

allowing Messrs. Textor and Eichenberger to continue to effectuate their scheme to fraudulently enrich themselves;

c.   Using Pulse's corporate form to nominally conduct purported business while, in actuality, serving as a personal bank account for Messrs. Textor and Eichenberger;

d.   Using Pulse's corporate form to enter into contractual agreements with investors and lenders, including the Plaintiffs, even though at the time these contractual agreements were made, Messrs. Textor and Eichenberger agreed with one another that they would ignore Pulse's contractual promises, along with federal and state law, whenever doing so would further their fraudulent scheme and allow them to benefit personally;

e.   Using Pulse's corporate form to enter into self-serving agreements with Messrs. Textor and Eichenberger individually, entities controlled and owned by Messrs. Textor and Eichenberger, and the friends and family of Messrs. Textor and Eichenberger, knowing that those agreements did not further any legitimate business interest of Pulse and knowing that those transactions would actually devalue Pulse and hurt its shareholders and employees.

28.   During the relevant period, and through their domination and control of Pulse, Messrs. Textor and Eichenberger implemented the Bad Faith Practices by intentionally abusing their positions of power, including their positions as directors, managers, and as signatories on Pulse's corporate bank accounts, to effectuate numerous improper, wrongful, and unlawful corporate actions (the "Corporate Abuses"), including their scheme to defraud the Plaintiffs as described herein.

29.   The Corporate Abuses effectuated by Messrs. Textor and Eichenberger during their

tenure on Pulse's board of directors included, without limitation:

a. Messrs. Textor and Eichenberger concealed the Bad Faith Practices from Pulse's other directors and managers;

b. Messrs. Textor and Eichenberger prevented Pulse's other directors and managers from discovering or disrupting their Bad Faith Practices by deliberately not including those directors and managers in so-called business transactions that effectuated those Bad Faith Practices;

c. Messrs. Textor and Eichenberger executed so-called "unanimous board resolutions" on behalf of Pulse that were not actually unanimously approved by Pulse's board of directors;

d. Messrs. Textor and Eichenberger caused Pulse to improperly, wrongfully, unlawfully, and in bad faith disburse millions of dollars in cash and equity to Messrs. Textor and Eichenberger, their friends and family, and entities owned and controlled by Messrs. Textor and Eichenberger, for personal, non-business purposes, which improper disbursements violated Pulse's bylaws and certain agreements entered into with the Plaintiffs, and which were neither in Pulse's best corporate interests nor in furtherance of any of Pulse's legitimate business objectives and, in fact, actually knowingly devalued Pulse and harmed Pulse's employees, shareholders, investors, and creditors (the "Improper Disbursements"), including without limitation:

    i. Cash disbursements of so-called bonuses paid to Messrs. Textor and Eichenberger, which were actually unsanctioned personal payments;

    ii. Cash disbursements of so-called business expenses to Messrs. Textor and

Eichenberger, which were actually personal expenses;

iii.   Cash disbursements of so-called business expenses that paid for Mr. Textor's personal legal expenses;

iv.   Cash disbursements of so-called business expenses that paid for the rental of office space in properties controlled by Mr. Eichenberger in Switzerland and California, which did not further a legitimate Pulse business purpose and were actually used for non-Pulse businesses and personal purposes;

v.   Cash disbursements of so-called business expenses that paid for the rental of office space in property controlled and/or owned by Mr. Textor in Florida, which was actually used by Mr. Textor for non-Pulse businesses and personal purposes;

vi.   Cash disbursements of so-called business expenses that paid the lease of Mr. Eichenberger's house in San Francisco, which was used by Mr. Eichenberger for non-Pulse business and personal purposes;

vii.   Cash disbursements of so-called business expenses paid to a soccer team and soccer preparatory academy owned and controlled by a friend of Mr. Textor's, Paul Filipe ("Mr. Filipe"), and in which Mr. Textor's sons were soccer players, which did not further a legitimate Pulse business purpose;

viii.   Equity issuances to domestic and offshore entities owned and controlled by Messrs. Textor and Eichenberger individually and their friends and family, including Mr. Filipe, which did not further a legitimate Pulse business purpose;

ix.   Equity issuances to Messrs. Textor and Eichenberger and entities controlled

and owned by Messrs. Textor and Eichenberger, which were not authorized to be issued nor furthered a legitimate Pulse business purpose, including without limitation the issuance of approximately 12,000,000 shares of Pulse stock to entities owned and controlled by Messrs. Textor and Eichenberger in August 2016;

e.  Messrs. Textor and Eichenberger caused Pulse to increase Messrs. Textor and Eichenberger's salaries in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, all while Pulse's creditors, vendors, contractors, and even its employees were not being paid what they were owed;

f.  Messrs. Textor and Eichenberger caused Pulse to enter into a so-called "management option pool" agreements, in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which effectuated the improper, wrongful, and unlawful transfer and/or issuance of Pulse equity to Messrs. Textor and Eichenberger;

g.  Messrs. Textor and Eichenberger caused Pulse to employ and pay the salaries and benefits of numerous individuals who were actually working for other non-Pulse companies owned and controlled by Messrs. Textor and Eichenberger;

h.  Messrs. Textor and Eichenberger caused Pulse to enter into various sham consulting and finder-fee agreements, in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which effectuated the improper, wrongful, and unlawful disbursement of cash and transfer and/or issuance of Pulse shares to Messrs. Textor and Eichenberger;

i.  Messrs. Textor and Eichenberger caused Pulse to enter into a "Memoranda of

Understanding," in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which provided the so-called corporate authorization for Messrs. Textor and Eichenberger to effectuate many of the Improper Disbursements;

j.  Messrs. Textor and Eichenberger caused Pulse to disburse cash entrusted to it by the Plaintiffs and others and earmarked for the payment of delineated business expenses, including employee payroll, to Messrs. Textor and Eichenberger's personal accounts;

k.  Messrs. Textor and Eichenberger commingled corporate assets, including corporate cash, with Messrs. Textor and Eichenberger's personal accounts and the accounts of non-Pulse entities controlled and owned by Messrs. Textor and Eichenberger;

l.  Messrs. Textor and Eichenberger caused Pulse to ignore corporate formalities or otherwise abide by Pulse's bylaws and the various agreements entered into with the Plaintiffs, including without limitation failing to hold or properly notice required board of directors meetings, keep corporate minutes, vote on corporate actions requiring such votes, and maintain sufficient and accurate corporate and financial records;

m.  Messrs. Textor and Eichenberger approved the filing of and caused Pulse to file SEC financial disclosure forms that contained knowing misrepresentations and omissions of material fact;

n.  Messrs. Textor and Eichenberger caused Pulse to repurchase its own common stock owned by Mr. Textor, and entities controlled and owned by Mr. Textor, at grossly inflated prices, in knowing violation of Pulse's bylaws and the various agreements

entered into with the Plaintiffs and with the intention of personally enriching Mr. Textor;

o.  Messrs. Textor and Eichenberger caused Pulse to grant Mr. Textor's mother a blanket security interest in Pulse's property without exchanging fair and adequate consideration so that Mr. Textor could indirectly establish a first-priority, secured lien on all of Pulse's property vis-à-vis his mother in case of Pulse's bankruptcy.

30.  In addition to the Corporate Abuses described above, Messrs. Textor and Eichenberger caused Pulse to covertly enter into numerous sham consulting and fee agreements (the "Sham Compensation Agreements") with each other individually, without receiving the requisite approvals under Pulse's bylaws and/or its contractual agreements with the Plaintiffs, which were designed to enrich themselves using Pulse's corporate funds.

31.  The Sham Compensation Agreements were designed to provide Messrs. Textor and Eichenberger with a steady flow of indirect, non-salary compensation through the façade of sham consulting and advising entities in order to fund each of these individual defendants' lavish lifestyles.

32.  The nature and circumstances of the sham entities involved in the Sham Compensation Agreements, and the payments made thereunder, were purposefully concealed from the Plaintiffs as investors and lenders, as well as Pulse's other directors and managers throughout the relevant period.

33.  By way of example and not limitation, Messrs. Textor and Eichenberger caused Pulse to enter into the following Sham Compensation Agreements:

a.  Mr. Textor, acting on behalf of Pulse, entered into a so-called advisory agreement with Mr. Eichenberger, as president and owner of New Venture Associates, Inc.

("New Venture"), under which New Venture agreed to provide to Pulse "such advisory services as agreed among the parties from time to time," and in exchange Pulse agreed to pay New Venture an unspecified fee, "as agreed from time to time," in addition to "reasonable out-of-pocket expenses."  New Venture is a company that is owned and controlled by Mr. Eichenberger and his wife and provides no legitimate business services to Pulse.

b.  Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Textor, as president and owner of Textor Ventures, Inc. ("Textor Ventures"), under which Textor Ventures agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Textor Ventures an unspecified fee as well as unspecified expenses.  Textor Ventures is a company that is owned and controlled by Mr. Textor and provides no legitimate business services to Pulse.

c.  Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Eichenberger, as president and owner of Clematis Properties, Inc. ("Clematis Properties"), under which Clematis Properties agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Clematis Properties an unspecified fee as well as unspecified expenses, including the lease payments on properties rented by Mr. Eichenberger in Switzerland.  Clematis Properties is a company that is owned and controlled by Mr. Eichenberger and provides no legitimate business services to Pulse.

d.  Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Eichenberger, as president and owner of Driftwood

Investment Corp. ("Driftwood"), under which Driftwood agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Driftwood an unspecified fee as well as unspecified expenses, including a monthly fee of approximately $42,000.  Driftwood is a company that is owned and controlled by Mr. Eichenberger and provides no legitimate business services to Pulse.

e.   Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Eichenberger, as president and owner of (Alternative) 2 Holdings AG ("Alternative Holdings"), under which Alternative Holdings agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Alternative Holdings an unspecified fee as well as unspecified expenses.  Alternative Holdings is a company that is owned and controlled by Mr. Eichenberger and provides no legitimate business services to Pulse.

f.   Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Textor, as president and owner of Tradition Studios IP Acquisition LLC ("Tradition Studios"), under which Tradition Studios agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Tradition Studios an unspecified fee as well as unspecified expenses.  Tradition Studios is a company that is owned and controlled by Mr. Textor and provides no legitimate business services to Pulse.

34.   Under the guise of the Sham Compensation Agreements, Messrs. Textor and Eichenberger caused Pulse to indirectly disburse to themselves, through New Venture, Textor Ventures, Clematis Properties, Driftwood, Alternative Holdings, and Tradition Studios

(collectively as the "Sham Companies"), tens of millions of dollars in cash payments and stock issuances throughout the relevant period.

35.     Messrs. Textor and Eichenberger's looting of Pulse's corporate funds for their own personal benefit occurred during a period in which Pulse conducted no legitimate business and generated no revenues.

36.     In essence, Messrs. Textor and Eichenberger, throughout their tenure on Pulse's board of directors, so dominated and controlled Pulse that they were able to use Pulse as their mere instrumentality to effectuate any corporate action they desired, even though such actions were in bad faith and furthered the Bad Faith Practices, were not in Pulse's interests and breached Messrs. Textor and Eichenberger's fiduciary duties as directors, and/or were designed solely and exclusively to personally enrich Messrs. Textor and Eichenberger.

