**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-14390-Civ-Martinez**

HOLOTRACK VENTURES CORP.,
HOLOTRACK AG, JR BETEILIGUNGS
HOLDING AG, MIRALCO HOLDING AG,
and PB INVEST SCHWEIZ AG,

       Plaintiffs,

-v-

JOHN TEXTOR, RENE EICHENBERGER,
FRANK PATTERSON, and PULSE
EVOLUTION CORPORATION,

       Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS AND**
**INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.      All Claims Should Be Dismissed Based On Improper "Shotgun" Pleading ..................... 4

II.     Plaintiffs Fail To Adequately Plead A Violation Of Section 10(b) And Rule 10b-
        Of The Exchange Act (Count 1) ...................................................................................... 5

        A.      Plaintiffs Fail To Adequately Plead Loss And Loss Causation ........................... 5

        B.      Plaintiffs Fail To Adequately Plead Fraud ........................................................ 7

        C.      Plaintiffs' "Holder" Claims Fail As A Matter Of Law. ..................................... 12

III.    Plaintiffs' Claim Under Section 20(a) Fails As A Matter Of Law (Count 2) ................. 13

IV.     Plaintiffs Fail To Adequately Plead A Claim Under Florida's Securities And
        Investor Protection Act (Count 3) ................................................................................. 13

        A.      Plaintiffs Fail To Adequately Fraud ................................................................ 13

        B.      Plaintiffs' "Holder" Claims Fail As A Matter Of Law. ..................................... 14

V.      Plaintiffs Fail To Adequately Plead Fraud (Count 4). .................................................. 15

VI.     Plaintiffs Fail To Adequately Plead Aiding And Abetting Fraud (Count 5). ................. 15

VII.    Plaintiffs' Claim For Conversion (Count 10) Fails As A Matter Of Law. ...................... 16

VIII.   Plaintiffs' Claim For Civil Theft (Count 6) Fails As A Matter Of Law. ......................... 18

IX.     Plaintiffs' FDTUPA Claim (Count 7) Fails As A Matter Of Law. ................................ 18

X.      Plaintiffs' Claim For Civil Conspiracy (Count 9) Fails As A Matter Of Law. ............... 19

XI.     Plaintiffs' Claim For An Equitable Accounting (Count 14) Fails As A
        Matter Of Law ............................................................................................................... 20

CONCLUSION ............................................................................................................... 20

Defendants John Textor, Rene Eichenberger, Frank Patterson, and Pulse Evolution Corporation (collectively, "Defendants") respectfully move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim upon which relief can be granted, Rule 8(a)(2) for failing to provide a short and plain statement of the claim showing the pleader is entitled to relief, Rule 9(b) for failing to pleading Counts 1-5 with particularly, and for failing to satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") for Counts 1-2.

## INTRODUCTION

This is a meritless lawsuit.  It is premised on baseless allegations and legally unfounded causes of action, and improperly brought by foreign investors frustrated they were unable to wrest control of Pulse Evolution Corporation ("Pulse"), a start-up technology company, away from its founders.  The Complaint is an exercise in legal hyperbole, attempting to dress up and convert vague, conclusory allegations regarding purported breaches of investment agreements into a larger "scheme" to defraud.  Plaintiffs have advanced these sensational, baseless claims against Pulse not because they actually desire the relief sought in the Complaint.  Rather, the Complaint is a merely an effort to use the court system to exact leverage in negotiations over control of Pulse.  The Complaint tries to do that by using "buzzwords"—*e.g.*, fraud, embezzlement—that might create headlines and stir media interest in the suit.[1]  But, as shown below, the use of buzzwords and conclusory allegations to support claims cannot withstand this Court's legal scrutiny.

Pulse is a pioneering media technology leader in the creation and introduction of photorealistic digital humans to the public.  In May 2014, Pulse revolutionized the entertainment industry by bringing onstage at the Billboard Music Awards a Virtual Michael Jackson, performing a previously unreleased recording by the deceased King of Pop.  Millions of viewers watched this hyper-realistic virtual performance on television and online, which gained widespread

---

[1] As a prime example, Plaintiffs borrow the 'Ponzi' reference from sensational allegations of an old defeated lawsuit and a discredited blog site.  As Plaintiffs are well aware, the prior litigation included no actual claim related to a 'Ponzi scheme,' and there was no finding of wrongdoing by Defendant Textor.  To the contrary: the plaintiff party (and lawyer) that made the sensational claim submitted to a Court-approved settlement that allocated a sizeable settlement payment **to Mr. Textor**, and the New York Supreme Court judge affirmed in her dismissal order a finding that "no misrepresentations of material facts can be attributed to [Mr. Textor]."  These facts are all well-known to Plaintiffs, who previously congratulated him on being vindicated.  That Plaintiffs would immediately race to the bottom by dredging up this discredited and inflammatory soundbite is highly disappointing.

international acclaim.[2]  This landmark technological achievement by Pulse in the field of digital humans has yet to be equaled.

The development of the new technology behind this performance (as nearly all groundbreaking technology) and the development of other virtual performers required and continues to require significant capital.  As a venture-backed start-up technology company, Pulse sought outside investors who wished to participate in the opportunity to continue to develop the potential of, and the market for, this new technology and entertainment sector.

The Plaintiffs in this matter are highly sophisticated international investors, backed by ultra-high net worth individuals and entertainment moguls from Switzerland and Germany who invested in and sought control over the future development and potential profits of this new Pulse entertainment and media technology.  Holotrack AG was created by Bernhard Burgener, a ultra-high net worth Swiss media magnate, who served on Pulse's Board of Directors, to be a production company partner of Pulse, responsible for the creative development and funding of large-scale Pulse productions featuring some of the world's most recognizable celebrities as virtual, holographic performers.  Mr. Burgener, with his knowledge and access as a company insider, and desperate to participate more deeply in the exciting new business of Pulse, solicited Plaintiffs JR Beteiligungs Holding Ag, Miralco Holding Ag, and PB Invest Schweiz Ag to become investors in the future of Pulse (through Holotrack AG).  These investors (along with their advisors and attorneys) conducted extensive due diligence before investing in Pulse and were aware of the risks involved in investing in a technology start-up company.