***Messrs. Textor and Eichenberger Victimize the Plaintiffs in Furtherance of Their Fraudulent Scheme to Use Pulse's Corporate Form to Personally Enrich Themselves***

37.     Over the course of the relevant period, from approximately 2014 to 2017, Messrs. Textor and Eichenberger fraudulently induced the Plaintiffs' to make numerous cash investments in and loans to Pulse, described below, for which the Plaintiffs were issued Pulse securities in the form of Pulse stock and promissory notes.

38.     For each of the Plaintiffs' investments, Messrs. Textor and Eichenberger conveyed false and misleading information and concealed material information upon which the Plaintiffs relied in deciding to invest in or loan money to Pulse.

39.     Throughout the relevant period, Messrs. Textor and Eichenberger represented to the Plaintiffs that Pulse was actively engaged in the production of various entertainment projects and that it needed the Plaintiffs' investments to fund Pulse's business-related expenses tied to the production of those various entertainment projects.

40.     These representations were knowingly false and misleading and omitted material information that would have revealed the truth of Messrs. Textor and Eichenberger's fraudulent scheme and actual motivations in seeking the Plaintiffs' investments.

41.     Messrs. Textor and Eichenberger represented to the Plaintiffs that their investments and loans would solely and exclusively be used to pay for specific Pulse business expenses, including expressly delineated employee payroll, taxes, insurance, and office rent expenses identified prior to making those investments and loans.  These representations too were knowingly false and misleading.

42.     In actuality and in direct contradiction to the statements and representations made to the Plaintiffs, Messrs. Textor and Eichenberger always intended to 1) cause Pulse to breach its agreements with the Plaintiffs by failing to use those proceeds as entrusted and earmarked, and then thereafter 2) separately convert and embezzle the proceeds of the Plaintiffs' entrusted and earmarked funds for their own personal benefit.

43.     Indeed, soon after Pulse received the proceeds of the Plaintiffs' investments and loans, Pulse breached their obligations by failing to use those investments and loans as expressly promised, and then thereafter Messrs. Textor and Eichenberger converted those funds by improperly and unlawfully embezzling them to themselves individually, to friends and family, and to entities controlled and owned by them.

44.     Throughout the course of the negotiations with the Plaintiffs that induced them to invest in and loan money to Pulse, Messrs. Textor and Eichenberger also concealed the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, among other material information that, had the Plaintiffs known, would have caused the Plaintiffs not to invest in or loan money to Pulse.

45.     Overall, as a result of their fraudulent scheme, Messrs. Textor and Eichenberger have made millions of dollars all while intentionally starving their so-called company of money. They have routinely, systematically, and all-too-casually used Pulse's corporate identity to personally enrich themselves, knowing that by doing so, they would be simultaneously making it impossible for Pulse to compensate its unwitting employees and pay their creditors and investors, including the Plaintiffs.

### *Pulse Solicits the Plaintiffs' Investments*

46.     In or around February 2014, Pulse retained the investment services of Jan Kollros ("Mr. Kollros"), a managing partner at the Swiss investment intermediary company Adbodmer AG ("Adbodmer"), to identify and solicit investors to invest in Pulse.

47.     At the first meeting between Mr. Kollros and representatives of Pulse, including Messrs. Textor, Eichenberger, and Patterson, and another individual, Christian Kruse, at Adbodmer's office in Horgen, Switzerland in or around February 2014, Messrs. Textor and Eichenberger pitched the Pulse investment opportunity to Mr. Kollros (the "February 2014 Pitch").

48.     At that February 2014 Pitch, Pulse asked Mr. Kollros to solicit investments from others which, according to Messrs. Textor and Eichenberger, were to be used for developing a feature-length (as opposed to short-form) virtual entertainment production starring the famous deceased musical artist Michael Jackson that would be included as part of a national or global touring event (the "Michael Jackson Project").

49.     In order to induce Mr. Kollros into soliciting those investments from others, Messrs. Textor and Eichenberger, acting on Pulse's behalf, during that February 2014 Pitch, through numerous oral statements made in person to Mr. Kollros, made intentional misrepresentations of material facts to Mr. Kollros and omitted and/or failed to disclose facts necessary to make those

affirmative statements not false and misleading.

50.    At the February 2014 Pitch, Messrs. Textor and Eichenberger, through numerous oral statements to Mr. Kollros, represented that 1) a unique selling point for Pulse as an investment opportunity was that it possessed the current, exclusive worldwide digital likeness rights to produce and exhibit the virtual Michael Jackson Project, and 2) Pulse intended on using the proceeds of investments solicited by Mr. Kollros primarily for developing the Michael Jackson Project.

51.    For example, Mr. Textor represented to Mr. Kollros at that February 2014 Pitch, that "we [Pulse] own all of the virtual Michael Jackson rights," indicating that Pulse possessed the requisite intellectual property rights to produce and develop the virtual Michael Jackson Project.

52.    These representations were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Mr. Kollros because 1) Messrs. Textor and Eichenberger knew at that time that Pulse did not possess the current, exclusive worldwide digital likeness rights to produce and exhibit the Michael Jackson Project, and 2) Messrs. Textor and Eichenberger knew at that time that Messrs. Textor and Eichenberger did not intend to use, nor could they use, the proceeds of investments solicited by Mr. Kollros as promised and actually intended to embezzle those investment proceeds to enrich themselves by later converting those investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them.

53.    In or around February 2014 and during the February 2014 Pitch, Pulse also concealed and omitted from their communications with Mr. Kollros:

    a.  the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements; and

b. that one of the intended purposes of utilizing Mr. Kollros's services was to solicit investments that would personally enrich Messrs. Textor and Eichenberger.

54.     At all times during Pulse's investment negotiations with Mr. Kollros, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations to Mr. Kollros were false and misleading.

55.     Mr. Kollros justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in agreeing to solicit other investors, including the Plaintiffs, to invest in Pulse.

56.     Indeed, Mr. Kollros relayed the misrepresentations and omissions of material fact described above to other investors, including the Plaintiffs, who in turn relied upon Mr. Kollros in deciding to make the investments described throughout this Complaint.

57.     Mr. Kollros would not have agreed to ask other investors to invest in Pulse but for Pulse's misrepresentations and omissions of material fact described above.

### *The PB Investment*

58.     In or around September 2014, Pulse solicited an investment of approximately $770,000 from PB Invest, which, according to Messrs. Textor and Eichenberger, was to be used for developing the Michael Jackson Project.

59.     In exchange for PB Invest's investment of approximately $770,000 in Pulse (the "PB Investment"), Pulse granted and delivered to PB Invest approximately 175 convertible depository receipts, shortly after which Pulse converted those depository receipts and granted and delivered to PB Invest approximately 756,000 shares of Pulse stock.

60.     This investment transaction was consummated in Florida, and the issuance and passing of title of these Pulse shares occurred in Florida.

61.     In order to induce PB Invest into making the PB Investment, Messrs. Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around September 2014, through numerous oral statements made on the phone and in person to representatives of PB Invest, made intentional misrepresentations of material facts to representatives of PB Invest and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading.

62.     In or around September 2014, including at an in-person meeting in Switzerland in September 2014 between representatives of PB Invest and Mr. Kollros, Mr. Kollros presented Pulse to PB Invest as a potential investment opportunity based on the misrepresentations and omissions of material fact that Pulse stated to Mr. Kollros in or around February 2014, including those statements made at the February 2014 Pitch.

63.     PB Invest justifiably and reasonably relied upon the statements made by Mr. Kollros concerning Pulse, and thereafter agreed to take a meeting with representatives of Pulse to discuss a potential Pulse investment opportunity.

64.     In or around September 2014, including at an in-person meeting in Switzerland in September 2014, and during investment negotiations with the PB Invest, Mr. Eichenberger, through numerous oral statements to representatives of PB Invest, that 1) a unique selling point for Pulse as an investment opportunity was that it possessed the current, exclusive worldwide digital likeness rights to produce and exhibit the Michael Jackson Project, and 2) Pulse intended on using the proceeds of the PB Investment primarily for developing the Michael Jackson Project.

65.     These representations were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to PB Invest because 1) Messrs. Textor and Eichenberger knew at that time that Pulse did not possess the current, exclusive worldwide digital likeness rights

to produce and exhibit the Michael Jackson Project, and 2) Messrs. Textor and Eichenberger knew at that time that Messrs. Textor and Eichenberger never intended to use, nor could they use, PB Invest's investment proceeds as promised and actually intended to embezzle those investment proceeds to enrich themselves by later converting those earmarked investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them.

66.     Indeed, soon after the PB Investment was made, Pulse breached its promises to PB Invest regarding the intended uses of the investment proceeds.

67.     Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the PB Investment to themselves individually and to entities controlled and owned by Messrs. Textor and Eichenberger and their friends and family, all in furtherance of their overarching fraudulent scheme.

68.     In or around September 2014 and during investment negotiations with PB Invest, Pulse also concealed and omitted from their oral communications with PB Invest:

  c. the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

  d. that one of the intended purposes of soliciting the PB Investment was to personally enrich Messrs. Textor and Eichenberger;

  e. that Messrs. Textor and Eichenberger did not intend on fully honoring the promises made to PB Invest concerning the disposition of its PB Investment from the inception of those promises; and

  f. that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities

controlled and owned by them, after Pulse received the Plaintiffs' investment.

69.     At all times during Pulse's investment negotiations with PB Invest, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the PB Investment were false and misleading.

70.     PB Invest justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the PB Investment.

71.     PB Invest would not have purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### *The First Holotrack Investment*

72.     From the period of late-2014 through March 2015, Pulse solicited an investment of approximately $3,700,000 from JR Holding, Miralco, PB Invest, and non-party Rainbow Home Entertainment AG ("Rainbow Home"), which, according to Messrs. Textor and Eichenberger, would be used primarily for developing the Michael Jackson Project and a feature-length virtual entertainment production starring the famous deceased musical artist Elvis Presley (the "Elvis Project").

73.     JR Holding, Miralco, PB Invest, and Rainbow Home formed and utilized a new Swiss corporation, Holotrack, for this joint investment and subsequent investment and loan transactions with Pulse.

74.     Holotrack agreed to pay Pulse approximately $3,700,000 in six monthly installments from January 2015 to June 2015, which funds Pulse represented were to be used primarily for developing and producing the Michael Jackson Project and the Elvis Project.

75.     In exchange for Holotrack's investment of approximately $3,700,000 in Pulse (the "First Holotrack Investment"), Pulse granted and delivered to JR Holding, Miralco, PB Invest, and

Rainbow Home (the "Holotrack Investors") approximately 6,000,000 shares of Pulse stock.

76.     The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

77.     This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

78.     In order to induce Holotrack into making the First Holotrack Investment, Messrs. Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around the period of late-2014 through March 2015, through numerous oral and written statements made to representatives of Holotrack, made intentional misrepresentations of material facts to representatives of Holotrack and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading.

79.     In or around late-2014 and January 2015, and during investment negotiations with representatives of Holotrack, including Bernard Burgener ("Mr. Burgener"), in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Holotrack, including Mr. Burgener, that Pulse needed additional cash infusions to fund its business operations and intended on using the proceeds of the First Holotrack Investment primarily for developing the Michael Jackson Project and Elvis Project.

80.     These representations regarding the intended use of the proceeds from the First Holotrack Investment were also explicitly communicated by Pulse to Holotrack through and memorialized in a January 15, 2015 "Heads of Agreement" document signed by Mr. Eichenberger

on behalf of Pulse.

81.     In or around February and March 2015, and during investment negotiations with representatives of Holotrack, including Mr. Burgener, in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Holotrack, that Pulse intended on implementing certain investor rights protections that would provide the Holotrack Investors with decision-making control and oversight over Pulse's business operations (the "Holotrack Investors' Rights Protections").