In January 2015, Holotrack AG made a proposal to the board of Pulse that would affirm Holotrack's belief in the attractive business opportunities of Pulse.  Holotrack AG requested that Pulse suspend, for a period of approximately one year, substantial components of its business plan that related to the extended, non-performance applications of digital humans.  The Holotrack proposal, which was accepted by the Company, resulted in Pulse becoming a single-property entertainment production company, dependent on Holotrack AG and its leadership and funding of the production.

Plaintiffs promised to fund Pulse with minimum monthly operating expenses, while Plaintiffs, in the name of Holotrack AG (while promoting their personal names) would conduct a

---

[2] *See, e.g.*, https://www.billboard.com/articles/events/bbma-2014/6092040/michael-jackson-hologram-billboard-music-awards.

full-scale investor road show across Europe to fund the production that would deliver Pulse to sustainability and prosperity.  With the well-known names of Philipp Boehringer, Bernhard Burgener, Otto Kunz, and the Reidel Family in full display, and with documentation that affirmed the Plaintiffs' belief in Pulse, Holotrack AG engaged the reputable investment bank Oddo Seydler and commenced a road show to raise more than 20 million Euros for Pulse.  Month after month during 2015, Holotrack AG assured Pulse that the larger production funding was imminent, that the Holotrack plan was reliable, and that Pulse should remain committed to the single production as its business activity. The road show took place without inclusion of Pulse management, as the offering documents made clear this was a financing that featured Holotrack (and its launch as a business partner of Pulse) as the issuer.  Pulse was left to trust Mr. Burgener and Holotrack with the raising of capital, and relied on the influence of the names of Boehringer, Burgener, Kunz, and Reidel in Europe.

    In August 2015, Mr. Burgener traveled to Pulse's California studio and, speaking on behalf of Holotrack AG and its principals, delivered to an assembled room of nearly all of the Pulse employees the apparent good news – that the road show was successful and that 20 million Euros would be available shortly.  Unfortunately, this news was untrue.  Holotrack had *not* been successful in its road show and no money was raised for the production.[3]  Pulse, having relied on Messrs. Burgener, Boehringer, Kunz and Reidel, found itself in a difficult business position.

    Since the failure of Holotrack in its capital-raising efforts, various parties connected with the Plaintiffs have made repeated attempts to take control of the attractive technology and entertainment properties of Pulse, through a variety of unattractive financial proposals, acts of tortious interference with key business relationships, and threats of litigation, sometimes from unidentifiable entities who have claimed to have acquired ownership of the Holotrack interests. These foreign investors have now launched this lawsuit to improperly achieve their own goals with Pulse by applying the financial burden of litigation.

    At the appropriate stage of this proceeding, Pulse will more fully address the grossly inaccurate and misleading statements that Plaintiffs make in their Complaint and seek appropriate remedies for the harm Plaintiffs and their related entities and individuals have caused Pulse and the other defendants.  However, as noted, even accepting the Complaint's allegations as true at

---

[3] To this day, as this road show was entirely done by Holotrack, Pulse has no information as to the details of Holotrack's actions or the reasons for Holotrack's failure.

this stage of the case, the Complaint suffers from numerous fatal flaws that compel dismissal.  For the reasons below, Defendants respectfully request that the Court dismiss the Complaint.

## ARGUMENT

### I.   All Claims Should Be Dismissed Based On Improper "Shotgun" Pleading.

It is well-established in the Eleventh Circuit that shotgun complaints are impermissible. "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors." *Strategic Income Fund, L.L.C. v. Spear, Leads & Kellog Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002); *see also Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) ("The most common type [of shotgun pleading]—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint.").  "Such disjointed pleadings make it difficult, if not impossible, to set the boundaries for discovery," leading to otherwise unnecessary disputes. *Byrne v. Nezhat*, 261 F.3d 1075, 1129 (11th Cir. 2001).  The Eleventh Circuit has addressed the topic of shotgun pleadings "at great length and always with great dismay." *Strategic Income Fund*, 305 F.3d at 1295 n.9.  Courts must dismiss shotgun pleadings because they violate Rule 8(a)(2), which "requires a short and plain statement of the claim showing that the pleader is entitled to relief. A shotgun pleading is in no sense a short and plain statement of the claim as required by Rule 8." *See Degirmenci v. Sapphire-Fort Lauderdale, LLLP*, 693 F. Supp. 2d 1325 (S.D. Fla. 2010) (citing *Magluta v. Samples,* 256 F.3d 1282, 1284-85 (11th Cir. 2001).

Here, the Complaint is clearly a shotgun pleading.  Each of Plaintiffs' counts begins with the following allegation: "The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations of this Complaint as if fully set forth herein."  (Compl. ¶¶ 227, 236, 254, 270, 275, 295, 307, 318, 324, 337, 344, 352, 360.)  As noted, this practice is the defining characteristic of a shotgun complaint and requires dismissal of the Complaint.  *See Weiland*, 792 F.3d at 1324 ("[T]his Court has condemned the incorporation of preceding paragraphs where a complaint contains several counts, each one incorporating by reference the allegations of its predecessors [i.e., predecessor *counts],* leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions.") (emphasis in original) (quotations and citation omitted); *see also Degirmenci*, 693 F. Supp. 2d at 1336 (S.D. Fla. 2010) ("This Court, *sua sponte,* is dismissing any counts not dismissed on other grounds as deficiently plead

under the Federal Rules of Civil Procedure and require Plaintiff to correct this deficiency.") (citing *Anderson,* 77 F.3d at 367 n. 5 (11th Cir. 1996) ("the court, acting *sua sponte,* should have struck the plaintiff's complaint, and the defendants' answer, and instructed plaintiff's counsel to file a more definite statement.")); *Magluta v. Samples*, 256 F.3d 1282, 1285 (11th Cir. 2001) ("On remand the district court should enter an order striking the complaint and require a repleading of all claims in a complaint that respects the requirements of Rule 8 and the heightened pleading requirement for cases such as this one."); *see also id.* at 1284 ("In the past when faced with complaints like this one, we have vacated judgments and remanded with instructions that the district court require plaintiffs to replead their claims.") (citation omitted).