82.     On March 5, 2015, Pulse and the Holotrack Investors entered into an Investors' Rights Agreement (the "Holotrack IRA"), signed by Mr. Textor on behalf of Pulse, which further explicitly communicated and memorialized Pulse's representations regarding its intentions to implement the Holotrack Investors' Rights Protections, including without limitation:

a.  Pulse's representation that it would deliver to each of the Holotrack Investors regular financial statements documenting Pulse's income and cash flow, among other financial information;

b.  Pulse's representation that it would permit a representative of the Holotrack Investors to examine its books and records upon demand;

c.  Pulse's representation that it would allow a representative of the Holotrack Investors (the "Holotrack Director") to actively serve on Pulse's board of directors;

d.  Pulse's representation that it would not effectuate a wide range of restricted corporate actions without first obtaining the unanimous approval of Pulse's board of directors, including the Holotrack Director, which restricted corporate actions included without limitation altering Messrs. Textor and Eichenberger's cash and

equity compensation, or entering into any agreement with any individual or entity that obligated Pulse to pay such entity more than $100,000;

e. Pulse's representation that it would provide to the Holotrack Investors a right of first offer on any future securities issued or sold by Pulse.

83. The representations described above were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Holotrack because 1) Messrs. Textor and Eichenberger knew at that time that Pulse did not possess the current, exclusive worldwide digital likeness rights to produce and exhibit the Michael Jackson Project, 2) Messrs. Textor and Eichenberger knew when they solicited the First Holotrack Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to use the investment proceeds of the First Holotrack Investment as promised and actually intended to embezzle those investment proceeds to enrich themselves by later converting those earmarked investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them, and 3) Messrs. Textor and Eichenberger knew when they solicited the First Holotrack Investment on behalf of Pulse that that Messrs. Textor and Eichenberger never intended to honor the Holotrack Investors' Rights Protections and actually intended on actively undermining the Holotrack Investors' Rights Protections when doing so would enable them to further their fraudulent scheme to enrich themselves.

84. Indeed, with each installment payment from the First Holotrack Investment, Pulse breached its promises to Holotrack regarding the intended uses of the investment proceeds.

85. Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the First Holotrack Investment to themselves individually and to entities controlled and owned by Messrs. Textor and Eichenberger and their friends and family,

all in furtherance of their overarching fraudulent scheme.

86.     In addition, through their implementation of the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, Messrs. Textor and Eichenberger repeatedly, systematically, and deliberately violated Holotrack's Investors' Rights Protections and purposefully undermined any ability of the Holotrack Director to actively participate in the management or oversight of Pulse's so-called business operations.

87.     For example, Messrs. Textor and Eichenberger entered into numerous agreements on behalf of Pulse that obligated Pulse to pay individuals and entities amounts in excess of $100,000, which were not unanimously approved by Pulse's board of directors as required by the Holotrack IRA.

88.     From the period of late-2014 through March 2015, and during investment negotiations with Holotrack, Pulse also concealed and omitted from their oral and written communications with Holotrack:

  a.  the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

  b.  that one of the intended purposes of soliciting the First Holotrack Investment was to personally enrich Messrs. Textor and Eichenberger;

  c.  that Messrs. Textor and Eichenberger did not intend on fully honoring the promises made to Holotrack concerning the disposition of the proceeds from the First Holotrack Investment from the inception of those promises; and

  d.  that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities

controlled and owned by them and their friends and family, after Pulse received the proceeds of the First Holotrack Investment.

89.     At all times during Pulse's investment negotiations with Holotrack, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the First Holotrack Investment were false and misleading.

90.     Holotrack justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the First Holotrack Investment.

91.     Holotrack would not have purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### *The Second Holotrack Investment*

92.     In or around August 2015, Pulse solicited an investment of $620,000 from Holotrack, which, according to Messrs. Textor and Eichenberger, would be used primarily for continuing to finance specific Pulse business expenses relating to the Michael Jackson Project and Elvis Project as identified during negotiations for the First Holotrack Investment.

93.     In exchange for Holotrack's investment of $620,000 in Pulse (the "Second Holotrack Investment"), Pulse granted and delivered to Holotrack a promissory note in the amount of $620,000, plus interest, in favor of Holotrack (the "August 2015 Promissory Note") and granted and delivered to Holotrack 1,240,000 shares of Pulse stock.

94.     The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

95.     This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida

through Pulse's bank accounts in Florida.

96.     In order to induce Holotrack into making the Second Holotrack Investment, Messrs. Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around August 2015, through numerous oral and written statements made to representatives of Holotrack, made intentional misrepresentations of material facts to representatives of Holotrack and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading.

97.     In or around August 2015, and during investment negotiations with representatives of Holotrack in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Holotrack, that Pulse needed additional cash infusions to fund its business operations and intended on using the proceeds of the Second Holotrack Investment for the continued development of the Elvis Project, as previously represented during negotiations for the First Holotrack Investment.

98.     Pulse's representations regarding the intended use of the proceeds from the First Holotrack Investment were also explicitly communicated by Messrs. Textor and Eichenberger to representatives of Holotrack during an in-person conference in Los Angeles on July 21-22, 2015.

99.     At that conference, Messrs. Textor and Eichenberger also orally reiterated Pulse's intentions to honor the Holotrack Investors' Rights Protections and explicitly represented that Pulse would not issue, grant, or sell any additional shares in Pulse without unanimous board approval, including the approval of Holotrack Director.

100.     The representations described above were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Holotrack because 1) Messrs. Textor and

Eichenberger knew at that time that Pulse did not possess the current, exclusive worldwide digital likeness rights to produce and exhibit the Michael Jackson Project, 2) Messrs. Textor and Eichenberger knew when they solicited the Second Holotrack Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to use the investment proceeds of the Second Holotrack Investment as promised and actually intended to embezzle those investment proceeds to enrich themselves by later converting those earmarked investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them, and 3) Messrs. Textor and Eichenberger knew when they solicited the Second Holotrack Investment on behalf of Pulse that that Messrs. Textor and Eichenberger never intended to honor the Holotrack Investors' Rights Protections and actually intended on actively undermining the Holotrack Investors' Rights Protections when doing so would enable them to further their fraudulent scheme to enrich themselves.

101.    Indeed, upon receiving payment from the Second Holotrack Investment, Pulse breached its promises to Holotrack regarding the intended uses of the investment proceeds.

102.    Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the Second Holotrack Investment to themselves individually and to entities controlled and owned by Messrs. Textor and Eichenberger and their friends and family, all in furtherance of their overarching fraudulent scheme.

103.    In addition, through their implementation of the Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, Messrs. Textor and Eichenberger repeatedly and systematically violated Holotrack's Investors' Rights Protections and purposefully undermined any ability of the Holotrack Director to participate in the management or oversight of Pulse's so-called business operations.

104.     In addition, on or around August 19, 2015, and during a call with Messrs. Textor and Eichenberger, representatives of Holotrack asked Messrs. Textor and Eichenberger to produce a chart showing the status of various production and development milestones involved in the Elvis Project ("Elvis Project Production Milestones Chart"), the goal of which was to determine what steps had been completed since the First Holotrack Investment and what the likely timeline of completion would be for the remainder of the Elvis Project.

105.     On or around August 20, 2015, representatives of Pulse emailed to representatives of Holotrack the Elvis Project Production Milestones Chart.

106.     The Elvis Project Production Milestones Chart was prepared at the direction and oversight of Messrs. Textor and Eichenberger.

107.     The Elvis Project Production Milestones Chart provided by Pulse to representatives of Holotrack contained numerous knowingly false and misleading statements regarding the progress that had been made by Pulse on the Elvis Project since the First Holotrack Investment as well as the likely timeline of completion for the remainder of the Elvis Project.

108.     For example, the Elvis Project Production Milestones Chart included numerous line items that showed certain development and production milestones marked as "completed" or "in progress," but which were not actually completed or in progress, or whose status was exaggerated.

109.     In and around August 2015, including at the July 21-22, 2015 conference in Los Angeles, and during investment negotiations with Holotrack, Pulse also concealed and omitted from their oral and written communications with Holotrack:

      a.     the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

      b.     that one of the intended purposes of soliciting the Second Holotrack Investment

was to personally enrich Messrs. Textor and Eichenberger;

    c.   that Messrs. Textor and Eichenberger did not intend on fully honoring the promises made to Holotrack concerning the disposition of the proceeds from the Second Holotrack Investment from the inception of those promises; and

    d.   that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities controlled and owned by them and their friends and family, after Pulse received the proceeds of the Second Holotrack Investment.

110.    At all times during Pulse's investment negotiations with Holotrack, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the Second Holotrack Investment were false and misleading.

111.    Holotrack justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above and including the Elvis Project Production Milestones Chart, in deciding to make the Second Holotrack Investment.

112.    Holotrack would not have purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### *The Third Holotrack Investment*

113.    In or around October 2015, Pulse solicited an investment of $1,000,000 from Holotrack, which, according to Messrs. Textor and Eichenberger, would be used primarily for continuing to finance specific Pulse business expenses relating to the Michael Jackson Project and Elvis Project as identified during negotiations for the First and Second Holotrack Investments.

114.    In exchange for Holotrack's investment of $1,000,000 in Pulse (the "Third

Holotrack Investment"), Pulse granted and delivered to Holotrack a promissory note in the amount of $1,000,000, plus interest, in favor of Holotrack (the "October 2015 Promissory Note") and granted and delivered to Holotrack 10,760,000 shares of Pulse stock.

115.    The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

116.    This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

117.    In order to induce Holotrack into making the Third Holotrack Investment, Messrs. Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around October 2015, through numerous oral and written statements made to representatives of Holotrack, made intentional misrepresentations of material facts to representatives of Holotrack and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading.

118.    In or around October 2015, and during investment negotiations with representatives of Holotrack in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Holotrack, that Pulse needed additional cash infusions to fund its business operations and intended on using the proceeds of the Third Holotrack Investment for the continued development of the Elvis Project, as previously represented during negotiations for the First and Second Holotrack Investments.

119.    Pulse's representations regarding the intended use of the proceeds from the First

Holotrack Investment were also explicitly communicated by Messrs. Textor and Eichenberger to representatives of Holotrack during in-person meetings in Zurich in September and October 2015.

120.    At those conferences, Messrs. Textor and Eichenberger also orally reiterated Pulse's intentions to honor the Holotrack Investors' Rights Protections.

121.    The representations described above were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Holotrack because 1) Messrs. Textor and Eichenberger knew at that time that Pulse did not possess the current, exclusive worldwide digital likeness rights to produce and exhibit the Michael Jackson Project, 2) Messrs. Textor and Eichenberger knew when they solicited the Third Holotrack Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to use the investment proceeds of the Third Holotrack Investment as promised and actually intended to embezzle those investment proceeds to enrich themselves by later converting those earmarked investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them, and 3) Messrs. Textor and Eichenberger knew when they solicited the Third Holotrack Investment on behalf of Pulse that that Messrs. Textor and Eichenberger never intended to honor the Holotrack Investors' Rights Protections and actually intended on actively undermining the Holotrack Investors' Rights Protections when doing so would enable them to further their fraudulent scheme to enrich themselves.

122.    Indeed, upon receiving payment from the Third Holotrack Investment, Pulse breached its promises to Holotrack regarding the intended uses of the investment proceeds.