Accordingly, the Defendants respectfully request that the Court dismiss the Complaint in its entirety and require Plaintiffs to plead any claims not dismissed with prejudice (on the grounds set forth below) in a manner consistent with the Federal Rules of Civil Procedure.

## II.    Plaintiffs Fail To Adequately Plead A Violation Of Section 10(b) And Rule 10b-5 Of The Exchange Act (Count 1).

To prove a securities fraud violation under Section 10(b) and Rule 10b–5 of the Exchange Act, a plaintiff must properly allege the following: (1) that a defendant made a misstatement or omission (2) of a material fact (3) with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiffs' loss.  *See Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir. 2001), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010).

Heightened pleading standards apply to these claims.  To properly plead a claim brought under Section 10(b) or Rule 10b-5, a complaint must satisfy (1) the federal notice pleading requirements found in Rule 8(a)(2); (2) the fraud pleading requirements found in Rule 9(b), *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"), *see Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).   As explained below, the Complaint's claim under Section 10(b) fails for multiple reasons.

### A.    Plaintiffs Fail To Adequately Plead Loss And Loss Causation.

As a preliminary matter, Plaintiffs fail to state a claim for relief under Rule 10b-5 because they fail to allege (1) economic loss in the securities, and (2) that Defendants' purported false or misleading statements "caused the loss for which [they] seek[] to recover."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. § 78u-4(b)(4)).  "A plaintiff must allege that

the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks and citation omitted).

Although Plaintiffs claim that they were damaged by a purported fraud, they assiduously avoid mentioning the actual economic loss at issue, or any theory of loss causation. "To show loss causation in a § 10(b) claim, a plaintiff must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997). The PSLRA specifically requires that the plaintiff prove that the misrepresentation "caused the loss for which the plaintiff seeks to recover." 15 U.S.C. § 78u-4(b)(4); *see also Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013). The reason for the strict requirement of pleading and proving loss causation is simple: without tying the specific drop in value in the security to the specific purported fraudulent statement, the securities laws could easily be used as an insurance vehicle by which any investor who lost money on an investment could seek to recover. *See, e.g., Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) ("By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not 'becom[e] a system of investor insurance that reimburses investors for any decline in the value of their investments.'") (quoting *Robbins,* 116 F.3d at 1447); *Dura,* 544 U.S. at 347-48 (explaining that allowing a plaintiff to forego the loss causation requirement "would bring about harm of the very sort the [federal securities] statutes seek to avoid" and "transform a private securities action into a partial downside insurance policy").

In their Complaint, Plaintiffs make no effort to specifically identify losses in the value of the securities at issue or tie those losses to purported false or misleading statements. Consequently, the Defendants (and the Court) are left guessing about key elements of these claims. What was the value of the shares when Plaintiffs purchased them? What was the loss purportedly caused by the allegedly fraudulent statements? When did the purported false statements become known to the investing public (*i.e.*, what was the corrective disclosure)? None of these details, or any of the essential facts necessary to satisfy the loss causation pleading requirements for a securities fraud case, appears in Plaintiffs' Complaint. *See, e.g.*, *Arnold v. McFall*, 839 F. Supp. 2d at 1288 (dismissing complaint after finding that "Plaintiffs fail to allege that Gulfstream's stock price

declined after Defendants disclosed their alleged misrepresentations or omission of material fact; also, Plaintiffs fail to allege a causal connection between the alleged false or misleading statement and the decline in Gulfstream's stock price").  Because Plaintiffs have failed to adequately plead loss and loss causation, Count I must be dismissed.

### B.     Plaintiffs Fail To Adequately Plead Fraud.

To satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must set forth "(1) precisely what documents or oral representations were made, . . . (2) the time and place of each such statement and [where possible] the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *In re Recoton Corp. Sec. Litig.,* 358 F.Supp.2d 1130, 1138 (M.D. Fla. 2005) (quoting *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001)).  The PSLRA also imposes additional heightened pleading requirements for securities fraud claims, mandating that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1).

### 1.     Plaintiffs Fail To Plead Misstatements With Required Specificity.

Plaintiffs' allegations regarding purported false or misleading statements fail to provide the specificity required under Rule 9(b).  The Complaint is replete with allegations that the Defendants made intentional misstatements of material facts to the Plaintiffs through "numerous oral and written" statements, yet Plaintiffs fail consistently to identify any <u>actual</u> written statement.  For instance, in connection with the "First Holotrack Investment," Plaintiffs allege that Messrs. Textor and Eichenberger, acting on behalf of Pulse, "through numerous oral and written statements made to representatives of Holotrack, made intentional misrepresentations of material facts to representatives of Holotrack and omitted and/or failed to disclose facts necessary to make those affirmative statements not false and misleading."  (Compl. ¶ 78 (emphasis added).)  Yet ***not one*** of these "numerous" written statements is identified.  Given counsel's choice of words, Plaintiffs presumably have specific, written documents in their possession upon which they are relying.  Are emails at issue? A Powerpoint presentation? A prospectus? A due diligence worksheet? Plaintiffs do not say.

This exact verbiage is then copied and pasted with respect to the Second Holotrack Investment and the Third Holotrack Investment. (Compl. ¶¶ 96, 117.) The same verbatim allegation is made regarding the December 2015 Investment, except the word "Holotrack" is replaced with "Miralco and Rainbow Home." (Compl., ¶ 135.) Finally, nearly identical language is used for the September 2016 Loan and March 2017 Secured Loan. (Compl., ¶ 153, 163.) *"Numerous" "written"* statements are alleged for each investment. Yet across all of these investments and loans, only two of these "numerous" "written" statements are actually identified in the Complaint – an Elvis milestone chart, and a September 22, 2016 email. (Compl. ¶¶ 105, 155.) The rest of these "numerous" written statements (of which Plaintiffs must have copies) are simply ignored, falling in with the vague, boilerplate allegations that permeate the Complaint.