123.    Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the Third Holotrack Investment to themselves individually and to entities controlled and owned by Messrs. Textor and Eichenberger and their friends and family,

all in furtherance of their overarching fraudulent scheme.

124.    In addition, through their implementation of the Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, Messrs. Textor and Eichenberger repeatedly and systematically violated Holotrack's Investors' Rights Protections and purposefully undermined any ability of the Holotrack Director to participate in the management or oversight of Pulse's so-called business operations.

125.    In addition, in or around October 2015, and during investment negotiations with representatives of Holotrack in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Holotrack, that as part of Pulse's share issuances to Holotrack under the Third Holotrack Investment, Pulse would take steps to file an amended certificate of designation with the Nevada secretary of state that was substantially similar in form and substance as the certificate of designation that was filed as part of the First Holotrack Investment and that would continue to protect against the dilution of the Holotrack Investors' shares.

126.    These representations were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Holotrack because Messrs. Textor and Eichenberger knew when they solicited the Third Holotrack Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to cause Pulse to file an amended certificate of designation with the Nevada secretary of state that would continue to protect against the dilution of the Holotrack Investors' shares, and in fact intended to use the filing of an amended certificate of designation to permit Pulse to, without Holotrack's approval, issue additional shares of Pulse stock.

127.    Indeed, and in a complete bait and switch maneuver, Messrs. Textor and

Eichenberger caused Pulse to re-write and file with the Nevada secretary of state a completely new certificate of designation, introduced a completely new class of shares of Pulse stock, and also authorized the issuance of additional shares of Pulse stock beyond the number of shares that were agreed to be authorized by Holotrack and Pulse as part of the Third Holotrack Investment, all of which was in direct opposition to Messrs. Textor and Eichenberger's representations to Holotrack.

128.    In and around October 2015, including at the in-person meetings in Zurich, and during investment negotiations with Holotrack, Pulse also concealed and omitted from their oral and written communications with Holotrack:

      a.    the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

      b.    that the intended purpose of soliciting the Third Holotrack Investment was to personally enrich Messrs. Textor and Eichenberger;

      c.    that Messrs. Textor and Eichenberger did not intend on fully honoring the promises made to Holotrack concerning the disposition of the proceeds from the Third Holotrack Investment from the inception of those promises; and

      d.    that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities controlled and owned by them and their friends and family, after Pulse received the proceeds of the Third Holotrack Investment.

129.    At all times during Pulse's investment negotiations with Holotrack, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the Third Holotrack Investment were false and misleading.

130.    Holotrack justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the Third Holotrack Investment.

131.    Holotrack would not have purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### *The December 2015 Investment*

132.    In or around December 2015, Pulse solicited an investment of $1,000,000 from Miralco and Rainbow Home ($500,000 each), which, according to Messrs. Textor and Eichenberger, would be used solely and exclusively for continuing to finance Pulse's legitimate business-related expenses relating to the Elvis Project like those identified during negotiations for the First, Second, and Third Holotrack Investments.

133.    The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

134.    This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

135.    In order to induce Miralco and Rainbow Home's investment of $1,000,000 in Pulse (the "December 2015 Investment"), Messrs. Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around December 2015, through numerous oral and written statements made to representatives of Miralco and Rainbow Home, made intentional misrepresentations of material facts to representatives of Miralco and Rainbow Home and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading.

136.     In or around December 2015, and during investment negotiations with representatives of Miralco and Rainbow Home in person, over the phone, using Skype, and through email communications, Messrs. Textor and Eichenberger represented, through numerous oral and written statements to representatives of Miralco and Rainbow Home 1) that Pulse would immediately, upon receipt of the proceeds of the December 2015 Investment, grant and deliver to Miralco and Rainbow Home promissory notes in the combined amount of $1,000,000, plus interest, in favor of Miralco and Rainbow Home and grant and deliver to Miralco and Rainbow Home 12,000,000 shares of Pulse stock (6,000,000 shares each), 2) that Pulse needed emergency cash infusions to pay its employees before the Christmas holiday and intended on using the proceeds of the December 2015 Investment solely and exclusively for to cover employee payroll before Christmas and for the continued development of the Elvis Project, as previously represented during negotiations for the First, Second, and Third Holotrack Investments.

137.     The representations described above were knowingly false and misleading when they were made by Messrs. Textor and Eichenberger to Miralco and Rainbow Home because 1) Messrs. Textor and Eichenberger knew when they solicited the December 2015 Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to grant and deliver to Miralco and Rainbow Home a promissory note in the amount of $1,000,000, plus interest, in favor of Miralco and Rainbow Home and grant and deliver to Miralco and Rainbow Home 12,000,000 shares of Pulse stock (6,000,000 shares each), and 2) Messrs. Textor and Eichenberger knew when they solicited the December 2015 Investment on behalf of Pulse that Messrs. Textor and Eichenberger never intended to use the investment proceeds of the December 2015 Investment as promised, specifically to pay emergency wages to its employees in advance of the Christmas holiday, and actually intended to embezzle those investment proceeds to enrich themselves by later

converting those earmarked investments for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them.

138.    In essence, Messrs. Textor and Eichenberger had used the Christmas holiday as a red herring to obtain additional cash for themselves all while, in actuality, failing to pay their employees.

139.    Indeed, upon receiving payment from the December 2015 Investment, Pulse breached its promises to Miralco and Rainbow Home regarding the intended uses of the investment proceeds.

140.    Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the December 2015 Investment to themselves individually and to entities controlled and owned by Messrs. Textor and Eichenberger and their friends and family, all in furtherance of their overarching fraudulent scheme.

141.    In addition, through their utilization of the Corporate Abuses and domination and control of Pulse, Messrs. Textor and Eichenberger caused Pulse not to grant and deliver to Miralco and Rainbow Home a promissory note in the amount of $1,000,000, plus interest, in favor of Miralco and Rainbow Home and immediately grant and deliver to Miralco and Rainbow Home 12,000,000 shares of Pulse stock (6,000,000 shares each).

142.    Instead, Messrs. Textor and Eichenberger caused Pulse to execute an executive producer's agreement with a representative of Rainbow Home in conjunction with the Elvis Project (the "Sham Elvis Producer's Agreement"), albeit without Miralco or Rainbow Home's consent or signature, as supposed substitute consideration for the December 2015 Loan and then used that Sham Elvis Producer's Agreement as a false basis to prevent Pulse from immediately granting and delivering a promissory note in the amount of $1,000,000, plus interest, in favor of Miralco and

Rainbow Home and 12,000,000 shares of Pulse stock (6,000,000 shares each) as promised.

143.     Further, and soon after Pulse received the proceeds of the December 2015 Investment, Messrs. Textor and Eichenberger entered into a January 2016 Memorandum of Understanding, which purported to authorize Pulse's execution of the Sham Elvis Producer's Agreement and also purported to authorize 1) Pulse's payments of $100,000 in new bonuses to Messrs. Textor and Eichenberger, 2) Pulse's increase in Messrs. Textor and Eichenberger salaries by $300,000, 3) Pulse's payments of Messrs. Textor and Eichenberger's so-called business expenses in the amount of approximately $200,000, and 4) Pulse's use of 10,000,000 shares of Pulse stock as a so-called "management option pool," among other things.

144.     This January 2016 Memorandum of Understanding was entered into by Messrs. Textor and Eichenberger on behalf of Pulse in furtherance of their fraudulent scheme and in violation of the promises that induced Miralco and Rainbow Home to make the December 2015 Investment, and also violated Pulse's by-laws, the Holotrack IRA, and the Holotrack Investors' Rights Protections.

145.     In and around December 2015, and during investment negotiations with Miralco and Rainbow Home, Pulse also concealed and omitted from their oral and written communications with Miralco and Rainbow Home:

    a.   the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

    b.   that one of the intended purposes of soliciting the December 2015 Investment was to personally enrich Messrs. Textor and Eichenberger;

    c.   that Messrs. Textor and Eichenberger did not intend on fully honoring the promises made to Miralco and Rainbow Home concerning the disposition of the proceeds

from the December 2015 Investment from the inception of those promises; and

d.   that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities controlled and owned by them and their friends and family, after Pulse received the proceeds of the December 2015 Investment.

146.   At all times during Pulse's investment negotiations with Miralco and Rainbow Home, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the December 2015 Investment were false and misleading.

147.   Miralco and Rainbow Home justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the December 2015 Investment.

148.   In or around December 2016, Pulse finally granted and delivered to representatives of Miralco and Rainbow Home 12,000,000 shares of Pulse stock (6,000,000 shares each).

149.   Miralco and Rainbow Home would not have purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

150.   Subsequent to the December 2015 Investment, Rainbow Home irrevocably sold, conveyed, transferred, and assigned to HVC all of its shares in Pulse and all of Rainbow Home's rights, titles, and interests in and to any claim or claims of Rainbow Home against the Defendants, including all legal and equitable claims, based on, and without limitation, Rainbow Home's ownership of Pulse shares, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, the Holotrack IRA, and the December 2015 Investment.

### *The September 2016 Loan*

151.    In or around September 2016, Pulse solicited a loan of $1,050,000 from HVC, PB Invest, and Miralco ($350,000 each), which, according to Messrs. Textor and Eichenberger, would be used solely and exclusively for financing specific Pulse business expenses.

152.    In exchange for HVC, PB Invest, and Miralco's investment of $1,050,000 in Pulse (the "September 2016 Loan"), Pulse granted and delivered to HVC, PB Invest, and Miralco a promissory note in the amount of $1,050,000, plus interest, in favor of HVC, PB Invest, and Miralco (the "September 2016 Promissory Note").

153.    In order to induce HVC, PB Invest, and Miralco into making the September 2016 Loan, Pulse, by and through its agents, including Messrs. Textor and Eichenberger, during investment negotiations in or around September 2016, through numerous oral and written statements, made intentional misrepresentations of material facts to HVC, PB Invest, and Miralco and omitted and/or failed to disclose facts necessary to make those written and oral statements not misleading.

154.    In or around September 2016 and during investment negotiations with the Plaintiffs, Messrs. Textor and Eichenberger represented, through numerous written and oral statements, that Pulse intended on using the proceeds of the September 2016 Loan solely and exclusively for financing specific Pulse's business expenses, including employee salaries, payroll taxes, insurance, office rent, and delineated development expenses.

155.    In a September 22, 2016 email to Mr. Burgener, a representative of HVC at the time, Mr. Textor represented that the proceeds of the 2016 Loan would be exclusively used for "immediate payroll and selected other most urgent obligations of the company."

156.    Pulse's representations regarding the intended use of the proceeds from the

September 2016 Loan were also explicitly communicated through and memorialized in the September 2016 Promissory Note, which was signed by Messrs. Textor and Eichenberger on behalf of Pulse.

157.    These representations were knowingly false when they were made by Messrs. Textor and Eichenberger to HVC, PB Invest, and Miralco because Messrs. Textor and Eichenberger actually intended to use the proceeds of the September 2016 Loan to personally enrich themselves by breaching their promises regarding how those funds would be used and thereafter converting those entrusted and earmarked funds for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them and their friends and family.

158.    Indeed, soon after the September 2016 Loan was made, Pulse breached its promises to HVC, PB Invest, and Miralco regarding the intended use of the loan proceeds.

159.    Thereafter, Messrs. Textor and Eichenberger improperly and unlawfully disbursed Pulse funds, derived from the September 2016 Loan, to themselves and entities controlled and owned by them and their friends and family.