The flaws in Plaintiffs' pleading regarding the purported "numerous oral and written statements" are only compounded by the wide date ranges that Plaintiffs provide for these alleged statements. For almost of the above identified allegations, the Plaintiffs give a date range of at least a month:

- during investment negotiations in or around August 2015 (Compl. ¶ 96)
- during investment negotiations in or around October 2015 (Compl. ¶ 117)
- during investment negotiations in or around December 2015 (Compl. ¶ 135)
- during investment negotiations in or around September 2016 (Compl. ¶ 153)
- during investment negotiations in or around March 2017 (Compl. ¶ 168)

At times, Plaintiffs do not even narrow their allegations to a single month: "during investment negotiations in or around the period of late-2014 through March 2015[.]" (Compl. ¶ 78.) These vague, broad allegations of unidentified statements taking place somewhere in the course of a month or more fall well short of the particularity required to allege fraud. *See, e.g.*, *Pucci v. Carnival Corp.*, 146 F. Supp. 3d 1281, 1291 (S.D. Fla. 2015) ("Plaintiffs must allege their misrepresentation claims with greater temporal precision [than saying that they occurred at some point over a two-day period] to comply with Rule 9(b)"); *Gayou v. Celebrity Cruises, Inc.*, 2012 WL 2049431, at * 7 (S.D. Fla. June 5, 2012) ("Merely saying that [defendant's] alleged false statements were made 'during the cruise,' '[p]rior to arriving at each destination,' or when [plaintiff] visited the excursion desk did not satisfy Rule 9(b).") (citations omitted).

## 2.  Plaintiffs Fail To Plead Omissions With Required Specificity.

Plaintiffs' treatment of purported omissions in the Complaint also fails to satisfy the pleading requirements for a fraud claim.

For instance, Plaintiffs provide categories of purported "improper" disbursements, the existence of which Pulse allegedly should have disclosed.  These include the following:

- "Cash disbursements of so-called bonuses" that were allegedly "unsanctioned personal payments"
- "Cash disbursements of so-called business expenses" that were allegedly "actually personal expenses"
- "Cash disbursements of so-called business expenses" that allegedly paid for "personal legal expenses"
- "Cash disbursements of so-called business expenses" that paid for office space allegedly used for non-Pulse purposes
- "Cash disbursements of so-called business expenses" that paid for a lease of an executive's residence that was allegedly used for non-Pulse purposes
- Equity issuances that allegedly "did not further a legitimate Pulse business purpose"

Nearly all of these are phrased in such general language, untethered to any timeframe, that they are impossible to address.  Obviously, a disbursement cannot be omitted from an investment disclosure if, at the time of the investment, the disbursement had not even occurred.  Nor can the materiality of these disbursements be analyzed, because Plaintiffs provide no details.[4]

The only "Improper Disbursement" for which Plaintiffs actually provide a date is an equity issuance alleged as occurring in ***August 2016***.  (Compl. ¶ 29(d)(ix).)  But that allegation does not support any claim of an omission.  Defendants could not have "concealed and omitted from their oral communications with PB Invest" this August 2016 equity issuance, as Plaintiffs allege, in connection with investment negotiations with Plaintiffs that took place "[i]n and around September 2014" – ***the event had not occurred yet***.  (Compl. ¶ 68 (the PB Investment).)  The same impossibility applies to "the period of late-2014 through March 2015[.]" (Compl. ¶ 88 (the First Holotrack Investment)); "[i]n and around August 2015" (Compl. ¶ 109 (the Second Holotrack Investment)); "[i]n and around October 2015" (Compl. ¶ 128 (the Third Holotrack Investment)); and "[i]n and around December 2015" (Compl. ¶ 145 (the December Investment)).[5]

### 3.    Plaintiffs Improperly Bootstrap Vague Or Demonstrably False Premises Into Web Of Impossible Or Implausible Claims.

Plaintiffs also use a convoluted structure of incorporating each category of vague allegations into other categories, such that a single, insufficiently pled allegation forms the basis

---

[4] The only disbursements Plaintiffs do identify come in a different section, covering a two-month time period after Pulse had received a large investment (from a company unrelated to any of the Plaintiffs or their successors).
[5] This "improper disbursement" was neither improper, nor was it concealed from Plaintiffs.  Even without addressing those issues, however, the mere timing of the disbursement as pled makes it impossible for it to serve as an omission for the investments.  The fact that Plaintiffs have so vaguely pled unidentifiable alleged improprieties without any timeline means that Rule 9(b) has not been satisfied.

for four inflammatory, Plaintiff-created characterizations.   For instance, a purported "Sham Compensation Agreement" may also be a "Bad Faith Practice," and also an "Improper Disbursement," which then further qualifies as a "Corporate Abuse."  Due to this web of pleading, most of the claims are indecipherable, and actual allegations of reliance and fraud are implausible or impossible.

For instance, only one purported "Sham Compensation Agreement" (Plaintiffs' inflammatory term) in the Complaint actually alleges a dollar amount.  Plaintiffs allege:

> "Messrs. Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Mr. Eichenberger, as president and owner of Driftwood Investment Corp. ("Driftwood"), under which Driftwood agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Driftwood an unspecified fee as well as unspecified expenses, including a monthly fee of approximately $42,000. Driftwood is a company that is owned and controlled by Mr. Eichenberger and provides no legitimate business services to Pulse."