160.    In and around September 2016, and during investment negotiations with HVC, PB Invest, and Miralco, Pulse also concealed and omitted from their oral and written communications with HVC, PB Invest, and Miralco:

    a.  the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

    b.  that one of the intended purposes of soliciting the September 2016 Loan was to personally enrich Messrs. Textor and Eichenberger;

    c.  that Messrs. Textor and Eichenberger did not intend on fully honoring the promises

made to HVC, PB Invest, and Miralco concerning the disposition of the proceeds from the September 2016 Loan from the inception of those promises; and

d.   that, at that time, Pulse had entered into a number of covert side-agreements with Messrs. Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Messrs. Textor and Eichenberger, including entities controlled and owned by them and their friends and family, after Pulse received HVC, PB Invest, and Miralco's loan proceeds.

161.   At all times during Pulse's investment negotiations with HVC, PB Invest, and Miralco, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the September 2016 Loan were false and misleading.

162.   HVC, PB Invest, and Miralco justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the September 2016 Loan.

163.   HVC, PB Invest, and Miralco would not have loaned Pulse money but for their reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### *The March 2017 Secured Loan*

164.   In or around March 2017, Pulse solicited an investment of $600,000 from PB Invest, which, according to Mr. Textor, would be used solely and exclusively for financing specific Pulse business expenses.

165.   In exchange for PB Invest's investment of $600,000 in Pulse (the "March 2017 Secured Loan"), Pulse granted and delivered to PB Invest a secured promissory note in the amount of $600,000, plus interest, in favor of PB Invest (the "March 2017 Promissory Note").

166.    Pulse also entered into a security agreement with PB Invest (the "March 2017 Security Agreement"), under which Pulse granted to PB Invest a security interest in Pulse's property.

167.    On March 7, 2017, PB Invest perfected its security interest in Pulse's property by filing a UCC Financing Statement with the Nevada Secretary of State

168.    In order to induce PB Invest into making the March 2017 Secured Loan, Pulse, by and through its agents, including Mr. Textor, during investment negotiations in or around March 2017, through numerous oral and written statements, made intentional misrepresentations of material facts to PB Invest and omitted and/or failed to disclose facts necessary to make those written and oral statements not misleading.

169.    In or around March 2017 and during investment negotiations with the Plaintiffs, Mr. Textor represented, through numerous written and oral statements, that 1) Pulse intended on using the proceeds of the March 2017 Secured Loan solely and exclusively for financing specific Pulse's business expenses, including specific employee payroll, office rents, previously delineated expense reimbursements, and employee benefits and insurance, and 2) the Pulse collateral to secure the March 2017 Secured Loan was free and clear of any existing security interests, liens, or charges.

170.    Pulse's representations regarding the intended use of the proceeds from the March 2017 Secured Loan were also explicitly communicated through and memorialized in the March 2017 Promissory Note, which was signed by Mr. Textor on behalf of Pulse.

171.    Pulse's representations regarding the free and clear status of the Pulse collateral used to secure March 2017 Secured Loan were also explicitly communicated through and memorialized in a concurrently executed March 2017 Security Agreement, which was signed by

Mr. Textor on behalf of Pulse.

172.     These representations were knowingly false when they were made by Mr. Textor to PB Invest because Mr. Textor actually intended to use the proceeds of the March 2017 Secured Loan to personally enrich himself by breaching Pulse's promises regarding how those funds would be used and thereafter converting those entrusted and earmarked funds for personal use and improperly disbursing those funds to himself and entities controlled and owned by him and his friends and family.

173.     Indeed, soon after the March 2017 Secured Loan was made, Pulse breached its promises to PB Invest regarding the intended uses of the investment proceeds.

174.     Thereafter, Mr. Textor improperly and unlawfully disbursed Pulse funds, derived from the March 2017 Secured Loan, to himself and entities controlled and owned by him and his friends and family.

175.     These representations were also knowingly false when they were made by Mr. Textor to PB Invest because, at the time those representations were made, the Pulse collateral used to secure the March 2017 Secured Loan was not free and clear of any existing security interests, liens, or charges.

176.     In fact, at that time, the Pulse collateral used to secure the March 2017 Secured Loan was encumbered by a security interest granted by Pulse to Mr. Textor's mother in 2014 as part of a sham transaction.

177.     In and around March 2017, and during investment negotiations with PB Invest, Pulse also concealed and omitted from their oral and written communications with PB Invest:

    a.  the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements;

b.  that one of the intended purposes of soliciting the March 2017 Secured Loan was to personally enrich Mr. Textor;

c.  that Mr. Textor did not intend on fully honoring the promises made to PB Invest concerning the disposition of the proceeds from the March 2017 Secured Loan from the inception of those promises; and

d.  that, at that time, Pulse had entered into a number of covert side-agreements with Mr. Textor that would require the payment of so-called consultation and finders fees to Mr. Textor, including entities controlled and owned by him and his friends and family, after Pulse received PB Invest's loan proceeds.

178.    At all times during Pulse's investment negotiations with PB Invest, Pulse had a duty to disclose these critical and material facts, without which, Pulse's affirmative representations concerning the March 2017 Secured Loan were false and misleading.

179.    PB Invest justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the March 2017 Secured Loan.

180.    PB Invest would not have loaned Pulse money but for its reliance upon the material misrepresentations and omissions of Messrs. Textor and Eichenberger and of Pulse.

### ***The Plaintiffs' Discovery of the Facts Underlying the Defendants' Fraudulent Scheme***

181.    Following the PB Investment, Pulse solicited the Plaintiffs to make additional investments.

182.    As part of that solicitation, before and after the PB Investment was made, Grant Murray ("Mr. Murray"), a financial consultant acting on behalf of Pulse, provided representatives of PB Invest remote access to a Pulse-hosted internet account holding certain due diligence documents for the Plaintiffs' review.

183.   As instructed by Mr. Murray, representatives of PB Invest accessed and saved those due diligence documents and thereafter began reviewing them.

184.   During the course of this review, representatives of PB Invest discovered documents showing certain previously unknown financial transactions made by and between Pulse and Messrs. Textor and Eichenberger, including many of the internal documents evidencing the Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements.

185.   In addition, in late-March 2017, representatives of Plaintiffs visited Pulse's office in California to meet with employees and tour the studio facilities in order to learn more about the status of Pulse's business operations in light of the newly discovered documentation (the "March 2017 Meeting").

186.   The March 2017 Meeting was a complete eye-opener for the representatives of the Plaintiffs who attended, as it revealed a number of troubling facts concerning Pulse's so-called business operations as conveyed directly by Pulse's employees.

187.   At one meeting during the March 2017 Meeting, these Pulse employees described, in private and without Mr. Textor present, that Pulse had not provided them with any concrete orders regarding the development and production of any feature-length virtual entertainment project.

188.   These employees also stated that Pulse had not paid its employees' salaries for the past several months.

189.   Following the private meetings with Pulse employees, it became clear that Messrs. Textor and Eichenberger were apparently using Pulse's corporate form to enrich themselves at the expense of their employees, investors, and creditors.

190.   After meeting with the Pulse employees in private, representatives of the Plaintiffs'

directly confronted Mr. Textor about his and Mr. Eichenberger's looting of the company, to which Mr. Textor made nonsensical excuses for his clearly inexcusable actions.

191.    For instance, representatives of the Plaintiffs showed Mr. Textor the January 2016 Memorandum of Understanding, which authorized numerous unsanctioned bonuses and payments in violation of Pulse's by-laws and the Holotrack IRA.

192.    Mr. Textor justified the payments made to him under the January 2016 Memorandum of Understanding on the basis that similar payments were made to Mr. Eichenberger; in other words, Mr. Textor's sole justification for paying himself some of the Improper Disbursements was, to the effect, "if Mr. Eichenberger is getting paid, so should I."

193.    Only after conducting a diligent review of the Pulse financial documents obtained following the PB Investment, meeting with Pulse's employees in private during the March 2017 Meeting, and fully analyzing this newly discovered information within the context of Pulse's continued lack of progress in the Michael Jackson Project, Elvis Project, and other supposed business projects, were the Plaintiffs able to discover the facts underlying the fraudulent scheme described in this Complaint.

### *Messrs. Textor and Eichenberg Are Subject to Corporate Veil Piercing Liability for Pulse's Injuries to the Plaintiffs in this Case*

194.    At all relevant times, as described throughout this Complaint, namely through the acts described as the Bad Faith Practices, Corporate Abuses, and Improper Disbursements, Pulse was created and/or used as the mere instrumentality of Messrs. Textor and Eichenberger, who personally exercised complete dominance and control over Pulse and utilized Pulse's corporate form to effectuate fraudulent, unlawful, and wrongful conduct that injured the Plaintiffs.

195.    Through their implementation of the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and fraudulent scheme described herein, Messrs. Textor and

Eichenberger also breached their fiduciary duties as Pulse directors.

196.    Messrs. Textor and Eichenberger's domination and control of Pulse was to such an extent that Pulse's purported distinct corporate form was nonexistent and Messrs. Textor and Eichenberg were, in fact, alter egos of Pulse throughout their tenure on Pulse's board of directors.

197.    Messrs. Textor and Eichenberger had complete and unfettered control over Pulse's corporate funds and decision making, had the unilateral authority to withdraw money and did withdraw money from Pulse's corporate account for their own personal use, were signatories to Pulse's corporate account, and had unilateral authority to effectuate and did effectuate the transfer of money and equity from Pulse to others, including to themselves and to entities controlled and owned by them.

198.    Messrs. Textor and Eichenberger had a unity of interest with Pulse, such that the separation between Messrs. Textor and Eichenberger, on the one hand, and Pulse, on the other hand, was nonexistent.

199.    Messrs. Textor and Eichenberger commingled and used Pulse's funds and resources, including without limitation its offices and employees, for personal purposes.

200.    Messrs. Textor and Eichenberger made a number of unauthorized and improper disbursements of funds and equity to themselves and to entities controlled and owned by them, including without limitation the Improper Disbursements described herein.

201.    By way of providing one representative example of the kinds of misuses of corporate funds effectuated by Messrs. Textor and Eichenberger through their domination and control of Pulse, from January to February 2016, Messrs. Textor and Eichenberger caused Pulse to disburse approximately $500,000 in cash payments to themselves individually, to the Sham Companies, and to friends and family of Messrs. Textor and Eichenberger, for no legitimate Pulse

business purpose and in bad faith, including without limitation the below wire transfers from Pulse's corporate bank account:

      a.  On January 11, 2016, Pulse wired $45,000 to Mr. Textor's American Express account.

      b.  On January 20, 2016, Pulse wired $29,166.67 to Clematis Properties, a Sham Company owned and controlled by Mr. Eichenberger.

      c.  On January 26, 2016, Pulse wired $50,000 to Alternative Holdings, a Sham Company owned and controlled by Mr. Eichenberger.

      d.  On January 29, 2016, Pulse wired $50,000 to Alternative Holdings, a Sham Company owned and controlled by Mr. Eichenberger.

      e.  On January 29, 2016, Pulse wired $50,000 to Textor Ventures, a Sham Company owned and controlled by Mr. Textor.

      f.  On February 1, 2016, Pulse wired $50,000 to Mr. Textor individually.

      g.  On February 3, 2016, Pulse wired $180,000 to Dale O. Lovett, Mr. Textor's mother.

      h.  On February 19, 2016, Pulse wired $25,000 to Mr. Textor's E*Trade Account.

202.    Messrs. Textor and Eichenberger caused Pulse to make the above-listed payments to themselves individually, the Sham Companies, and their friends and family over the period of January to February 2016 without obtaining requisite approvals from Pulse's board of directors and in violation of Pulse's by-laws, the Holotrack IRA, and the Holotrack Investors' Rights Protections, among other agreements.