(Compl. ¶ 33(d).)  Plaintiffs also allege: "The nature and circumstances of the sham entities involved in the Sham Compensation Agreements, and the payments made thereunder, were purposefully concealed from the Plaintiffs as investors and lenders, as well as Pulse's other directors and managers **throughout the relevant period**."  (Compl. ¶ 32 (emphasis added).)  Plaintiffs claim that Pulse "concealed" this "Sham Compensation Agreement" from the Plaintiffs on the following (approximate) dates:

- "[i]n and around September 2014" (Compl. ¶ 68 (the PB Investment))
- "the period of late-2014 through March 2015" (Compl. ¶ 88 (the First Holotrack Investment))
- "[i]n and around August 2015" (Compl. ¶ 109 (the Second Holotrack Investment))
- "[i]n and around October 2015" (Compl. ¶ 128 (the Third Holotrack Investment))
- "[i]n and around December 2015" (Compl. ¶ 145 (the December Investment))
- "[i]n and around September 2016" (Compl. ¶ 160 (the September 2016 Loan))
- "[i]n and around March 2017" (Compl. ¶ 177 (the March 2017 Secured Loan))

The chronology, however, does not make any sense, and even a cursory review of Pulse's SEC filings would have foreclosed this allegation.  In March 2016, the Company entered into the consulting agreement.  The consulting agreement was disclosed publicly in the Company's Form 10-Q filed in August 2016:

> "In March 2016, the Company entered into a 2 year contract with Driftwood Invest Corporation, a company related to our Vice Chairman in connection with his provision of consulting services to the Company. The contract provides for a 2 year consulting contract with a monthly retainer of $41,666.67 with either party able to terminate the

contract with 3 months notice. The contract also granted 6,000,000 shares to Driftwood Invest Corporation from its stock option pool."

(*See* Exhibit A at F-16, Pulse 2016 10-Q.)[6]

Based on this 10-Q disclosure, for the first five alleged investments in this case, there could not have been an omission, because the consulting agreement ***was not even in existence yet***. And for the final two purported loans, this public announcement in August 2016 meant that sophisticated, accredited investors (who had even placed a member on the Board of Directors of the company) could not plausibly (or in good faith) claim that they were unaware of the consulting agreement – it was disclosed directly in the Company's 10-Q. Plaintiffs, however, allege that this was somehow "concealed" from them. (Compl. ¶¶ 160, 177.) Such claims fails as a matter of law, and Plaintiffs' pleading fails under Rule 9(b).

### 4.    Plaintiffs Fail To Sufficiently Allege Facts Regarding Purported Failure To Perform And Intention Not To Perform.

Finally, Plaintiffs repeatedly attempt to allege that Defendants did not intend to perform under the agreements, and point to the alleged failure to perform as evidence of that intention. Plaintiffs, however, (a) never provide any facts showing the basis for their claims that Pulse did not perform (*i.e.*, did not expend the monies on the specific projects that Plaintiffs identified), and (b) provide no independent evidence of any intention not to perform. With respect to the issue of actual expenditures of invested or loaned monies, Plaintiffs provide no details or facts except for listing expenditures that Pulse made in a two-month time frame – January and February 2016. This period coincides directly with a $10,000,000 investment from a third party, as disclosed in Pulse's SEC filings: "In January 2016, the Company entered into a Stock Purchase Agreement with Original Force and U9. The parties purchased a total of 14,760,000 Common Shares **for $10,000,000** . . . ." (Ex. A at F-16.) Having received an infusion of $10,000,000 (larger than all of the investments and loans at issue in the Complaint put together), the Company was in a position to pay off certain debts it had incurred. There was nothing wrong with those payments, and nothing

---

[6] The Court may consider this public filing via judicial notice under Fed. R. Evid. 201(b). *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) ("[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed."); *see also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1320 (S. D. Fla. 2004) ("since *Bryant*, district courts have taken judicial notice of publicly filed documents in securities fraud cases upon a motion to dismiss").

even plausibly ties the Plaintiffs' investments with those disbursements.  For every time period other than January to February 2016, Plaintiffs put forward no facts to show how monies were spent, or what Pulse actually did that was (allegedly) improper.  Furthermore, Plaintiffs rely on this purported (and unspecified) failure to spend the money properly as evidence of an intent on Pulse's behalf at the time of entering into the agreement not to spend the money.  If failure to perform under a contract is sufficient evidence to bring a fraud claim (because the failure to perform is evidence that a party never intended to perform), then every contract dispute sounds in fraud.  A party pleading fraud should be required to show more than a breach of a contract.  In this case, as noted, Plaintiffs fail to even adequately provide a factual basis for their claims of failure to perform.

### C.    Plaintiffs' "Holder" Claims Fail As A Matter Of Law.

Plaintiffs also allege that "Mr. Textor, Mr. Eichenberger, and Pulse deceived the Plaintiffs and caused them to purchase and **forego** **selling** Pulse securities in reliance on the intentionally deceptive acts and statements described above."  (Compl. ¶ 217 (emphasis added).)  These "holder" claims (*i.e.*, foregoing the selling of a security based on an alleged false statement) are not recognized under Section 10(b).  *See, e.g.*, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 77-80 (2006) (explaining the standing limitation of purchaser or seller for private federal securities actions as espoused in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)); *City of St. Petersburg v. Wachovia Bank*, (M.D. Fla. 2010) ("Because this case does not involve the purchase or sale of securities, but rather the "holding" of securities, it cannot be brought as a federal private right of action under § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) or Rule 10b-5 based on the standing requirement.") (citing *Dabit*, 547 U.S. at 77-80).  To the extent that Count 1 relies on the holding of securities based on a purported misstatement or other act of the Defendants, this Count must be dismissed for this additional reason.

### III.    Plaintiffs' Claim Under Section 20(a) (Count 2) Fails As A Matter Of Law.

Liability for a control person under Section 20(a) of the Exchange Act depends on an underlying securities violation.  "Because a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency." *Thompson v.*

*RelationServe Media, Inc.*, 610 F.3d 628, 635-36 (11th Cir. 2010) (citing *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1261 (11th Cir. 2006)).

 As explained above, Plaintiffs' claim for a violation of Section 10(b) must be dismissed. As this is the alleged underlying securities violation upon which Plaintiffs base their Section 20(a) claim, that Section 20(a) claim must be dismissed as well. *See id.*; *see also Meyer v. Green*, 710 F.3d 1189, 1194 n.7 (11th Cir. 2013) ("Though the Investors also bring a claim under § 20(a) of the Exchange Act, liability under § 20(a) is derivative to liability under § 10(b), so the analysis of the Investors' § 20(a) claim is subsumed by the analysis of their § 10(b) claim.") (citation omitted).