203.    The personal payments described in the two-month period above—made without any regard to corporate formalities and without any involvement of the board of directors as required by Pulse's by-laws and the Holotrack IRA—were representative of the kinds of personal

payments made from Pulse's corporate bank account to Messrs. Textor and Eichenberger during Messrs. Textor and Eichenberger's approximately three-year tenure on Pulse's board of directors.

204.    Because of Messrs. Textor and Eichenberger's fraudulent conduct, operation of a Ponzi scheme, Bad Faith Practices, Corporate Abuses, Improper Disbursements, and entering into the Sham Compensation Agreements, Pulse was, by Messrs. Textor and Eichenberger's design, perpetually undercapitalized and essentially held no cognizable assets.

205.    Overall, Messrs. Textor and Eichenberger made tens of millions of dollars in the Plaintiffs' and others' loans and investments disappear without anything to show for it, including no corporate revenue and not even one invoice for real Pulse business.

206.    Through Messrs. Textor and Eichenberger's fraudulent scheme, they caused Pulse to become insolvent and unable to pay its debts, all while embezzling millions of dollars in funds that were deposited into Pulse's bank accounts.

207.    Adherence to the fiction of Pulse's corporate existence separate and apart from Messrs. Textor and Eichenberger would sanction a fraud or wrong or otherwise promote an injustice to the Plaintiffs.

208.    Specifically, the Plaintiffs would be precluded from any reasonable recovery in this case for their claims against Pulse should Messrs. Textor and Eichenberger not be held personally liable, because Pulse is on the brink of financial collapse and holds no cognizable assets due to the fraudulent, unlawful, and wrongful misuse of Pulse's corporate funds and undercapitalization by Messrs. Textor and Eichenberger.

209.    Thus, the Court should pierce Pulse's corporate veil because Messrs. Textor and Eichenberger are liable, as alter egos of Pulse, for Pulse's fraudulent, unlawful, and wrongful conduct effectuated against the Plaintiffs, as described throughout this Complaint.

210.    Messrs. Textor and Eichenberger's conduct, described above, damaged and continues to damage the Plaintiffs.

## COUNT I
**Securities Fraud Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse
Violations of Section 10(b) of the Exchange Act
(15 U.S.C. § 78J, Rule 10b-5, and 17 C.F.R. § 240.10b-5)**

211.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

212.    Mr. Textor, Mr. Eichenberger, and Pulse each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5.

213.    During the relevant period, these defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and courses of business which have operated as a fraud upon the Plaintiffs as purchasers of Pulse's securities.

214.    Mr. Textor, Mr. Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

215.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make investments in Pulse, which resulted in the purchase and sale of Pulse securities, based on knowingly false and misleading statements.

216.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse engaged in a number of Bad Faith Practices and Corporate Abuses,

including effectuating the Improper Disbursements and entering into and making payments under the Sham Compensation Agreements, which were intended on and did indeed personally enrich Messrs. Textor and Eichenberger and funded their lavish lifestyles.

217.    Mr. Textor, Mr. Eichenberger, and Pulse deceived the Plaintiffs and caused them to purchase and forego selling Pulse securities in reliance on the intentionally deceptive acts and statements described above.

218.    Mr. Textor, Mr. Eichenberger, and Pulse violated the Exchange Act Section 10(b) and Exchange Act Rule 10b-5 because, with the intent to deceive, manipulate, and/or defraud, and/or with severe recklessness, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, and the December 2015 Investment, all of which resulted in the purchase and sale of Pulse securities.

219.    Mr. Textor, Mr. Eichenberger, and Pulse effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for those investments, that intentionally misrepresented, among other things, how the Plaintiffs' cash investments would be spent, the current status of Pulse's rights to produce virtual entertainment projects, and Messrs. Textor and Eichenberger's control and domination of Pulse, and omitted to disclose the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, as described in greater detail above.

220.    The statements and omissions made by Messrs. Textor and Eichenberger as described herein were purportedly made on behalf of Pulse, and Messrs. Textor and Eichenberger always represented that they were acting in their capacity as directors of Pulse.

221.    For all of the investments highlighted in this Complaint, Mr. Textor, Mr.

Eichenberger, and Pulse entered the investment negotiations knowing that the proceeds obtained would be used for purposes other than those represented to the Plaintiffs during those investment negotiations, and would actually be used to personally enrich Messrs. Textor and Eichenberger and implement a Ponzi scheme.

222.    Mr. Textor, Mr. Eichenberger, and Pulse knew or should have known that these statements and omissions of fact were materially false and misleading, because they misrepresented the Mr. Textor, Mr. Eichenberger, and Pulse's intentions in soliciting those investments from the Plaintiffs, misrepresented how the Plaintiffs' investments would be managed and controlled, misrepresented how the Plaintiffs' investments would be disbursed and appropriated, and misrepresented the Mr. Textor, Mr. Eichenberger, and Pulse's intentions in honoring Pulse's corporate formalities and protocols and their agreements with the Plaintiffs.

223.    Mr. Textor, Mr. Eichenberger, and Pulse were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to use Pulse's corporate form to personally enrich Messrs. Textor and Eichenberger, including their friends and family, and to fund their lavish lifestyles.

224.    Throughout the Plaintiffs' relationship with Mr. Textor, Mr. Eichenberger, and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse and purchase Pulse securities, hold onto those investments, and forego enforcing certain contractual rights relating to those investments, including without limitation those contractual rights provided for under the Holotrack IRA, August 2015 Promissory Note, and October 2015 Promissory Note, the Plaintiffs reasonably and justifiable relied on the statements and omissions of material fact made to them by Mr. Textor, Mr. Eichenberger, and Pulse, as described throughout this Complaint.

225.    As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance

on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages.

226.     The Plaintiffs have been damaged by all of the foregoing, and are entitled to rescission and/or damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

<u>**COUNT II**</u>
**Securities Fraud Against Defendants Mr. Textor and Mr. Eichenberger**
**Violations of Section 20(a) of the Exchange Act**
**(15 U.S.C. § 78T)**

227.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

228.     As fully alleged above, Mr. Textor and Mr. Eichenberger violated Exchange Act Section 20(a).

229.     During the relevant period, Mr. Textor and Mr. Eichenberger had the power, both direct and indirect, to control Pulse and did in fact exercise such control, and were therefore "controlling persons" within the meaning of Section 20(a) of the Exchange Act.

230.     In particular, Mr. Textor was a control person because:

   a.   Mr. Textor, throughout the relevant period, was the chairman of Pulse's Board of Directors, the highest-level position of power at Pulse;

   b.   Mr. Textor was Pulse's largest individual shareholder and held a plurality of Pulse's common stock;

   c.   Mr. Textor directed Pulse's operations and therefore had knowledge of, made, and caused Pulse to make the false and misleading statements and omissions disseminated to the Plaintiffs;

   d.   Mr. Textor had the power to influence and control, and did influence and control, the decision-making of Pulse, including the content and dissemination of the false

and misleading statements and omissions described herein;

    e.  Mr. Textor supervised and directed the day-to-day operations of Pulse;

    f.  Mr. Textor had intimate knowledge of the finances of Pulse and the financial statements prepared by Pulse, and Mr. Textor was responsible for communicating with and addressing issues raised by Pulse's outside accountant; and

    g.  Mr. Textor implemented the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and fraudulent scheme described herein.

231.    In particular, Mr. Eichenberger was a control person because:

    a.  Mr. Eichenberger, throughout the relevant period, was the vice-chairman of Pulse's Board of Directors, the second-highest-level position of power at Pulse;

    b.  Mr. Eichenberger directed Pulse's operations and therefore had knowledge of, made, and caused Pulse to make the false and misleading statements and omissions disseminated to the Plaintiffs;

    c.  Mr. Eichenberger had the power to influence and control, and did influence and control, the decision-making of Pulse, including the content and dissemination of the false and misleading statements and omissions described herein;

    d.  Mr. Eichenberger supervised and directed the day-to-day operations of Pulse;

    e.  Mr. Eichenberger had intimate knowledge of the finances of Pulse and the financial statements prepared by Pulse, and Mr. Eichenberger was responsible for communicating with and addressing issues raised by Pulse's outside accountant; and

    f.  Mr. Eichenberger implemented the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and fraudulent scheme described herein.

232.    Messrs. Textor and Eichenberger were also "controlling persons" within the meaning of Section 20(a) of the Exchange Act based upon their domination and control of Pulse as described in this Complaint.

233.    Messrs. Textor and Eichenberger personally participated and aided in both inducing the Plaintiffs to make the investments and purchase Pulse securities as described herein and making the sale of Pulse securities to the Plaintiffs.

234.    The Plaintiffs have been damaged by Messrs. Textor and Eichenberger's wrongful and fraudulent conduct through their control of Pulse, which conduct caused the Plaintiffs to invest in Pulse and purchase Pulse securities, make loans to Pulse, hold onto their investments, lose their money, and forego enforcing a number of contractual rights, including without limitation those contractual rights provided for under the Holotrack IRA, the August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, and March 2017 Secured Promissory Note.

235.    As such, Messrs. Textor and Eichenberger are jointly and severally liable for all damages or losses suffered by the Plaintiffs during the relevant period, including without limitation rescission damages, relating to their and Pulse's violations of the Exchange Act.

<u>COUNT III</u>
**Securities Fraud Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse
Violations of Florida's Securities and Investor Protection Act
(Fla. Stat. §§ 517.011, *et seq*.)**

236.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

237.    Mr. Textor, Mr. Eichenberger, and Pulse each violated Florida's Securities and Investor Protection Act.

238.    During the relevant period, these defendants, in connection with the offer, sale, and

purchase of Pulse investments and securities in Florida, directly and indirectly (i) employed devices, schemes, and artifices to defraud; (ii) obtained money or property by making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a the Plaintiffs.

239.    Mr. Textor, Mr. Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

240.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make investments in Pulse, which resulted in the purchase and sale of Pulse securities, based on knowingly false and misleading statements.

241.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse engaged in the Bad Faith Practices and a number of Corporate Abuses, including effectuating the Improper Disbursements and entering into and making payments under the Sham Compensation Agreements, which were intended on and did indeed personally enrich Messrs. Textor and Eichenberger and funded their lavish lifestyles.

242.    Mr. Textor, Mr. Eichenberger, and Pulse deceived the Plaintiffs and caused them to purchase and forego selling Pulse securities in reliance on the intentionally deceptive acts and statements described above.

243.    Mr. Textor, Mr. Eichenberger, and Pulse violated Florida's Securities and Investor

Protection Act because, with the intent to deceive, manipulate, and/or defraud, and/or with severe recklessness, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, and the December 2015 Investment, all of which resulted in the purchase and sale of Pulse securities.

244.    Mr. Textor, Mr. Eichenberger, and Pulse effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for those investments, that, among other things, intentionally misrepresented how the Plaintiffs' cash investment would be spent, as described in greater detail above.

245.    The statements and omissions made by Messrs. Textor and Eichenberger as described herein were purportedly made on behalf of Pulse, and Messrs. Textor and Eichenberger always represented that they were acting in their capacity as directors of Pulse.

246.    For all of the investments highlighted in this Complaint, Mr. Textor, Mr. Eichenberger, and Pulse entered the investment negotiations knowing that the proceeds obtained would be used for purposes other than those represented to the Plaintiffs during those investment negotiations, and would actually be used to personally enrich Messrs. Textor and Eichenberger and implement a Ponzi scheme.