**IV.** **Plaintiffs Fail To Adequately Plead A Claim Under Florida's Securities And Investor Protection Act (Count 3).**

 In Count 3, Plaintiffs allege that Defendants violated "Fla. Stat. §§ 517.011, *et seq*." – *i.e.*, the Florida Securities and Investor Protection Act (the "FSIPA"). (Compl. Count III Heading.) Plaintiffs do not specify which section(s) of the FSIPA that they allege Defendants violated. Defendants assume that Plaintiffs intended to allege a claim under Section 517.301(1)(a) ("Section 301"). In order to state a claim under Section 301, a plaintiff must allege the following: (1) that a defendant made a misstatement or omission (2) of a material fact (3) with scienter (4) upon which the plaintiff relied. *See Theoharous v. Fong,* 256 F.3d 1219, 1224 (11th Cir. 2001), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds,* 559 U.S. 633 (2010).

 **A.** **Plaintiffs Fail To Adequately Plead Fraud.**

 A plaintiff bringing a claim under Section 301 "must also satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure in order to state a claim upon which relief can be granted." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011). To satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must set forth "(1) precisely what documents or oral representations were made, . . . (2) the time and place of each such statement and [where possible] the person responsible for making (or, in the case of omissions, not making) same, . . . (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *In re Recoton Corp. Sec. Litig.,* 358 F.Supp.2d 1130, 1138 (M.D. Fla. 2005) (quoting *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001)). The "'particularity' requirement 'serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent

behavior.'"  *Arnold v. McFall*, 839 F. Supp. 2d at 1286-87 (quoting *Ziemba v. Cascade Intern., Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001)) (internal citation omitted).

Given the applicability of Rule 9(b) to Section 301 claims, Defendants incorporate by reference the arguments put forward *supra* in section II.B, regarding Plaintiffs' failure to adequately plead fraud.

### B.     Plaintiffs' "Holder" Claims Fail As A Matter Of Law.

Similar to their allegations in Count 1, Plaintiffs also state in Count 3 that "Mr. Eichenberger, Mr. Textor, and Pulse deceived the Plaintiffs and caused them to purchase and **forego selling** Pulse securities . . . ."  (Compl. ¶ 243; *see also id.* ¶ 249 ("when the Plaintiffs decided to invest money in Pulse and purchase Pulse securities, **hold onto** those investments, . . .").)  To the extent that Plaintiffs are attempting to plead "holder" claims, these suffer no better fate in Count 3 than they do in Count 1.  Just as these "holder" claims are not recognized under the Federal securities laws, they are also not recognized under the FSIPA.  *See, e.g.*, *Rogers v. Cisco Systems, Inc.,* 268 F. Supp. 2d 1305, 1316 (N.D. Fla. 2003) ("'holding' claims may not be asserted under *either* the federal or Florida securities laws"); *City of St. Petersburg v. Wachovia Bank, N.A.*, 2010 WL 2991431 at *4 (M.D. Fla. July 27, 2010) ("[T]his Court will follow *Rousseff* and the plain language of Florida securities law that a "holder" may not bring a statutory securities fraud action."); *Pafumi v. Davidson,* 2007 WL 1729969 at *3 n.4 (S.D. Fla. Jun. 14, 2007) (finding "securities holding claims are not permitted in actions pursuant to Florida and federal securities laws"); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254 (M.D. Fla. 2010) ("In the absence of a statutory remedy, this Court will follow *City of St. Petersburg* and the plain language of section 517.211(2) that requires an action to be brought in connection with the purchase or sale of a security and does not extend the scope of FSIPA to include holding claims, even if such claims are based upon fraudulent investment advice.").  To the extent that Count 3 relies on the holding of securities based on a purported misstatement or other act of the Defendants, this Count must be dismissed for this additional reason.

## V.     Plaintiffs Fail To Adequately Plead Fraud (Count 4).

To allege a claim for common law fraud under Florida law, a party must set forth the following: 1) the defendant made a false statement or omission of material fact; 2) the defendant knew the statement was false; 3) the statement was made for the purpose of inducing plaintiff to rely on it; 4) plaintiff's reliance was reasonable; and 5) plaintiff suffered damages. *See Mergens v.*

*Dreyfoos,* 166 F.3d 1114 (11th Cir. 1999); *see also Brough v. Imperial Sterling Ltd.,* 297 F.3d 1172 (11th Cir. 2002).   The heightened pleading standard of Rule 9(b) applies to allegations of common law fraud.

Given the applicability of Rule 9(b) to common law fraud claims, Defendants incorporate by reference the arguments put forward *supra* in section II.B, regarding Plaintiffs' failure to adequately plead fraud.

Finally, Plaintiffs fail to explain how they suffered loss through their investments.   The Complaint does not explain when, if ever, Plaintiffs sold their shares, nor for how much.   Without any allegation of actual loss, Plaintiffs do not state a claim for fraud.   *See, e.g.*, *Morgan Stanley & Co., Inc. v. Coleman (Parent) Holdings Inc.*, 955 So. 2d 1124, 1132 (Fla. 4th DCA 2007) ("'[A]ctual damages and the measure thereof are essential as a matter of law in establishing a claim of fraud.'") (citation omitted).

## VI.   Plaintiffs Fail To Adequately Plead Aiding And Abetting Fraud (Count 5).

"Although no Florida court has explicitly recognized a cause of action for aiding and abetting fraud, Florida courts have assumed a cause of action" for aiding and abetting fraud with the following elements: (1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud.   *HSI Chang v. JPMorgan Chase Bank, NA*, 841 F.3d 914 (11th Cir. 2016) (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 371-72 (Fla. Dist. Ct. App. 2005)).   Again, Plaintiffs' claim fails for multiple reasons.

First, as explained above, Plaintiffs fail to adequately plead an underlying fraud.