247.    Mr. Textor, Mr. Eichenberger, and Pulse knew or should have known that these statements and omissions of fact were materially false and misleading, because they misrepresented the Mr. Textor, Mr. Eichenberger, and Pulse's intentions in soliciting those investments from the Plaintiffs, misrepresented how the Plaintiffs' investments would be managed and controlled, misrepresented how the Plaintiffs' investments would be disbursed and appropriated, and misrepresented Mr. Textor, Mr. Eichenberger, and Pulse's intentions in honoring

Pulse's corporate formalities and protocols and their agreements with the Plaintiffs.

248.     Mr. Textor, Mr. Eichenberger, and Pulse were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to use Pulse's corporate form to personally enrich Messrs. Textor and Eichenberger, including their friends and family, and to fund their lavish lifestyles.

249.     Throughout the Plaintiffs' relationship with Mr. Textor, Mr. Eichenberger, and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse and purchase Pulse securities, hold onto those investments, and forego enforcing certain contractual rights relating to those investments, including without limitation those contractual rights provided for under the Holotrack IRA, August 2015 Promissory Note, and October 2015 Promissory Note, the Plaintiffs reasonably and justifiable relied on the statements and omissions of material fact made to them by Mr. Textor, Mr. Eichenberger, and Pulse, as described throughout this Complaint.

250.     As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages.

251.     The Plaintiffs have been damaged by all of the foregoing, and are entitled to rescission and/or damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

252.     Messrs. Textor and Eichenberger personally participated and aided in both inducing the Plaintiffs to make the investments described herein and making the sale of Pulse securities to the Plaintiffs.

253.     As such, Messrs. Textor and Eichenberger are jointly and severally liable for all damages or losses suffered by the Plaintiffs during the relevant period relating to their and Pulse's violations of Florida's Securities and Investor Protection Act, including without limitation

rescission damages.

## COUNT IV
**Fraud Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse**

254.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

255.    Mr. Textor, Mr. Eichenberger, and Pulse, by acts of both omission and commission, made false and misleading statements of material facts to the Plaintiffs, which the Plaintiffs relied upon to their detriment and which caused the Plaintiffs to invest money in Pulse, loan money to Pulse, hold onto those investments, lose money, and forego enforcing certain contractual rights, including without limitation those contractual rights provided for under the Holotrack IRA, August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, and March 2017 Secured Promissory Note.

256.    Mr. Textor, Mr. Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

257.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make investments in Pulse and lend Pulse money based on knowingly false and misleading statements.

258.    In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse engaged in the Bad Faith Practices and a number of Corporate Abuses, including effectuating the Improper Disbursements and entering into and making payments under the Sham Compensation Agreements, which were intended on and did indeed personally enrich Messrs. Textor and Eichenberger and funded their lavish lifestyles.

259.    Mr. Textor, Mr. Eichenberger, and Pulse deceived the Plaintiffs and caused them to purchase and forego selling Pulse securities, make loans to Pulse, and forego enforcing certain contractual rights, in reliance on the intentionally deceptive acts and statements described above.

260.    Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, the December 2015 Investment, the September 2016 Loan, and the March 2017 Secured Loan.

261.    Mr. Textor, Mr. Eichenberger, and Pulse effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for those investments, which, among other things, intentionally misrepresented how the Plaintiffs' cash investment would be spent, as described in greater detail above.

262.    The statements and omissions made by Messrs. Textor and Eichenberger as described herein were purportedly made on behalf of Pulse, and Messrs. Textor and Eichenberger always represented that they were acting in their capacity as directors of Pulse.

263.    For all of the investments and loans highlighted in this Complaint, Mr. Textor, Mr. Eichenberger, and Pulse entered the investment and loan negotiations knowing that the proceeds obtained would be used for purposes other than those represented to the Plaintiffs during those investment and loan negotiations, and would actually be used to personally enrich Messrs. Textor and Eichenberger.

264.    Mr. Textor, Mr. Eichenberger, and Pulse knew or should have known that these statements and omissions of fact were materially false and misleading, because they misrepresented the Mr. Textor, Mr. Eichenberger, and Pulse's intentions in soliciting those investments and loans from the Plaintiffs, misrepresented how the Plaintiffs' investments and loans

would be managed and controlled, misrepresented how the Plaintiffs' investments and loans would be disbursed and appropriated, and misrepresented Mr. Textor, Mr. Eichenberger, and Pulse's intentions in honoring Pulse's corporate formalities and protocols and their agreements with the Plaintiffs.

265.     Mr. Textor, Mr. Eichenberger, and Pulse were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to use Pulse's corporate form to personally enrich Messrs. Textor and Eichenberger, including their friends and family, and to fund their lavish lifestyles.

266.     Throughout the Plaintiffs' relationship with Mr. Textor, Mr. Eichenberger, and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse, loan money to Pulse, hold onto those investments, and forego enforcing certain contractual rights, including without limitation those contractual rights provided for under the Holotrack IRA, August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, and March 2017 Secured Promissory Note, the Plaintiffs reasonably and justifiable relied on the statements and omissions of material fact made to them by Mr. Textor, Mr. Eichenberger, and Pulse, as described throughout this Complaint.

267.     As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages.

268.     Therefore, the Plaintiffs have are entitled to damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

269.     In addition, Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's fraudulent acts under the corporate veil piercing theories of liability discussed in this Complaint.

## COUNT V
### Aiding and Abetting Fraud Against Defendant Mr. Patterson

270.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

271.    Mr. Patterson had knowledge of the fraudulent scheme, Ponzi scheme, Bad Faith Practices, Corporate Abuses, and Improper Disbursements committed by Mr. Textor, Mr. Eichenberger, and Pulse.

272.    Mr. Patterson substantially assisted Mr. Textor, Mr. Eichenberger, and Pulse in perpetuating those fraudulent and unlawful acts described herein by repeatedly approving Messrs. Textor and Eichenberger directorship despite knowledge of Messrs. Textor and Eichenberger's fraudulent scheme, approving board resolutions that knowingly effectuated the Improper Disbursements, and failing to remove Messrs. Textor and Eichenberger from their positions at Pulse despite knowledge of the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements.

273.    As a direct and proximate result of Mr. Patterson's aiding and abetting, the Plaintiffs were injured and suffered damages.

274.    Therefore, the Plaintiffs are entitled to damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

## COUNT VI
### Violations of Florida's Civil Theft Statute Against Defendant Mr. Textor, Mr. Eichenberger, and Pulse
### (Fla. Stat. § 772.11)

275.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

276.    The Defendants engaged in a fraudulent scheme, described above, in which they

induced the Plaintiffs to deposit cash with Pulse to be entrusted and earmarked for specific business purposes, based on knowingly false and misleading statements.

277.    As described above, Pulse converted those funds invested in and loaned to Pulse by the Plaintiffs when Pulse knowingly obtained and used, and endeavored to obtain and use, the Plaintiffs' entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both a) deprive the Plaintiffs of its rights to and benefit from that property, and b) appropriate the Plaintiffs' property for Pulse's own use and for the use of other individuals and entities not entitled to that property.

278.    Pulse's misappropriation and conversion of these funds, as described above and throughout this Complaint, constitutes criminal theft under Florida law in violation of Fla. Stat. § 812.014.

279.    Pulse temporarily or permanently obtained money belonging to the Plaintiffs with the intent of depriving the Plaintiffs of their use and enjoyment of this money, in violation of Fla. Stat. § 812.014.

280.    Therefore, Pulse violated Florida's Civil Theft Statute, Fla. Stat. § 772.11.

281.    Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's violations of Florida's Civil Theft Statute under the corporate veil piercing theories of liability discussed in this Complaint.

282.    In addition to Pulse's violations of Florida's Civil Theft Statute, and separate and distinct from Pulse's conduct in depriving the Plaintiffs of their use and enjoyment of their deposited funds, Messrs. Textor and Eichenberger also violated Florida's Civil Theft Statute through their embezzlement of the entrusted and earmarked funds for their personal use.

283.    Messrs. Textor and Eichenberger caused Pulse to obtain the Plaintiffs' cash

investments and loans through their fraudulent scheme described herein.

284.    After causing Pulse not to disburse those entrusted and earmarked funds as promised, Messrs. Textor and Eichenberger thereafter converted those funds for their own personal use and the use of their friends and family by stealing those earmarked funds to which Pulse was entrusted.

285.    The Plaintiffs were harmed on each date that their entrusted and earmarked funds were stolen by Messrs. Textor and Eichenberger from Pulse's bank accounts to be personally used by Messrs. Textor and Eichenberger and others not authorized to use those funds.

286.    Messrs. Textor and Eichenberger converted those funds invested and loaned by the Plaintiffs to Pulse when it knowingly obtained and used, and endeavored to obtain and use, the Plaintiffs' entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both a) deprive the Plaintiffs of its rights to and benefit from that property, and b) appropriate the Plaintiffs' property for Messrs. Textor and Eichenberger's own use and to the use of other individuals and entities not entitled to that property.

287.    Messrs. Textor and Eichenberger's misappropriation and conversion of these funds, as described above and throughout this Complaint, constitutes criminal theft under Florida law in violation of Fla. Stat. § 812.014**.**

288.    Messrs. Textor and Eichenberger temporarily or permanently obtained money belonging to the Plaintiffs with the intent of depriving the Plaintiffs of their use and enjoyment of this money, in violation of Fla. Stat. § 812.014.

289.    Therefore, Messrs. Textor and Eichenberger violated Florida's Civil Theft Statute, Fla. Stat. § 772.11.

290.    The Plaintiffs have presented to Mr. Textor, Mr. Eichenberger, and Pulse formal,

written demands for the treble damage amount of the value of the converted property.

291.    As of the date of the filing of this lawsuit, the Plaintiff's demands for the treble damage amount of the value of the converted property have gone unfulfilled.

292.    As a direct and proximate result of Mr. Textor, Mr. Eichenberger, and Pulse's actions, the Plaintiff has suffered damages.

293.    Pursuant to Florida's Civil Theft Statute, the Plaintiffs are entitled to recover from Mr. Textor, Mr. Eichenberger, and Pulse three times the current monetary value in compensatory damages for which Mr. Textor, Mr. Eichenberger, and Pulse would otherwise be liable.

294.    Pursuant to Florida's Civil Theft Statute, the Plaintiffs are entitled to recover from Mr. Textor, Mr. Eichenberger, and Pulse the reasonable amount of attorneys' fees and costs.

## <u>COUNT VII</u>
### Violations of Florida's Deceptive and Unfair Trade Practices Act Against All Defendants
### (Fla. Stat. §§ 501.201-501.213)

295.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

296.    Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect consumers from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

297.    The Plaintiffs are consumers within the meaning of FDUTPA.

298.    The Defendants engaged in trade and commerce within the meaning of FDUTPA.

299.    While FDUTPA does not define "deceptive" and "unfair," it incorporate by reference the Federal Trade Commission's interpretations of these terms.  The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to

mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

300.    As described throughout this Complaint, the Defendants engaged in deceptive and unfair business practices that harmed Plaintiffs.

301.    The Defendants fraudulently induced the Plaintiffs into investing in Pulse, loaning Pulse money, and purchasing securities by disseminating materially false and misleading statements.

302.    The Defendants furthered their fraudulent scheme by engaging in numerous Corporate Abuses, including effectuating the Improper Disbursements.