Second, Plaintiffs provide no plausible basis for the assertion that Mr. Patterson had knowledge of the purported fraud.[7] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *American Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283 (11th Cir. 2010) (the complaint "must . . .contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" ) (quoting *Twombly*, 550 U.S. at 570).   In the "Relevant Facts Applicable to All Claims" section of the Complaint (spanning nearly 50 pages), Plaintiffs mention Mr. Patterson twice: (1) Plaintiffs state that Mr. Textor founded Pulse with Mr. Patterson

---

[7] Because Plaintiffs provide no factual basis for understanding Plaintiffs' claim regarding when or how Mr. Patterson gained any knowledge of the purported fraud, Defendant cannot address the "substantial assistance" element, which also lacks any factual or legal basis.

and Mr. Eichenberger (Compl. ¶ 15); and (2) Plaintiffs list Mr. Patterson as one of the attendees at a meeting in February 2014 in Switzerland (*id.* ¶ 47), but ascribe no statements or conduct to him. *That is the total discussion of Mr. Patterson in the purported "factual" section of the Complaint.* Despite this, Plaintiffs bring a count of "aiding and abetting fraud" against Mr. Patterson and allege in the count that "Mr. Patterson had knowledge of the fraudulent scheme, Ponzi scheme, Bad Faith Practices, Corporate Abuses, and Improper Disbursements." (Compl. ¶ 271.) Plaintiffs do not even *attempt* to provide a foundation for that allegation. Because Plaintiffs have failed to provide a plausible factual basis to support their claim, Plaintiffs' claim for aiding and abetting fraud must be dismissed.

### VII.    Plaintiffs' Claim For Conversion (Count 10) Fails As A Matter Of Law.

Plaintiffs' claim for conversion should be dismissed, as Plaintiffs cannot meet the standard applicable to "identifiable" funds for a conversion claim.

It is well-settled law that breach of a repayment on a loan does not give rise to a conversion claim. "The requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally." *Belford Trucking Co. v. Zagar*, 243 So. 2d 646 (Fla. 4th DCA 1970) (citation omitted); *see also Gambolati v. Sarkisian*, 622 So. 2d 47 (Fla. 4th DCA 1993) ("A debt which may be discharged by the payment of money in general cannot form the basis for conversion.") (citing *Capital Partners Inv. Co. v. American Inv. Group, Inc.,* 500 So. 2d 249 (Fla. 4th Dist. Ct. App. 1986) and *Rosen v. Marlin,* 486 So. 2d 623 (Fla. 3d Dist. Ct. App.), *rev. denied,* 494 So. 2d 1151 (Fla. 1986)). Further, for money to be the object of conversion, "there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. 3d Dist. Ct. App. 2008) (citations and quotations omitted); *see also Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970) (explaining that valid claims for conversion existed where a sum of money in a sealed envelope was misdelivered and where a specified sum of money in a deposit bag was never credited to the depositor's account). In other words, if a "defendant is not required to pay the plaintiff the identical moneys which he collected there can be no action in tort for conversion." *Belford*, 243 So. 2d at 648 (citation omitted).

Plaintiffs allege they invested money in Pulse in exchange for shares of Pulse, and in some cases loaned money to Pulse. In each case, as the Complaint admits, the expectation was not that

the money would be held separate and untouched, but that Pulse would *spend* the money (working capital). (*See* Compl. ¶ 58 (money "was to be used for developing the Michael Jackson Project"); *id.* ¶ 72 (money "would be used primarily for developing the Michael Jackson Project" and the Elvis Project); *id.* ¶ 92 (money "would be used primarily for continuing to finance specific Pulse business expenses relating to the Michael Jackson Project and Elvis Project"); *id.* ¶ 113 (money "would be used primarily for continuing to finance specific Pulse business expenses relating to the Michael Jackson Project and Elvis Project"); *id.* ¶ 132 (money "would be used solely and exclusively for continuing to finance Pulse's legitimate business-related expenses relating to the Elvis Project"); *id.* ¶ 151 (money "would be used solely and exclusively for financing specific Pulse business expenses"); *id.* ¶ 164 (money "would be used solely and exclusively for financing specific Pulse business expenses").  Those monies were properly deposited into Pulse's corporate accounts.  At that point, Plaintiffs did not have "possession of the property, or an immediate right to the property."  *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So.2d 490, 495 (Fla. 3d DCA 1994) (quoting *Scherer v. Labors Int'l Union*, 746 F. Supp. 73, 84 (N.D. Fla. 1988) ("In order to maintain an action for conversion, one must have possession of the property or an immediate right to the property.")).  The shares of Pulse were delivered to Plaintiffs as consideration for the investments, and the loans simply required repayment by Pulse.

Notably, Pulse was not required to hold the specific money in, for example, an escrow account for a third party, where those specific funds would not be touched.  Rather, even Plaintiffs concede that the investments and loans envisioned that the invested and loaned monies were working capital to be *spent* by Pulse.  Pulse in turn took on the obligation to repay the loaned money.  Any failure to do so (if not excused) would be a breach of the loan agreement (if it is valid), not a conversion of a chattel.  Plaintiffs' conversion claim therefore fails as a matter of law.

## VIII.   Plaintiffs' Claim For Civil Theft (Count 6) Fails As A Matter Of Law.

Closely related to Plaintiffs' claim for conversion is the claim for civil theft, which also fails as a matter of law.  "To establish a claim for civil theft, a party must prove that a conversion has taken place, and that the accused party acted with criminal intent."  *Gasparini*, 972 So. 2d at 1056 (citing *Gersh v. Cofman*, 769 So. 407, 408 (Fla. 4th DCA 2000)).  As noted above, "It is well-established law in Florida that a simple debt which can be discharged by the payment of money cannot generally form the basis of a claim for conversion or civil theft."  *Gasparini*, 972 So. 2d at 1055 (citations omitted).  For money to be the object of a claim for conversion or civil

theft, there must be an obligation to "keep intact or deliver the specific money in question, so that the money can be identified." *Id.* at 1056 (quotations and citations omitted).  As discussed above, this is plainly inapplicable to the money at issue here, which was delivered to Pulse in order to be spent, and which (in the case of the loans) at most gave rise to an obligation to repay those loans. For these reasons, Plaintiffs' claim for civil theft also must be dismissed.

**IX.   Plaintiffs' FDTUPA Claim (Count 7) Fails As A Matter Of Law.**

Plaintiffs' claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") fails as a matter of law.  Securities transactions are not covered under the FDUTPA and Plaintiffs' claims should therefore be dismissed.