303.    As a result of the Defendants improper and unlawful misconduct, including the statutory violations contained in Counts I, II, III, and VI of this Complaint, the Plaintiffs have been damaged by, among other things, losing money that was invested and/or loaned and being precluded from receiving a positive return on those investments and/or loans.

304.    Therefore, the Defendants engaged in unfair and deceptive trade practices in violation of FDUTPA.

305.    Pursuant to FDUTPA, the Plaintiffs are entitled to recover from the Defendants the reasonable amount of their attorneys' fees and costs.

306.    Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's violations of FDUTPA under the corporate veil piercing theories of liability discussed above.

## COUNT VIII
**Breach of Promissory Notes Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse**

307.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

308.    Pulse executed and delivered binding and enforceable promissory notes to the Plaintiffs, including the August 2015 Promissory Note, the October 2015 Promissory Note, the

September 2016 Promissory Note, and the March 2017 Secured Promissory Note (collectively as the "Pulse Promissory Notes"), in which Pulse promised to pay the Plaintiffs certain sums of money described above.

309.     The Plaintiffs have fully performed their contractual obligations under the Pulse Promissory Notes.

310.     In accordance with their terms, the Pulse Promissory Notes were payable upon demand after certain dates of maturity and/or acceleration, which were triggered through the Plaintiffs presentation and delivery of written demands thereunder.

311.     For each of the Pulse Promissory Notes, the Plaintiffs have presented to Mr. Textor, Mr. Eichenberger, and Pulse formal, written demands for payment in accordance with the terms of those Pulse Promissory Notes.

312.     As of the date of the filing of this lawsuit, which is more than thirty days after the date on which these written demands were served, the Plaintiff's demands for payment under the Pulse Promissory Notes have gone unfulfilled.

313.     For each of the Pulse Promissory Notes, the dates of maturity and/or acceleration have passed and Pulse has failed to pay in accordance with the Plaintiffs' demands.

314.     Therefore, Pulse has breached its contractual obligations and is in default under each of the Pulse Promissory Notes.

315.     No event has occurred that excuses or otherwise absolves Pulse of its failure to pay under the Pulse Promissory Notes.

316.     As a direct and proximate result of Pulse's breaches, the Plaintiffs have suffered damages in an amount to be proven at trial, but including without limitation, and in accordance with the terms of the Pulse Promissory Notes, the principal and interest under the Pulse Promissory

Notes and attorneys' fees and costs.

317.    In addition, Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's breaches of the Pulse Promissory Notes under the corporate veil piercing theories of liability discussed above.

<u>**COUNT IX**</u>
**Civil Conspiracy Against Defendants Mr. Textor and Mr. Eichenberger**

318.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

319.    Messrs. Textor and Eichenberger schemed to implement the Bad Faith Practices and use their positions of power at Pulse in order to fraudulently induce the Plaintiffs to invest and lend cash into Pulse's bank accounts, which they would then embezzle for their own personal use.

320.    Messrs. Textor and Eichenberger agreed and reaffirmed their agreement to effectuate the fraudulent scheme described herein throughout their management and control of Pulse and tenure on Pulse's board of directors.

321.    In furtherance of this conspiracy, Messrs. Textor and Eichenberger did numerous unlawful acts and lawful acts by unlawful means, as described above.

322.    These acts, including without limitation the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and entering into and making payments under the Sham Compensation Agreements, furthered Messrs. Textor and Eichenberger's conspiracy to embezzle those funds invested in and loaned to Pulse by the Plaintiffs in order to personally enrich themselves individually and enrich their friends and family.

323.    As a result of the Messrs. Textor and Eichenberger's conspiratorial conduct, the Plaintiffs have been damaged, in an amount to be determined at trial, and are entitled to an award of punitive damages and attorneys' fees and costs

## COUNT X
## Conversion

324.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

325.    The Defendants engaged in a fraudulent scheme, described above, in which they induced the Plaintiffs to deposit cash with Pulse to be entrusted and earmarked for specific business purposes, based on knowingly false and misleading statements.

326.    As described above, Pulse converted those funds invested in and loaned to Pulse by the Plaintiffs when Pulse knowingly obtained and used, and endeavored to obtain and use, the Plaintiffs' entrusted and earmarked funds, both temporarily and permanently, to both a) deprive the Plaintiffs of its rights to and benefit from that property, and b) appropriate the Plaintiffs' property for Pulse's own use and to the use of other individuals and entities not entitled to that property.

327.    Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's conversion of the Plaintiffs' funds under the corporate veil piercing theories of liability discussed in this Complaint

328.    In addition to Pulse's conversion, and separate and distinct from Pulse's conduct in depriving the Plaintiffs of their use and enjoyment of their deposited funds, Messrs. Textor and Eichenberger also converted the Plaintiffs' funds through their embezzlement of those entrusted and earmarked funds for their personal use.

329.    Messrs. Textor and Eichenberger caused Pulse to obtain the Plaintiffs' cash investments and loans through their fraudulent scheme described herein.

330.    After causing Pulse to fail to disburse those entrusted and earmarked funds as promised, Messrs. Textor and Eichenberger thereafter converted those funds for their own use and

the use of their friends and family by stealing those earmarked funds to which Pulse was entrusted.

331.    The Plaintiffs were harmed on each date that their entrusted and earmarked funds were stolen by Messrs. Textor and Eichenberger from Pulse's bank accounts to be personally used by Messrs. Textor and Eichenberger.

332.    Messrs. Textor and Eichenberger converted those funds invested and loaned by the Plaintiffs to Pulse when it knowingly obtained and used, and endeavored to obtain and use, the Plaintiffs' entrusted and earmarked funds, both temporarily and permanently, to both a) deprive the Plaintiffs of its rights to and benefit from that property, and b) appropriate the Plaintiffs' property for Messrs. Textor and Eichenberger's own use and to the use of other individuals and entities not entitled to that property.

333.    The Plaintiffs have presented to Mr. Textor, Mr. Eichenberger, and Pulse formal, written demands for the return of the value of the converted property.

334.    As of the date of the filing of this lawsuit, the Plaintiff's demands for the return of the value of the converted property have gone unfulfilled.

335.    As a direct and proximate result of Mr. Textor, Mr. Eichenberger, and Pulse's actions, the Plaintiff has suffered damages in an amount to be proven at trial.

336.    The Plaintiffs are also entitled to recover from Mr. Textor, Mr. Eichenberger, and Pulse the reasonable amount of attorneys' fees and costs.

## COUNT XI
**Breach of the Holotrack IRA Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse**

337.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

338.    On March 5, 2015, Pulse and the Holotrack Investors entered into the Holotrack IRA, a binding and valid contract, in which Pulse promised to implement and honor the Holotrack

Investors' Rights Protections, among other obligations, in consideration for the First Holotrack Investment.

339.    The Holotrack Investors have fully performed their contractual obligations under the Holotrack IRA.

340.    Pulse breached the Holotrack IRA by, among other things, violating Sections 2, 3, 4, and 5 of that agreement and its contractual promises thereunder to implement and honor the Holotrack Investors' Rights Protections as stated in the Holotrack IRA.

341.    No event has occurred that excuses or otherwise absolves Pulse of its breaches under the Holotrack IRA.

342.    As a direct and proximate result of Pulse's breaches, the Holotrack Investors have suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

343.    In addition, Messrs. Textor and Eichenberger are personally liable to the Holotrack Investors for Pulse's breaches of the Holotrack IRA under the corporate veil piercing theories of liability discussed above.

### COUNT XII
**Breach of the March 2017 Security Agreement Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse**

344.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

345.    On March 2, 2017, Pulse and PB Invest entered into the March 2017 Security Agreement, a binding and valid contract, in which PB Invest promised to loan Pulse $600,000 and, in exchange, Pulse promised to grant PB Invest a first priority security interest in certain free and clear Pulse collateral and permit PB Invest to enforce this security agreement upon Pulse's default

thereunder.

346.     PB Invest has fully performed its contractual obligations under the March 2017 Security Agreement.

347.     Pulse breached its contractual obligations under the March 2017 Security Agreement and is in default thereunder due to, among other things, its failure to make a timely repayment of the March 2017 Secured Promissory Note upon PB Invest's demand under that note.

348.     No event has occurred that excuses or otherwise absolves Pulse of its breaches under the March 2017 Security Agreement.

349.     As a direct and proximate result of Pulse's breaches, PB Invest has suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

350.     Under the March 2017 Security Agreement, PB Invest is also entitled to take a number of actions to enforce its rights thereunder, including those actions and remedies stated in Sections 6 and 8 of the March 2017 Security Agreement.

351.     In addition, Messrs. Textor and Eichenberger are personally liable to PB Invest for Pulse's breaches of the March 2017 Security Agreement under the corporate veil piercing theories of liability discussed above.

## COUNT XIII
### Unjust Enrichment Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse

352.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

353.     If the Plaintiffs do not prevail on its legal claims, including without limitation its contractually-based claims, the Plaintiffs lack an adequate remedy at law.

354.     The Plaintiffs' conferred a benefit on Mr. Textor, Mr. Eichenberger, and Pulse, who

have knowledge of that benefit.

355.    The Plaintiffs provided millions of dollars in cash investments and loans to Pulse.

356.    Pulse accepted and retained the benefits of the Plaintiffs cash investments and loans and thereafter disbursed those cash investments and loans to the personal accounts of Messrs. Textor and Eichenberger.

357.    Under the circumstances, and for the reasons more fully stated above, it would be inequitable for Mr. Textor, Mr. Eichenberger, and Pulse to retain the benefits of the Plaintiffs' cash investments and loans.

358.     As a direct and proximate result of Mr. Textor, Mr. Eichenberger, and Pulse's unjust enrichment, the Plaintiffs have suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

359.    In addition, Messrs. Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's unjust enrichment under the corporate veil piercing theories of liability discussed above

## COUNT XIV
### Equitable Accounting Against Defendants Mr. Textor, Mr. Eichenberger, and Pulse

360.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein.

361.    Pulse, including its alter egos Messrs. Textor and Eichenberger, had a fiduciary relationship with the Plaintiffs as investors and shareholders of that company.

362.    Pulse, including its alter egos Messrs. Textor and Eichenberger, also engaged in numerous complex investment transactions.

363.    An accounting of the books and records of Pulse, including its alter egos Messrs. Textor and Eichenberger, is required to ascertain the full extent of the Defendants' fraud, identify the accounts in which the Defendants improperly disbursed the Plaintiffs' cash investments, and

determine whether the Plaintiffs' violated other contractual obligations that may give rise to additional claims in this case.

## **JURY DEMAND**

The Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, the Plaintiffs respectfully demand judgment in its favor and against the Defendants as follows:

A.      Awarding damages as described in each of the above claims, in favor of the Plaintiffs and against the Defendants in amounts to be determined at trial.

B.      Awarding punitive damages in favor of the Plaintiffs and against the Defendants in the amount of $25,000,000, the exact amount to be determined at trial.

C.      Awarding the Plaintiffs pre-judgment and post-judgment interest, and its attorneys' fees, costs, and other expenses incurred in this action.

D.      Granting the Plaintiffs such other and further relief as this Court deems just and proper.

Dated:  November 8, 2017

Respectfully submitted,

Jason Canales
Florida Bar No. 793981
jcanales@mosessinger.com

MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174
Tel: 212-554-7800
Fax: 212-554-7700

*Attorneys for Plaintiffs Holotrack
Ventures Corp., Holotrack AG, JR
Beteligungs Holding AG, Miralco
Holding AG, and PB Invest
Schweiz AG*