The FDUTPA, like most state unfair competition laws, is largely modeled after Section 5 of the Federal Trade Commission Act ("FTC Act").  Indeed, the FDUTPA explicitly instructs that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to" Section 5(a)(1) of the FTC Act.  Fla. Stat. § 501.204(2).

"The FTC Act has been consistently 'interpreted to preclude coverage of securities claims' in the overwhelming majority of state and federal courts addressing this issue." *Crowell v. Morgan, Stanley, Dean Witter Servs*., 87 F. Supp. 2d 1287, 1294 (S.D. Fla. 2000) (quoting *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir.1988)).  In *Crowell*, the Court dismissed the FDUTPA claims related to securities transactions.  "This Court believes that the Florida Supreme Court, if confronted with the question whether the [FDUTPA] applies to claims arising from securities transactions, would hold that it does not." *Id.* at 1295.  Subsequent to *Crowell*, the Northern District of Florida relied on the statutory language of the FDUTPA similarly to conclude that securities claims do not give rise to claims under the FDUTPA: "This provision indicates that the FDUTPA should be interpreted consistently with the FTC Act, which has been held inapplicable to securities claims." *Rogers v. Cisco Systems, Inc*., 268 F. Supp. 2d 1305, 1315–17 (N.D. Fla. 2003) (dismissing claims under FDTUPA that Plaintiffs retained their securities based on alleged fraudulent statements).  The other courts that have addressed the applicability of FDUTPA to securities transactions have followed *Rogers* and *Crowell*.  *See, e.g.*, *Rogers v. Nacchio*, No. 05–60667, slip op. at * 28–29 (S.D. Fla. Jun. 5, 2006) (following *Cisco* and *Crowell* and holding that FDUTPA does not apply to securities claims).  Because Plaintiffs' claims under the FDUTPA rely on securities transactions with Pulse, this Count should be dismissed.

## X.   Plaintiffs' Claim For Civil Conspiracy (Count 9) Fails As A Matter Of Law.

Plaintiffs' claim for civil conspiracy violates the intracorporate conspiracy doctrine and should therefore be dismissed. Florida's intracorporate conspiracy doctrine "holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Energy Supreme LLC v. Supreme Energy Resources, Inc.*, Case No. 15-cv-60034-UU, 2015 WL 11198012 (S.D. Fla. Sept. 8, 2015) (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)).

Here, Plaintiffs allege repeatedly and consistently that Pulse was involved in the purported "scheme" and "fraud."  (*See, e.g.*, Compl. ¶¶ 212, 213 ("Mr. Textor, Mr. Eichenberger, and Pulse each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5.  213.  During the relevant period, these defendants (i) employed devices, schemes, and artifices to defraud . . . ."); *id.* ¶ 215 ("In furtherance of their unlawful scheme, plan, and course of conduct, Mr. Textor, Mr. Eichenberger, and Pulse fraudulently induced the Plaintiffs . . . ."); *id.* ¶ 219 ("Mr. Textor, Mr. Eichenberger, and Pulse effectuated this fraud . . . ."); *id.* ¶ 259 ("Mr. Textor, Mr. Eichenberger, and Pulse deceived the Plaintiffs . . . ").)

"[J]ust as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (citing *Dussouy,* 660 F.2d at 603 ("the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor)).  Because Plaintiffs' civil conspiracy claim violates the intracorporate conspiracy doctrine, it should be dismissed.

## XI.   Plaintiffs' Claim For An Equitable Accounting (Count 14) Fails As A Matter Of Law.

It is well-settled that under Florida law, a party seeking an equitable accounting must demonstrate that the remedy at law is inadequate.  *Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538 (11th Cir. 1990) (citing *Parliament Ins. Co. v. Hanson,* 676 F.2d 1069, 1072 (5th Cir. 1982) (applying Florida law) and *F.A. Chastain Constr., Inc. v. Pratt,* 146 So.2d 910, 913 (Fla 3rd Dist. Ct. App. 1962)); *see also Chiron v. Isram Wholesale Tours and Travel, Ltd.,* 519 So.2d 1102, 1103 (Fla. 4th DCA 1988) (dismissing complaint requesting accounting where evidentiary facts did not show inadequacy of legal remedy).

Plaintiffs plainly fail to meet this burden, alleging instead, for instance, that an equitable accounting is "necessary to determine whether the Plaintiffs' [sic] violated other contractual obligations that may give rise to additional claims in this case." (Compl. ¶ 363.)  That is not the proper test, and the remedies at law available to Plaintiffs (if they were to succeed) are plainly adequate.  "When a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy. *Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538 (11th Cir. 1990) (citing *Mary Dee's, Inc. v. Tartamella,* 492 So.2d 815, 816 (Fla. 4th Dist. Ct. App. 1986)); *see also Dairy Queen v. Wood*, 369 U.S. 469 (1962) ("A jury, under proper instructions from the court, could readily determine the recovery, if any, to be had here . . . .  The legal remedy cannot be characterized as inadequate merely because the measure of damages may necessitate a look into petitioner's business records.").  Here, where Plaintiffs have pled the breach of a handful of promissory notes, each for a specific dollar amount, it is clear that an adequate remedy exists at law.  Plaintiffs' claim for an equitable accounting should therefore be dismissed.

## CONCLUSION

For the foregoing reasons stated above, the Defendants respectfully request that the Court dismiss the complaint.


Dated:  Miami, Florida
        January 18, 2018                                    By:   /s/ Michael A. Pineiro

**CARSTEN LAW PC**                              **MARCUS NEIMAN & RASHBAUM LLP**
Eric J. Carsten (admitted *pro hac vice*)       Michael A. Pineiro
12424 Wilshire Boulevard                        Fla. Bar No. 41897
12th Floor                                      mpineiro@mnrlawfirm.com
Los Angeles, CA 90025                           2 South Biscayne Boulevard
Telephone: (424) 273-4160                       Suite 1750
ecarsten@carstenlaw.com                         Miami, Florida 33131
                                                Telephone: (305) 400-4268

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 18, 2018, the foregoing motion to dismiss was served on all counsel of record via CM/ECF.

/s/ Michael A. Pineiro