UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

HOLOTRACK VENTURES CORP.,
HOLOTRACK AG and PB INVEST
SCHWEIZ AG,

                Plaintiffs,

vs.

JOHN TEXTOR, RENE EICHENBERGER,
FRANK PATTERSON, PULSE
EVOLUTION CORPORATION and
EVOLUTION AI CORPORATION,

                Defendants.

Case No. 2:17-CV-14390

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

---

     Holotrack Ventures Corp. ("HVC"), Holotrack AG ("Holotrack") and PB Invest Schweiz

AG ("PB Invest," collectively with the other plaintiffs as the "Plaintiffs"), by and through their

attorneys, bring this First Amended Complaint (this "Complaint") against John Textor ("Textor"),

Rene Eichenberger ("Eichenberger"), Frank Patterson ("Patterson"), Evolution AI Corporation

("EAI") and Pulse Evolution Corporation ("Pulse," collectively with the other defendants as the

"Defendants"), and allege, on knowledge as to their own actions, and otherwise upon information

and belief, as follows:

### NATURE OF THE ACTION

     1.     This action is brought to remedy the Defendants' unlawful conduct in fraudulently

inducing the Plaintiffs into investing and loaning millions of dollars into the Defendants' sham

visual effects production company, Pulse, the cash proceeds of which Textor and Eichenberger

embezzled in order to fund their lavish lifestyles and the lifestyles of their friends and family.  The

remedies the Plaintiffs seek through this action include monetary relief, damages, an accounting,

and other relief specified herein.

## THE PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff HVC is a corporation, formerly known as Highlight Ventures Corporation, organized and existing under the laws of Delaware with its principal place of business in Switzerland.

3.      Plaintiff Holotrack is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

4.      Plaintiff PB Invest is a corporation, organized and existing under the laws of Switzerland with its principal place of business in Switzerland.

5.      Defendant Textor is a citizen of Florida.

6.      Defendant Eichenberger is a citizen of Switzerland.

7.      Defendant Patterson is a citizen of Georgia (United States).

8.      Defendant Pulse is a corporation, organized and existing under the laws of Nevada with its principal place of business in Florida.

9.      Defendant EAI is a corporation, organized and existing under the laws of Florida with its principal place of business in Florida.

10.     This Court has jurisdiction over the subject matter of Counts I and II of this action (violations of the Securities Exchange Act of 1934 (the "Exchange Act"), pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and has supplemental jurisdiction over the subject matter of the remaining Counts of this action pursuant to 28 U.S.C. § 1367.

11.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000 and the action is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

Specifically, as described above, the Plaintiffs are citizens of Delaware and Switzerland, and the Defendants are citizens of Florida, Nevada, Georgia (United States), and Switzerland.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as a substantial part of the acts, events, or omissions that effectuated the frauds giving rise to the claims pleaded herein occurred in this District, and Defendants Textor, Pulse and EAI maintain their respective residence and principal places of business in this District, and many of the contracts relevant to this action provide for this District as venue for litigation.

## FACTS

### I.     Facts Common to All Causes of Action

13.     Following the 2012 bankruptcy of Textor's production company, Digital Domain, and facing multiple lawsuits accusing him of defrauding Digital Domain investors out of approximately $100 million to enrich himself, Textor founded Pulse, a company listed and traded on the OTC markets in the United States, with Patterson (also formerly associated with Digital Domain) and Eichenberger.

14.     Pulse is nothing more than Textor's tool to persuade investors to invest and loan money through the lure of unique technology and related intellectual property rights.  Textor first implemented his scheme through Digital Domain, then through Pulse, and currently through his newly formed sham entity, EAI.  Once Textor bleeds a company of all its assets and essentially renders it insolvent, he creates a new entity and continues to enrich himself and his cronies, including Eichenberger.

15.     Pulse purports to produce virtual reality entertainment productions using holographic images, computer animation and visual effects.  In *actual* reality, however, Pulse was

created and/or managed as a sham entity to personally enrich Textor and Eichenberger.

16.     Over the course of Textor and Eichenberger's respective tenures as chairman and vice-chairman of Pulse's board of directors, the only visual effects Pulse produced was causing tens of millions of dollars of the Plaintiffs' and others' investments in Pulse to not-so-magically disappear.

17.     Since Pulse's founding, Textor and Eichenberger, through the use of interstate mails and wires and as described in greater detail herein, fraudulently induced investors and lenders to deposit funds into Pulse's corporate accounts, which they then either embezzled into their own personal accounts and/or transferred to companies owned or controlled by them or their families.

18.     Textor and Eichenberger were able to effectuate this fraudulent scheme by creating the illusion that Pulse operated as a legitimate virtual entertainment business when, in fact, it did not. Pulse chiefly solicited investments and borrowed money from the Plaintiffs and others promising that those funds would go towards Pulse's business operations, but then used those funds to pay themselves personally and replace old debt with new debt in order to keep the sham enterprise going.

19.     To date, Pulse has not once completed or publicly exhibited any feature-length virtual entertainment production, has never generated any earnings or cognizable revenues from its operations, has never paid any dividends to its shareholders and has never owned any cognizable assets. If Pulse had operated with a legitimate business model, it would have eventually generated some sort of operations-based revenues, let alone profits, and Textor and Eichenberger would not have had to constantly seek out new investments and loans to supposedly pay for "business expenses" and "stay in business."

20.     Simply stated, at all material times relevant hereto, Pulse was designed to operate and/or did in fact operate as Textor and Eichenberger's personal piggy bank.

***Textor and Eichenberger Set Up and Utilize Pulse's Corporate Form to Fraudulently and Unlawfully Enrich Themselves to Plaintiffs' Detriment***

21.     Textor and Eichenberger created and/or managed Pulse with the intention of effectuating their fraudulent scheme through numerous illegal and bad faith practices (the "Bad Faith Practices"), including without limitation:

a.  Using Pulse's corporate form to perpetuate a fraudulent scheme in which Textor and Eichenberger induced investors and lenders, including the Plaintiffs, to deposit cash into Pulse's corporate bank accounts based on false and misleading pretenses, which funds Textor and Eichenberger then embezzled in their own personal bank accounts through their domination and control of Pulse and abuse of Pulse's corporate form;

b.  Using Pulse's corporate form to effectuate a fraudulent scheme in which Textor and Eichenberger solicited cash investments and loans on behalf Pulse that were primarily used to pay off existing creditors (including those personal creditors of Textor and Eichenberger's whose debts were unrelated to Pulse or Pulse's business), and not to fund Pulse's business operations, thus furthering the illusion that Pulse was generating legitimate cash flow and allowing Textor and Eichenberger to continue to effectuate their scheme to fraudulently enrich themselves;

c.  Using Pulse's corporate form to enter into contractual agreements with investors and lenders, including the Plaintiffs, even though at the time these contractual

agreements were made, Textor and Eichenberger agreed with one another that they would ignore Pulse's contractual promises, along with federal and state law, whenever doing so would further their fraudulent scheme and allow them to benefit personally;

d.   Using Pulse's corporate form to enter into self-serving agreements with Textor and Eichenberger individually, entities controlled and owned by Textor and Eichenberger, and the friends and family of Textor and Eichenberger, knowing that those agreements did not further any legitimate business interest of Pulse and knowing that those transactions would actually devalue Pulse and hurt its shareholders and employees;

e.   Misappropriating Pulse's intellectual property and proprietary technology;

f.   Entering into self-serving agreements with EAI, a company incorporated and controlled by Textor, for the purported license of Pulse's intellectual property and technology to EAI, without consideration flowing from EAI to Pulse and without proper corporate authorizations for such transaction; and,

g.   Attracting investors to invest in EAI through the purported license of Pulse's intellectual property and technology, in order to continue the aforementioned fraudulent scheme.

22.   During the relevant period, and through the domination and control of Pulse, Textor and Eichenberger implemented the Bad Faith Practices by intentionally abusing their positions of power, including their positions as directors and managers, and taking advantage of Textor's

signatory power on Pulse's corporate bank accounts, to effectuate numerous improper and unlawful corporate actions (the "Corporate Abuses"), including without limitation:

    a. Concealing their fraudulent scheme from Pulse's directors and managers, other than  Patterson, and preventing Pulse's other directors and managers from discovering or disrupting their fraudulent scheme by deliberately not including those directors and managers in so-called business transactions that effectuated that fraudulent scheme;

    b. Executing so-called Pulse's "unanimous board resolutions" that were not actually unanimously approved by Pulse's board of directors;

    c. Causing Pulse to improperly, wrongfully, unlawfully, and in bad faith disburse millions of dollars in cash and equity to themselves, their friends and family, and entities owned and controlled by them, for personal, non-business purposes, which improper disbursements violated Pulse's bylaws and certain agreements entered into with the Plaintiffs, and which were neither in Pulse's best corporate interests nor in furtherance of any of Pulse's legitimate business objectives and, in fact, actually knowingly devalued Pulse and harmed Pulse's employees, shareholders, investors, and creditors  (the "Improper Disbursements"), including without limitation:

        i. cash disbursements of so-called bonuses paid to Textor and Eichenberger, which were actually unsanctioned personal payments;

        ii. cash disbursements of so-called business expenses to Textor and Eichenberger, which were actually personal expenses;

        iii. cash disbursements of approximately $900,000 in so-called business

expenses that paid for Textor's personal legal expenses;

iv.  cash disbursements of so-called business expenses that paid for the rental of office space in properties controlled by Eichenberger in Switzerland and California, which did not further a legitimate Pulse business purpose and were actually used for non-Pulse businesses and personal purposes;

v.  cash disbursements of so-called business expenses that paid the lease of Eichenberger's house in San Francisco, which was used by Eichenberger for non-Pulse business and personal purposes;

vi.  cash disbursements of so-called business expenses paid directly or indirectly to a soccer team and soccer preparatory academy, which did not further a legitimate Pulse business purpose;

vii.  cash disbursements of so-called business expenses paid to purchase medical insurance for Eichenberger's family even though he was not employed by Pulse;

viii.  equity issuances to domestic and offshore entities owned and controlled by Textor and Eichenberger individually and their friends and family, including Paul Filipe, which did not further a legitimate Pulse business purpose;

ix.  equity issuances to Textor and Eichenberger and entities controlled and owned by Textor and Eichenberger, which were not authorized to be issued nor furthered a legitimate Pulse business purpose, including without limitation the issuance of approximately 12,000,000 shares of Pulse stock to entities owned and controlled by Textor and Eichenberger in August 2016

without the required board approval.

d.   causing Pulse to increase their salaries in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs;

e.   pay themselves first while Pulse's creditors, vendors, contractors, and even employees were not being paid in due course what they were owed;

f.   causing Pulse to enter into a so-called "management option pool" agreement, in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which effectuated the improper, wrongful, and unlawful transfer and/or issuance of Pulse equity to Textor and Eichenberger;

g.   causing Pulse to employ and pay the salaries and benefits of numerous individuals who were not working on any Pulse's projects and were hired to give investors the impression that Pulse conducted legitimate business;

h.   causing Pulse to enter into various sham consulting and finder-fee agreements, in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which effectuated the improper, wrongful, and unlawful disbursement of cash and transfer and/or issuance of Pulse shares to  Textor and Eichenberger, including cash transfers in the form of bonus that they took from funds paid to Pulse by certain Chinese investors;

i.   causing Pulse to enter into "Memoranda of Understanding," in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs, which provided the so-called corporate authorization for Textor and Eichenberger to effectuate many of the Improper Disbursements;

j.   causing Pulse to disburse to them cash entrusted to it by the Plaintiffs and

earmarked for the payment of delineated business expenses;

k.   commingling Pulse's corporate assets, including corporate cash, with their personal accounts and the accounts of non-Pulse entities controlled and owned by Textor and Eichenberger and/or siphoned off said assets to the aforementioned accounts, and/or otherwise dispose of said assets at will;

l.   causing Pulse to ignore corporate formalities or otherwise abide by Pulse's bylaws and the various agreements entered into with the Plaintiffs, including without limitation failing to hold or properly notice required board of directors meetings, keep corporate minutes, vote on corporate actions requiring such votes, and maintain sufficient and accurate corporate and financial records;

m.   approving the filing of and causing Pulse to file SEC financial disclosure forms that contained knowing misrepresentations and omissions of material fact, including without limitation not disclosing (i) the fact that numerous Pulse shareholders (including those with voting rights) were entities owned or controlled by Textor and Eichenberger; (ii) the fact that Textor bankrupted Digital Domain; and (iii) the termination of Pulse's key officers, including its CFO;

n.   causing Pulse to repurchase its own common stock owned by Textor, and entities secretly controlled or owned by Textor, at grossly inflated prices, in knowing violation of Pulse's bylaws and the various agreements entered into with the Plaintiffs and with the intention of personally enriching Textor;

o.   causing Pulse to grant Textor's mother or her trust (controlled by Textor) a blanket security interest in Pulse's property without exchanging fair and adequate consideration so that Textor could indirectly establish a first-priority, secured lien

on all of Pulse's property vis-à-vis his mother;

    p.  causing Pulse to grant Textor a purported license to use Pulse's intellectual property and proprietary technology without consideration flowing from Textor to Pulse, without proper corporate authorizations for such transaction, and in knowing violation of Pulse's contractual agreements with the Plaintiffs;

    q.  causing Pulse to grant EAI a purported license to use Pulse's intellectual property and proprietary technology without consideration flowing from EAI to Pulse, without proper corporate authorizations for such transaction, and in knowing violation of Pulse's contractual agreements with the Plaintiffs.

23.    In addition to these Corporate Abuses, Textor and Eichenberger caused Pulse to covertly enter into numerous sham consulting and fee agreements (the "Sham Compensation Agreements") with each other individually, without receiving the requisite corporate approvals under Pulse's bylaws and/or its contractual agreements with the Plaintiffs, without proper consideration from them to Pulse, which were designed to enrich themselves using Pulse's corporate and Plaintiffs' funds.

24.    The Sham Compensation Agreements were designed to provide Textor and Eichenberger with a steady flow of indirect, non-salary compensation through the façade of sham consulting and advising entities in order to fund each of these individual defendants' lavish lifestyles.

25.    The specific nature and circumstances of the sham entities involved in the Sham Compensation Agreements, and the payments made thereunder, were purposefully concealed from the Plaintiffs as investors and lenders, as well as Pulse's directors and managers, other than Patterson, throughout the relevant period.

26.     The following are examples of Sham Compensation Agreements Textor and Eichenberger caused Pulse to enter into:

a.  Textor, acting on behalf of Pulse, entered into a so-called advisory agreement with Eichenberger, as president and owner of New Venture Associates, Inc. ("New Venture"), a corporation formed before Plaintiffs' investments in Pulse, under which New Venture agreed to provide to Pulse "such advisory services as agreed among the parties from time to time," and in exchange Pulse agreed to pay New Venture an unspecified fee, "as agreed from time to time," in addition to "reasonable out-of-pocket expenses."  New Venture is a company that is owned and controlled by Eichenberger and his wife and provides no legitimate business services to Pulse.

b.  Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Textor, as president and owner of Textor Ventures, Inc. ("Textor Ventures"), a corporation formed before Plaintiffs' investments in Pulse, under which Textor Ventures agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Textor Ventures an unspecified fee as well as unspecified expenses.  Textor Ventures is a company that is owned and controlled by Textor and provides no legitimate business services to Pulse.

c.  Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Eichenberger, as president and owner of Clematis Properties, Inc. ("Clematis Properties"), a corporation formed before Plaintiffs' investments in Pulse, under which Clematis Properties agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Clematis

Properties an unspecified fee as well as unspecified expenses, including the lease payments on properties rented by Eichenberger in Switzerland. Clematis Properties is a company that is owned and controlled by Eichenberger and provides no legitimate business services to Pulse.

d.  Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Eichenberger, as president and owner of Driftwood Investment Corp. ("Driftwood"), a corporation formed before all or some of Plaintiffs' investments in Pulse, under which Driftwood agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Driftwood an unspecified fee as well as unspecified expenses, including a monthly fee of approximately $42,000. Driftwood is a company that is owned and controlled by Eichenberger and provides no legitimate business services to Pulse.

e.  Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with  Eichenberger, as president and owner of (Alternative) 2 Holdings AG ("Alternative Holdings"), under which Alternative Holdings agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Alternative Holdings an unspecified fee as well as unspecified expenses. Alternative Holdings is a company that is owned and controlled by Eichenberger and provides no legitimate business services to Pulse.

f.  Textor and Eichenberger, acting on behalf of Pulse, entered into a so-called consulting agreement with Textor, as president and owner of Tradition Studios IP Acquisition LLC ("Tradition Studios"), a corporation formed before Plaintiffs'

investments in Pulse, under which Tradition Studios agreed to provide to Pulse unspecified consulting services, and in exchange Pulse agreed to pay Tradition Studios an unspecified fee as well as unspecified expenses. Tradition Studios is a company that is owned and controlled by Textor and provides no legitimate business services to Pulse.

27.     Under the guise of the Sham Compensation Agreements, Textor and Eichenberger caused Pulse to indirectly disburse to themselves, through New Venture, Textor Ventures, Clematis Properties, Driftwood, Alternative Holdings, and Tradition Studios (collectively as the "Sham Companies"), tens of millions of dollars, including Plaintiffs' money, in cash payments and stock issuances throughout the relevant period.

28.     In sum, in order to loot Pulse and embezzle Plaintiffs' money, Textor and Eichenberger used several techniques including without limitation:

    a.  Skimming from the top – investors' money came in and was taken out through Improper Disbursements;

    b.  Using investors' money to purchase, on behalf of Pulse, Pulse's shares from entities owned or controlled by Textor and Eichenberger or their families and friends;

    c.  Using investors' money to pay to themselves or to entities owned by them or their families and friends finder's fees even for investments they solicited from Pulse's investors;

    d.  Using investors' money to pay fees to Sham Companies.

29.     Textor and Eichenberger's looting of Pulse's corporate funds and assets, including Plaintiffs' money, for their own personal benefit occurred during a period in which Pulse conducted no legitimate business and generated no cognizable revenues.

*Textor and Eichenberger Victimize the Plaintiffs in Furtherance of Their Fraudulent Scheme to Use Pulse's Corporate Form to Personally Enrich Themselves*

30.     From approximately 2014 to 2017, Textor and Eichenberger fraudulently induced the Plaintiffs to make numerous cash investments in and loans to Pulse. In return, the Plaintiffs were issued Pulse securities in the form of Pulse stock and promissory notes.

31.     As specifically set forth below, Textor and Eichenberger lured the Plaintiffs into investing in and loaning money to Pulse by:

a.     misrepresenting to the Plaintiffs that, *inter alia*, Pulse was actively engaged in the production of various entertainment projects, that Pulse possessed the requisite intellectual property rights to produce and exhibit those entertainment projects, and that the Plaintiffs' investments were needed to fund Pulse's business-related expenses, such as, for instance, employees payroll, taxes, insurance, and office rent;

b.     omitting from their communications with the Plaintiffs certain material information including but not limited to, the fact that Pulse was, at all relevant times, in a precarious financial position; that Textor had a rich litigation history which included a lawsuit sounding in fraud that resulted in a stipulated judgment being entered against Textor for $10,000,000; that Textor and Eichenberger had intended to embezzle and/or misappropriate the money the Plaintiffs would be sending to Pulse; and that Pulse had omitted and/or misrepresented material facts in its SEC filings, including but not limited to, Textor's $10,000,000 judgment, the fact that Textor was involved in bankrupting Digital Domain in 2012, and the fact that Pulse had terminated its Chief Financial Officer, William Krueger ("Krueger"), on or about January 30, 2015; and

c.   concealing, at different points throughout the course of the various negotiations with the Plaintiffs, the Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements, among other material information that, had the Plaintiffs known, would have caused the Plaintiffs not to invest in or loan money to Pulse.

32.   Soon after Pulse received the proceeds of the Plaintiffs' investments and loans, Pulse breached its obligations to them by failing to use those investments and loans as expressly promised.

33.   Instead, Textor and Eichenberger converted those funds by improperly and unlawfully embezzling them to themselves individually, to friends and family, and to entities controlled or owned by them.

34.   Overall, as a result of their fraudulent scheme, Textor and Eichenberger have made millions of dollars all while intentionally starving their so-called company of money.  They have routinely, systematically, and all-too-casually used Pulse's corporate identity to personally enrich themselves, knowing that by doing so, they would be simultaneously making it impossible for Pulse to compensate its unwitting employees and pay their creditors and investors including the Plaintiffs.

## II.   The Solicitation of the Plaintiffs' Investments and Loans

35.   Textor, Eichenberg and Pulse first began targeting the Plaintiffs on January 29, 2014.  At that time, representatives of Pulse, including  Textor, Eichenberger, Patterson, and another individual, Christian Kruse, met with Jan Kollros ("Kollros") in Horgen, Switzerland, and pitched to the Plaintiffs an investment in Pulse (the "January 2014 Pitch").

36.   At that January 2014 Pitch, Textor, Eichenberger and Patterson asked Kollros to

solicit investments from others which, according to Textor, Eichenberger and Patterson, were to be used for developing a long-form, feature-length (as opposed to short-form) virtual entertainment production starring the famous deceased musical artist Michael Jackson that would be included as part of a national and worldwide touring event (the "Michael Jackson Project").

37.     Textor and Eichenberger represented to Kollros that a unique selling point for Pulse as an investment opportunity was that it possessed the current, exclusive worldwide digital likeness and virtual performance intellectual property rights to produce and exhibit the virtual Michael Jackson Project (the "Michael Jackson Rights"), and Pulse intended on using the proceeds of investments for producing the Michael Jackson Project.

38.     For example, at the January 2014 Pitch, Textor stated to Kollros, in form or substance, that "we [Pulse] own all of the virtual Michael Jackson rights," indicating in the context of the January 2014 Pitch that Pulse possessed the Michael Jackson Rights; this statement was repeated, in form or substance, by Textor and Eichenberger throughout the January 2014 Pitch.

39.     These representations were knowingly false and misleading when they were made because Textor and Eichenberger knew at that time of the January 2014 Pitch that Pulse did not possess the Michael Jackson Rights, and instead it possessed very limited rights which did not include the worldwide right to produce a long-form, feature-length production.

40.     Neither Textor nor Eichenberger intended to use, nor could they use, the proceeds of investments as promised, and actually intended to embezzle those investment proceeds to enrich themselves by later converting those investments for personal use and improperly disbursing those funds to themselves and entities controlled or owned by them.

41.     Despite participating in the January 2014 Pitch, hearing Textor's and Eichenberger's oral statements regarding the Michael Jackson Rights, and having actual

knowledge that the aforementioned oral statements contained misrepresentations and omissions of material fact, Patterson did nothing to rectify these misrepresentations and omissions and, in so doing, assisted, helped conceal, and enabled Textor and Eichenberger to mislead Kollros.

42.     On March 18, 2014, representatives of Pulse, including Textor (via Skype) and Eichenberger met with Kollros and Bernhard Burgener ("Burgener") at the office of non-party Rainbow Home Entertainment AG ("Rainbow Home") located in Pratteln, Switzerland. During that meeting, Textor and Eichenberger once again pitched the Pulse investment opportunity to Rainbow Home, of which Burgener was a representative (the "March 2014 Pitch"). Textor and Eichenberger again reiterated almost verbatim their misrepresentations already made at the January 2014 Pitch.

43.     As expected by Textor and Eichenberger, Kollros relayed those misrepresentations to a potential investor, Philipp Boehringer ("Boehringer"), a representative of PB Invest.

## II(a).   The PB Invest Investment

44.     On September 1, 2014 (the "September 2014 Pitch"), Boehringer met in-person with Eichenberger in Zurich, Switzerland. Kollros also participated in the meeting.

45.     During the meeting, Eichenberger pitched the Pulse investment opportunity to PB Invest by stating that Pulse was looking for an investment that would be used for developing the Michael Jackson Project using the Michael Jackson Rights.

46.     During the September 2014 Pitch, in order to induce PB Invest to invest in Pulse, Eichenberger, acting on Pulse's behalf, through numerous oral statements, reiterated the misrepresentations made at the January 2014 Pitch and the March 2014 Pitch concerning Michael Jackson.

47.     Eichenberger, however, omitted from the September 2014 Pitch certain issues Pulse was having with Michael Jackson's Estate at or around that time as a result of a lawsuit that had been filed before September 2014 against Pulse relating to a certain Michael Jackson hologram performance which may have prevented Pulse from then developing the Michael Jackson Project and/or using the Michael Jackson Rights all together.

48.     During the September 2014 Pitch, PB Invest made clear to Eichenberger that, in addition to Pulse's ownership of the Michael Jackson Rights and the development of the Michael Jackson Project, the immediate ability to freely trade any Pulse shares PB Invest would be issued and the receipt by PB Invest of most-favored nation participation rights, were all critical factors in PB Invest's decision to invest in Pulse.

49.     Eichenberger stated that Pulse intended on immediately registering with the SEC at least 20% of any share issued to PB Invest as to allow those shares to be freely and publicly tradeable.  Moreover, to make his pitch more attractive, Eichenberger stated that Pulse could realistically meet the financial criteria necessary to even uplist its stock to the NASDAQ exchange. Lastly, Eichenberger confirmed that Pulse would give PB Invest most favored nation participation rights with regard to the company's future investment offerings.

50.     Over the next several weeks of investment negotiations, Eichenberger repeated these false and misleading statements in oral conversations with and emails to Boehringer and/or Kollros, expecting that Kollros would relay those false and misleading statements to Boehringer:

> a.  In a September 8, 2014 email from Kollros to Eichenberger, Kollros, relaying investment-related questions from Boehringer, sought assurances from Eichenberger that Pulse's stock would be immediately registered with the SEC as to become freely tradeable. In a September 9, 2014 email response from

Eichenberger to Kollros, Eichenberger stated he was "happy to confirm" that Pulse was "immediately" registering 20% of Pulse's shares through the filing of a SEC Form S-1 and that the remaining "shares will then be registered within the coming months."

b. In a September 10, 2014 email from Kollros to Eichenberger, Kollros, again relaying investment-related questions from Boehringer, sought additional assurances from Eichenberger that Pulse's stock would be immediately registered with the SEC as to become freely tradeable, asking bluntly whether there was any risk that the Pulse shares could not be registered. In a September 10, 2014 email from Eichenberger to Kollros, Eichenberger responded that "this danger [that shares could not be registered] does not exist," and reiterated that Pulse was "immediately" registering 20% of Pulse's shares.

c. In a September 8, 2014 email from Kollros to Eichenberger, Kollros, relaying investment-related questions from Boehringer, asked Eichenberger "when would [Pulse's] switch [from the OTC] to the Nasdaq really be realistic?" In a September 9, 2014 email from Eichenberger to Kollros, Eichenberger responded that Pulse would and could realistically uplist its shares from the OTC to the NASDAQ in a process taking approximately twelve months to complete.

d. In a September 9, 2014 email to Kollros, Eichenberger again represented that Pulse intended to give PB Invest most favored nation participation rights with regard to future Pulse investment offerings. Pulse memorialized its purported intentions to give PB Invest most favored nation participation rights in a September 15, 2014 Letter Agreement executed by Pulse and PB Invest (the "September 2014 Letter

Agreement"), which stated that "PB Invest shall have the right to participate in future private sales of [Pulse's] Common stock … on terms and prices no less favorable than as offered to other third parties in such future private sales of the [Pulse's] Common Stock."

51.     The aforementioned statements regarding Pulse's registration of shares were knowingly false when made, as Eichenberger and Pulse knew at that time that Pulse had no actual intention of "immediately" registering 20% of its shares, or even registering shares "within the coming months," especially since SEC registration would bring greater regulatory scrutiny, legal liability, and disclosure requirements, all of which would have threatened to expose Textor's and Eichenberger's fraudulent scheme.

52.     For instance, Eichenberger and Pulse knew that Pulse could not realistically meet the financial criteria and did not have the required manpower and resources to uplist Pulse's stock. Eichenberger and Pulse were also aware at the time Eichenberger made the statements that Pulse was in a precarious financial position and that certain filings that were previously made by Pulse with the SEC had omitted certain required material information which may have blocked any attempt to register Pulse shares.

53.     The statements regarding Pulse's intention to give PB Invest most favored nation participation rights were also knowingly false when Eichenberger and Pulse made them. Eichenberger and Pulse knew at that time that Pulse had no intention of fully performing under the terms of the September 2014 Letter Agreement since its inception and Pulse has never given PB Invest most favored nation participation rights with regard to its subsequent Pulse investment offerings.

54.     In reliance on the aforementioned material misrepresentations, including without limitation, those pertaining to the Michael Jackson Rights and the Michael Jackson Project, PB Invest invested $451,500 in Pulse Entertainment, a privately held entity controlled by Textor which was later acquired by Pulse.

55.     In connection with PB Invest investment in Pulse Entertainment, on or about September 15, 2014, Pulse granted and delivered to PB Invest 175 convertible depository receipts. Those depository receipts were shortly thereafter converted by Pulse and were delivered to PB Invest as 756,000 shares of Pulse stock (the "PB Investment").

56.     The PB Investment was consummated in Florida, and the issuance and passing of title of these Pulse shares occurred in Florida.

57.     PB Invest would not have made the PB Investment but for its reliance upon the above-material misrepresentations. Moreover PB Invest would not have made the PB Investment had it known about the then existing or contemplated Bad Faith Practices, Improper Disbursements, Corporate Abuses and Sham Compensation Agreements.

## II(b).   *The First Holotrack Investment*

58.     Following its solicitation of the PB Investment, from the period of December 2014 through March 2015, through numerous phone calls and emails, Pulse solicited another investment of $3,720,000 from PB Invest and non-parties JR Beteiligungs Holding AG ("JR Holding"), Miralco Holding AG ("Miralco") and Rainbow Home, which eventually assigned its rights to HVC as described below (collectively the "Holotrack Investors").

59.     It was represented to the Holotrack Investors that the $3,720,000 investment "shall be used solely" for acquiring the required rights for, and producing a feature-length virtual

entertainment production starring the famous deceased musical artist Elvis Presley (the "Elvis Project").

60.     The aforementioned investment negotiations culminated with the aforementioned parties' execution, on January 15, 2015, of a "Heads of Agreement" contract (the "Holotrack HOA").

61.     Under the terms of the Holotrack HOA, the Holotrack Investors agreed to pay Pulse $3,720,000 in six monthly installments from January 2015 to June 2015, and in exchange for Holotrack Investors' investment (the "First Holotrack Investment"), Pulse agreed to grant and deliver, and did grant and deliver, to the Holotrack Investors 6,000,000 shares of Pulse stock, delivered in monthly installments of 1,000,000 shares as follows:

- 840,000 shares to JR Holding which paid $498,489;

- 1,127,000 shares to PB Invest which paid $698,920;

- 2,032,000 shares to Miralco which paid $1,261,300:

- 2,032,000 shares to Rainbow Home which paid $1,261,300.

Under the terms of the Holotrack HOA, Pulse also agreed to pledge to Holotrack Pulse's proprietary technology and intellectual property and its production partnership agreement with the estate of Elvis Presley and to transfer its place of business from Nevada to Delaware, none of which was done.  The Holotrack HOA was executed by Eichenberger and Patterson for Pulse.

62.     Plaintiffs' investment was not used "solely" to acquire the required rights and product the Elvis Project; instead, it was embezzled (in whole or in part) by Textor and Eichenberger.

63.     The contracts that effectuated the purchase, sale, issuance, and delivery of Pulse's shares as part of the First Holotrack Investment and that resulted in the parties' incurrence of

irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

64.     This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

65.     In order to further induce the Holotrack Investors to invest in Pulse, from approximately February 15, 2015 through March 5, 2015, over the phone and Skype, Textor and Eichenberger represented to representatives of the Holotrack Investors, including Burgener, that Pulse intended on implementing certain investor rights protections that would provide the Holotrack Investors with decision-making control and oversight over Pulse's business operations (the "Holotrack Investors' Rights Protections").

66.     On March 5, 2015, Pulse and the Holotrack Investors entered into an Investors' Rights Agreement (the "Holotrack IRA"), signed by Textor on behalf of Pulse, which expressly memorialized Pulse's representations regarding its intentions to implement the Holotrack Investors' Rights Protections, including without limitation:

    a.  delivery to each of the Holotrack Investors of regular financial statements documenting Pulse's income and cash flow, among other financial information;

    b.  permission to a representative of Holotrack Investors (the "Holotrack Director") to examine Pulse's books and records upon demand;

    c.  allowing a representative of the Holotrack Investors to actively serve on Pulse's board of directors;

    d.  prohibition upon Pulse to make a wide range of restricted corporate actions without first obtaining the unanimous approval of Pulse's board of directors, including the

Holotrack Director, including without limitation altering Textor and Eichenberger's cash and equity compensation, or entering into any agreement with any individual or entity that obligated Pulse to pay such entity more than $100,000, or license Pulse's technology or intellectual property, or dispose or transfer Pulse's assets;

    e.   Providing to the Holotrack Investors a right of first offer on any future securities issued or sold by Pulse.

67.     The representations described above were knowingly false and misleading when they were made because Textor and Eichenberger knew that Pulse never intended to fully perform under the Holotrack HOA and the Holotrack IRA since their inception.

68.     Textor and Eichenberger never intended to honor the Holotrack Investors' Rights Protections and actually intended on actively undermining the Holotrack Investors' Rights Protections when doing so would enable them to further their fraudulent scheme to enrich themselves.

69.     With each installment payment from the First Holotrack Investment, Pulse breached its promises to the Holotrack Investors regarding the intended uses of the investment proceeds. Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the First Holotrack Investment to themselves individually and to entities controlled and owned by Textor and Eichenberger and their friends and family, all in furtherance of their overarching fraudulent scheme.

70.     In addition, through their implementation of the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, Textor and Eichenberger repeatedly, systematically, and deliberately violated Holotrack's Investors' Rights Protections and

purposefully undermined any ability of the Holotrack Director to actively participate in the management or oversight of Pulse's so-called business operations.

71.      For example, Textor and Eichenberger entered into numerous agreements on behalf of Pulse that obligated Pulse to pay individuals and entities amounts in excess of $100,000.  They also entered into agreements that disposed of Pulse's assets which were not unanimously approved by Pulse's board of directors as required by the Holotrack IRA.

72.      The Holotrack Investors would not have entered into the Holotrack HOA or Holotrack IRA, made the First Holotrack Investment, or purchased Pulse's stock but for its reliance upon the material misrepresentations and omissions of Textor and Eichenberger and of Pulse described above.   Morover, the Holotrack Investors would not have made the First Holotrack Investment, had they known about the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disbursements and Compensation Sham Agreements.

II(c).   *The Second Holotrack Investment*

73.      As the monthly payments from the First Holotrack Investment approached completion, Pulse solicited an additional investment from the Holotrack Investors of $620,000, which, according to Textor and Eichenberger, would be used exclusively for continuing to finance specific Pulse business expenses relating to Elvis Project as identified during negotiations for the First Holotrack Investment and specified in the Holotrack HOA.

74.      In an April 7, 2015 email to Kollros and Boehringer, Eichenberger provided, via a PowerPoint presentation, an update of Pulse's progress with regards to the Elvis Project (the "April 2015 PowerPoint"), which was intended on both demonstrating that Pulse had achieved cognizable results with regards to the Elvis Project since the First Holotrack Investment and also inducing the Holotrack Investors into continuing to invest in Pulse in order to develop the Elvis Project.

75.     In that April 2015 PowerPoint, Pulse represented that it possessed the current, exclusive worldwide digital likeness and virtual performance intellectual property rights to produce and exhibit the Elvis Project by 2016 and specifically stated that it had "negotiated an exclusive, worldwide license to develop and produce a musical show that exploits the name, image and likeness of Elvis Presley, and the associated trademarks," i.e., the Elvis Project (the "Elvis Rights").

76.     The representations in the April 2015 PowerPoint regarding Pulse's purported "exclusive rights" were false and misleading when they were made because Pulse did not possess the exclusive worldwide digital likeness and virtual performance intellectual property rights to produce and exhibit the Elvis Project by 2016, and also because, to the extent that Pulse had negotiated certain limited production rights in partnership with the estate of Elvis Presley, those rights were only exclusive through May 2015, meaning that they would not have allowed for the exclusive production of the Elvis Project by Pulse through the remainder of 2015 for exhibition beginning in 2016.

77.     Moreover, in an April 22, 2015 email, Kollros asked Textor for an "update on the registration of our shares," referring to Pulse's prior representations that it would "immediately" register at least 20% of its shares and uplist those shares to the NASDAQ exchange.

78.     In two email responses on April 22, 2015, sent by Textor to Kollros and Burgener, copying Eichenberger and Patterson, Textor made false and misleading excuses for not yet registering the shares as previously stated in order to induce investments from the Holotrack Investors.  For example, Textor acknowledged that the immediate registration of Pulse's shares and uplisting to the NASDAQ exchange was "a key selling point" for the Holotrack Investors, but stated that it had not yet pursued registration and uplisting because "a significant number of

shareholders" had stated a preference that Pulse not be registered or uplisted.   Textor also stated that Pulse had not yet registered or uplisted its shares because "the expense of completing a registration of shares is significant as compared to our existing monthly budget."  Notwithstanding these excuses, Textor represented that because of the "significant step-up in business activity," the timing was ripe for share registration and uplisting and Pulse should move forward with Pulse's share registration and uplisting in the near future.

79.     The representations made by Textor in his April 22, 2015 response emails were false and misleading because Textor knew at the time that Pulse had no intention of registering its shares, "a significant number of shareholders" had not stated a preference that Pulse not be registered or uplisted, the expense of registration and uplisting was not as "significant" as represented, and that the "significant expense" was a misleading excuse to cover for the fact that Pulse did not intend on registering or uplisting its shares and/or to solicit additional payments from Plaintiffs to pay for such "significant expense".

80.     In addition, Textor knew that share registration and uplisting would likely not be possible due to his failure to disclose in previous Pulse filings with the SEC certain material information such as the Digital Domain bankruptcy which occurred while he was an officer/director of the company, Textor's rich litigation history, including a fraud litigation which resulted in a $10,000,000 judgment entered against him, and the termination of Krueger, Pulse's former CFO.

81.     Eventually, in or around June 2015, the Holotrack Investors formally created Holotrack to facilitate and manage their future joint investment in Pulse.

82.     At an in-person conference in Los Angeles on July 21-22, 2015 (the "July 2015 Conference"), Textor and Eichenberger solicited from representatives of the newly formed

Holotrack, including Burgener, an investment that, according to Textor and Eichenberger, would be used exclusively for the continuing development of the Elvis Project.

83.     At the July 2015 Conference, Textor and Eichenberger also orally reiterated to representatives of Holotrack, including Burgener, Pulse's intentions to honor the Holotrack Investors' Rights Protections, explicitly represented that Pulse would not issue, grant, or sell any additional shares in Pulse without unanimous board approval, including the approval of the Holotrack Director, and once again confirmed that the funds of the Second Holotrack Investment would be used exclusively for the Elvis Project.

84.     The representations from the July 2015 Conference were knowingly false and misleading when they were made by Textor and Eichenberger because they knew at the time that Pulse did not intend on using Holotrack's investment proceeds exclusively for the Elvis Project, and that they actually intended to embezzle Holotrack's investment proceeds (which they did), and at that time that they never intended to honor the Holotrack Investors' Rights Protections and actually intended on actively undermining the Holotrack Investors' Rights Protections.

85.     In addition, during a call on or around August 19, 2015, representatives of Holotrack asked Textor and Eichenberger to produce a chart showing the status of various production and development milestones involved in the Elvis Project ("Elvis Project Production Milestones Chart"), to determine what steps had been completed since the First Holotrack Investment and what the likely timeline of completion would be for the remainder of the Elvis Project.

86.     On or around August 20, 2015, representatives of Pulse emailed to representatives of Holotrack the Elvis Project Production Milestones Chart, which was prepared at the direction and oversight of Textor and Eichenberger.

87.     The Elvis Project Production Milestones Chart contained knowingly false and misleading statements regarding the progress that had been made by Pulse on the Elvis Project since the First Holotrack Investment, as well as the likely timeline of completion for the remainder of the Elvis Project.  For example, the Elvis Project Production Milestones Chart included line items that showed certain development and production milestones marked as "completed" or "in progress," but which were not actually completed or in progress, or the status of which was grossly exaggerated.

88.     In exchange for the Second Holotrack Investment, Pulse granted and delivered to Holotrack a promissory note in the amount of $620,000, plus interest (the "August 2015 Promissory Note"), and 1,240,000 shares of Pulse stock.

89.     The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

90.     This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

91.     Following Holotrack's payment of the Second Holotrack Investment, Textor and Eichenberger improperly and unlawfully converted and disbursed some or all of the funds derived from that investment to themselves individually and to entities controlled and owned by Textor and Eichenberger and their friends and family, all in furtherance of their overarching fraudulent scheme.

92.     In addition, Textor and Eichenberger repeatedly and systematically violated and continued to violate Holotrack's Investors' Rights Protections and purposefully undermined any

ability of the Holotrack Director to participate in the management or oversight of Pulse's so-called business operations.

93.    Holotrack would not have made the Second Holotrack Investment and purchased Pulse's stock but for its reliance upon the aforementioned material misrepresentations of Textor and Eichenberger and of Pulse.  Moreover, had Defendants disclosed to Holotrack the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disburesements and Sham Compensation Agreement, Holotrack would not have made the Second Holotrack Investment.

**II(d).   *The Third Holotrack Investment***

94.    In or around October 2015, including during in-person meetings in Zurich, Switzerland, on or around the period from October 1, 2015 through October 15, 2015 (the "October 2015 Meetings"), Pulse, through numerous oral representations by Textor and Eichenberger, solicited an additional investment of $1,000,000 from Holotrack, which, according to  Textor and Eichenberger, would be used exclusively for continuing to finance specific Pulse business expenses relating to the Elvis Project as identified during negotiations for the First and Second Holotrack Investments.

95.    The representations described above were knowingly false and misleading when they were made because Textor and Eichenberger knew at that time that Pulse did not intend on using Holotrack's investment proceeds exclusively for the Elvis Project, and that they actually intended to embezzle Holotrack's investment proceeds, which they did.

96.    At the October 2015 Meetings, Textor and Eichenberger presented an October 2015 Investor Brief on behalf of Pulse through a PowerPoint presentation (the "October 2015 PowerPoint").  The October 2015 PowerPoint represented again that a unique selling point for

Pulse as an investment opportunity was that it possessed the Michael Jackson Rights and Elvis Rights and that the Elvis Project was "coming Fall 2016."

97.     The statements made in the October 2015 PowerPoint were knowingly false and misleading when they were made because Textor and Eichenberger knew at that time that Pulse did not possess the Michael Jackson Rights and Elvis Rights and that Pulse could not produce and exhibit the Elvis Project by "Fall 2016."

98.     In addition, at the October 2015 Meetings, Textor and Eichenberger represented, through numerous oral statements to representatives of Holotrack, that as part of Pulse's share issuances to Holotrack under an October 2015 investment, Pulse intended on taking steps to file an amended certificate of designation with the Nevada Secretary of State that was substantially similar in form and substance as the certificate of designation that was filed as part of the First Holotrack Investment and that would continue to protect against the dilution of Holotrack's and the Holotrack Investors' shares.

99.     These representations were knowingly false and misleading when they were made because Textor and Eichenberger knew that they never intended to cause Pulse to file an amended certificate of designation with the Nevada Secretary of State that would continue to protect against the dilution of Holotrack's and the Holotrack Investors' shares, and in fact intended to use the filing of an amended certificate of designation to permit Pulse to, without Holotrack's approval, issue additional shares of Pulse stock.

100.     Indeed, and in a complete bait and switch, Textor and Eichenberger caused Pulse to re-write and file with the Nevada Secretary of State a completely new certificate of designation, introduced a completely new class of shares of Pulse stock, and also authorized the issuance of additional shares of Pulse stock beyond the number of shares that were agreed to be authorized by

Holotrack and Pulse, and also stripped these Plaintiffs of their investors rights, all of which was in direct opposition to Textor and Eichenberger's representations to Holotrack.

101.    Moreover, before deciding to make an additional investment in Pulse, Holotrack once again sought assurances that Pulse intended on registering and uplisting its shares as it previously represented:

    a.   In an October 13, 2015 email from Michael Bamberg ("Bamberg"), a representative of Holotrack, to Textor, Bamberg reiterated to Textor that Holotrack "needs tradeable shares," meaning that it needed Pulse to register its shares with the SEC as previously represented.   Bamberg stated that the registration of shares would be one of the "major topics" in the upcoming Holotrack investment meeting, meaning that it was a key consideration in their decision to make future investments in Pulse, and Bamberg asked Textor whether Pulse could register its shares within the next six weeks, as this was "important for [Holotrack]."

    b.   In an October 13, 2015 email response from Textor to  Bamberg and Eichenberger, in which other representatives of Holotrack were also copied, Textor represented that with Holotrack's investment, Pulse would and could file an SEC Form S-1 registration statement by November 1, 2015, and Pulse's shares would be registered and freely tradeable "just after year-end" and Pulse "will up-list to a national exchange and we are working on that every day," and that if Pulse paid "auditors, accountants, lawyers, etc., then we will keep that promise."  Lastly, in that email, Textor also reiterated representations previously made to Holotrack and PB Invest representatives, i.e. that he and  Eichenberger were some of the best equipped people to complete registration transactions with the SEC.

102.    The representations made by Textor in his October 13, 2015 email response were false and misleading because Textor knew at that time that Pulse had no intention of registering its shares, could not realistically file an SEC Form S-1 registration statement by November 1, 2015, could not realistically have its shares registered and freely tradeable "just after year-end", did not intend on uplisting its shares to a national exchange, such as NASDAQ or the NYSE, and was not working on uplisting its shares "every day."

103.    Pulse memorialized these misrepresentations in an promissory note dated October 16, 2015, in the amount of $1,000,000, plus interest, in favor of Holotrack (the "October 2015 Promissory Note"), which stated that Pulse intended on and was committed to "register eighty percent (80%) of the [shares] held by Holotrack and its affiliates with the U.S. Securities and Exchange Commission (the 'SEC'), by filing a Registration Statement on Form S-1 ('Form S-1') covering such Registrable Shares as soon as possible."

104.    Pulse knew these representations were false and misleading when they made them because Pulse had no intention, since the inception of the October 2015 Promissory Note to file an SEC Form S-1 registration statement "as soon as possible," and to use Holotrack's funds to pay "auditors, accountants, lawyers, etc."

105.    In reliance on the above misrepresentations and all relevant representations made to Plaintiffs, Holotrack paid $1,000,000 to Pulse (the "Third Holotrack Investment"). In exchange for the Third Holotrack Investment, Pulse granted and delivered to Holotrack the executed October 2015 Promissory Note and 10,760,000 shares of Pulse stock.

106.    The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

107. This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

108. Upon receiving payment from the Third Holotrack Investment, Pulse breached its promises to Holotrack regarding the intended uses of the investment proceeds since Textor and Eichenberger improperly and unlawfully converted and disbursed funds derived from the Third Holotrack Investment to themselves individually and to entities controlled and owned by them and their friends and family.

109. In addition, Textor and Eichenberger repeatedly and systematically violated and continue to violate Holotrack's Investors' Rights Protections and purposefully undermined any ability of the Holotrack Director to participate in the management or oversight of Pulse's so-called business operations.

110. Holotrack would not have made the Third Holotrack Investment but for its reliance upon the aforementioned material misrepresentations of Pulse, Textor and Eichenberger. Moreover, Holotrack would not have made the Third Holotrack Investment, had it know about the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements.

*II(e).* ***The December 2015 Investment***

111. In or around December 15, 2015, Pulse solicited an investment of $1,000,000 from non-parties Rainbow Home[1] and Miralco ($500,000 each), which, according to Textor and

---

[1] Subsequent to the December 2015 Investment, Rainbow Home irrevocably sold, conveyed, transferred, and assigned to HVC all of its shares in Pulse and all of Rainbow Home's rights, titles, and interests in and to any claim or claims of Rainbow Home against the Defendants, including all legal and equitable claims, based on, and without limitation, Rainbow Home's ownership of Pulse shares, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, the Holotrack IRA, and the December 2015 Investment.

Eichenberger, would be used solely and exclusively for continuing to finance Pulse's legitimate business-related expenses relating to the Elvis Project like those identified during negotiations for the First, Second and Third Holotrack Investments.  Pulse issues shares to these Plaintiffs.

112.    The contracts that effectuated the purchase, sale, issuance, and delivery of these Pulse shares as part of this transaction and that resulted in the parties' incurrence of irrevocable liability to carry out that transaction were negotiated, formed, and executed in the United States.

113.    This transaction was consummated in Florida, the issuance and passing of title of these Pulse shares occurred in Florida, and the transfer of money to Pulse occurred in Florida through Pulse's bank accounts in Florida.

114.    In order to induce this investment (the "December 2015 Investment"), Textor and Eichenberger, acting on Pulse's behalf, during investment negotiations in or around December 15, 2015 (the "December 2015 Meetings"), through numerous oral statements made to representatives of Rainbow Home, made the following intentional misrepresentations of material facts:

  a.   Pulse intended immediately upon receipt of the proceeds of the December 2015 Investment on granting and delivering to Rainbow Home a promissory note in the amount of $500,000, plus interest (as well as a promissory note to Miralco);

  b.   Pulse needed an emergency cash infusion in order to pay its employees before the Christmas holiday;

  c.   Pulse intended on using the proceeds of the December 2015 Investment solely and exclusively to cover employee payroll before Christmas, in furtherance of the continued development of the Elvis Project, as previously represented during negotiations for the First, Second and Third Holotrack Investments.

115.     The representations described above were knowingly false and misleading when they were made because Textor and Eichenberger knew that they never intended on immediately granting and delivering to Rainbow Home a promissory note, and on using the investment proceeds of the December 2015 Investment solely and exclusively to pay emergency wages to its employees in advance of the Christmas holiday, and actually intended to embezzle some or all of those investment proceeds, which they did.

116.     For example, on the very same day that Rainbow wired its $500,000 to Pulse, Textor embezzled nearly $40,000 in cash to his own personal accounts, cash which had been entrusted to Pulse and earmarked for purported emergency Christmas holiday payments to Pulse's employee payroll.

117.     In addition, Textor and Eichenberger caused Pulse not to grant and deliver to Rainbow Home the promised promissory note.

118.     Instead, Textor and Eichenberger caused Pulse to execute an executive producer's agreement with a representative of Rainbow Home in conjunction with the Elvis Project (the "Sham Elvis Producer's Agreement"), albeit without Rainbow Home's consent or signature, as supposed substitute consideration for the December 2015 Loan and then used that Sham Elvis Producer's Agreement as a false basis to prevent Pulse from immediately granting and delivering to Rainbow Home the promised promissory note.

119.     Further, and less than two weeks after Pulse received the proceeds of the December 2015 Investment (in the total amount of $1,000,000 when considering Miralco's investment), Textor and Eichenberger entered into a January 1, 2016 Memorandum of Understanding, which purported to authorize Pulse's execution of the Sham Elvis Producer's Agreement and also purported to authorize (1) Pulse's payments of $100,000 in new bonuses to   Textor and

Eichenberger, (2) Pulse's increase in Textor and Eichenberger salaries by $300,000, (3) Pulse's payments of Textor and Eichenberger's so-called business expenses in the amount of approximately $200,000, and (4) Pulse's use of 10,000,000 shares of Pulse stock as a so-called "management option pool," among other things.

120.    Rainbow Home justifiably and reasonably relied upon all of Pulse's misrepresentations of material fact described above, in deciding to make the December 2015 Investment. Rainbow Home would not have purchased Pulse's stock but for its reliance upon those material misrepresentations, including without limitation the representations made in connection with the First, Second and Third Holotrack Investments. Moreover, Rainbow Home would not have made this investment, had it known about the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements.

## II(f).    *The September 2016 Loan*

121.    In or around September 2016, Pulse solicited a loan of $1,050,000 from HVC ($350,000), PB Invest ($350,000), and Miralco ($350,000), which, according to Textor and Eichenberger, would be used solely and exclusively for financing specific Pulse business expenses.

122.    In exchange for HVC, PB Invest, and Miralco's investment of $1,050,000 in Pulse (the "September 2016 Loan"), Pulse granted and delivered to HVC, PB Invest, and Miralco a promissory note, dated September 28, 2016, in the amount of $1,050,000, plus interest (the "September 2016 Promissory Note").

123.    In order to induce HVC and PB Invest into making the September 2016 Loan, Pulse, through numerous oral and written statements by Textor and Eichenberger, made intentional misrepresentations of material facts to HVC and PB Invest that Pulse intended on using the

proceeds of the September 2016 Loan solely and exclusively for financing specific business expenses, including employee salaries, payroll taxes, insurance, office rent, and delineated development expenses.

124.    For instance, in a September 22, 2016 email to Burgener, a representative of HVC at the time, Textor represented that the proceeds of the 2016 Loan would be "exclusively" used for "immediate payroll and selected other most urgent obligations of the company."

125.    Pulse's representations regarding the intended use of the proceeds from the September 2016 Loan were also explicitly communicated through and memorialized in the September 2016 Promissory Note, which was signed by Textor and Eichenberger on behalf of Pulse.

126.    Specifically, the September 2016 Promissory Note stated that the $1,050,000 proceeds from the September 2016 Loan were earmarked for specific expenses in specific amounts.

127.    These representations were knowingly false when they were made because Textor and Eichenberger actually intended to use the proceeds of the September 2016 Loan to personally enrich themselves by breaching their promises regarding how those funds would be used and thereafter converting those entrusted and earmarked funds for personal use and improperly disbursing those funds to themselves and entities controlled and owned by them and their friends and family.

128.    Indeed, soon after the September 2016 Loan was made, Pulse breached its promises regarding the intended use of the loan proceeds since Textor and Eichenberger improperly and unlawfully disbursed the entrusted and earmarked funds derived from the September 2016 Loan to themselves and entities controlled and owned by them and their friends and family.

129.   HVC and PB Invest justifiably and reasonably relied upon Pulse's misrepresentations in deciding to make the September 2016 Loan.  HVC and PB Invest would not have loaned Pulse money but for their reliance upon the material misrepresentations of Textor and Eichenberger and of Pulse.   Moreover, these Plaintiffs would not have made this loan, had they know about the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disburesements and Sham Compensation Agreements.

### II(g).   *The March 2017 Secured Loan*

130.   In or around March 2017, Pulse solicited a loan of $600,000 from PB Invest, which, according to Textor, would be used solely and exclusively to keep financing specific Pulse business expenses.

131.   In order to further induce PB Invest into making yet another payment to Pulse, Pulse, by and through its agents, including  Textor, during investment negotiations in or around the period from February 20, 2017 through March 2, 2017, through oral and written statements, offered to PB Invest Pulse collateral, which included among other things Pulse's proprietary technology and intellectual property, and which, according to Textor, was free and clear of any existing security interests, liens, or charges, to secure this loan.

132.   In reliance on the aforementioned representations, PB Invest loaned $600,000 to Pulse (the "March 2017 Secured Loan") and, in exchange, Pulse granted and delivered to PB Invest a secured promissory note, dated March 2, 2017, in the amount of $600,000, plus interest (the "March 2017 Promissory Note").  Simultaneously, Pulse also entered into a security agreement with PB Invest dated March 2, 2017 (the "March 2017 Security Agreement"), under which Pulse granted to PB Invest a security interest in Pulse's property.

133.    Pulse's representations regarding the free and clear status of the Pulse collateral were explicitly communicated through and memorialized in the March 2017 Security Agreement, which was signed by Textor on behalf of Pulse.

134.    Through the March 2017 Security Agreement, Textor also represented that Pulse intended to "do all acts that may be reasonably necessary to maintain, preserve, and protect the collateral."

135.    These representations were knowingly false when they were made because, at the time those representations were made, the Pulse collateral used to secure the March 2017 Secured Loan was not free and clear of any existing security interests, liens, or charges, and instead was encumbered by a security interest granted by Pulse to Textor's mother or her trust (which upon information he controls) in 2014 as part of a sham transaction and while Pulse was insolvent and unable to make payroll.  In addition,  Textor knew at the time he entered into the March 2017 Security Agreement that Pulse did not intend on taking steps to "maintain, preserve, and protect the collateral" since the inception of that agreement.

136.    In March 2017, either prior to or immediately after the March 2017 Loan was made, Textor licensed to himself, without the requisite corporate authorization under Pulse's by-laws or the Holotrack IRA and without the payment of fair consideration, the very collateral that he had agreed to "maintain, preserve, and protect."

137.    PB Invest justifiably and reasonably relied upon Pulse's misrepresentations and omissions of material fact, described above, in deciding to make the March 2017 Secured Loan.

138.    PB Invest would not have loaned Pulse money but for its reliance upon the aforementioned material misrepresentations.   Moreover, PB Invest would not have made this loan

had it known about the then existing or contemplated Bad Faith Practices, Corporate Abuses, Improper Disburesements and Sham Compensation Agreements.

139.    None of the above Pulse Promissory Notes has been satisfied notwithstanding Plaintiffs' respective demands for payment after the relevant maturity dates.

### III.    Plaintiffs' Discovery of the Facts Underlying Defendants' Fraudulent Scheme

140.    Thereafter, Pulse solicited the Plaintiffs to make additional investments.

141.    As part of that solicitation, Grant Murray ("Murray"), a financial consultant acting on behalf of Pulse, provided representatives of PB Invest remote access to a Pulse-hosted internet account holding certain due diligence documents for the Plaintiffs' review.

142.    As instructed by Murray, representatives of PB Invest accessed and saved those due diligence documents and thereafter began reviewing them.

143.    During the course of this review, representatives of PB Invest discovered documents showing certain previously unknown financial transactions made by and between Pulse and Textor and Eichenberger, including many of the internal documents evidencing the Improper Disbursements and Sham Compensation Agreements.

144.    In addition, in late-March 2017, representatives of Plaintiffs visited Pulse's office in California to meet with employees and tour the studio facilities in order to learn more about the status of Pulse's business operations in light of the newly discovered documentation (the "March 2017 Meeting").

145.    The March 2017 Meeting was a complete eye-opener for the representatives of the Plaintiffs who attended, as it revealed a number of troubling facts concerning Pulse's so-called business operations as conveyed directly by Pulse's employees.

146.    During the March 2017 Meeting, these Pulse employees described that Pulse had

not provided them with any concrete orders regarding the development and production of any feature-length virtual entertainment project.

147.    These employees also stated that Pulse had not paid its employees' salaries for the past several months.

148.    It became clear that Textor and Eichenberger were apparently using Pulse's corporate form to enrich themselves at the expense of their employees, investors, and creditors.

149.    After meeting with the Pulse employees, representatives of the Plaintiffs directly confronted Textor about his and Eichenberger's looting of the company, to which Textor made nonsensical excuses for his clearly inexcusable actions.

150.    For instance, representatives of the Plaintiffs showed Textor the January 2016 Memorandum of Understanding, which authorized numerous unsanctioned bonuses and payments in violation of Pulse's by-laws and the Holotrack IRA.   Textor justified the payments made to him under the January 2016 Memorandum of Understanding by saying "if Eichenberger is getting paid, so should I."   Textor admitted taking some of Plaintiffs' money and donating same to a soccer academy and without any Pulse-related-business-reason.

151.    Only after conducting a diligent review of the Pulse financial documents obtained following the PB Investment and fully analyzing this newly discovered information within the context of Pulse's continued lack of progress in the Michael Jackson Project, Elvis Project, and other supposed business projects, were the Plaintiffs able to discover the facts underlying the continuous fraudulent scheme described in this Complaint.

152.    On August 31, 2017, Pulse filed a "Form 15" with the SEC suspending its duty to publicly file reports concerning its business activities.

IV.    **Textor Incorporates EAI to Further Loot Pulse and Victimize Unwitting Investors**

153.    After the fraudulent scheme was exposed to the Plaintiffs and Pulse suspended its public filing requirements with the SEC, on October 31, 2017, Textor incorporated EAI.

154.    In or around November 2017, Textor transferred or licensed, or caused Pulse to transfer or license, Pulse's proprietary technology and intellectual property to EAI (the "EAI Transfer") without any consideration flowing from EAI to Pulse, leaving Pulse, a moribund entity, with no real assets and effectively rendering Pulse completely insolvent and unable to pay its creditors, including Plaintiffs.

155.    The transfer of Pulse's proprietary technology and intellectual property to EAI was not approved by Pulse's board of directors.

156.    The transfer is in violation of Pulse's by-laws, the Holotrack IRA, the Holotrack Investors' Rights Protections, and the March 2017 Security Agreement.

157.    Textor has solicited and continues as of the date of the filing of this Complaint to solicit investments in EAI under the false pretense that EAI has a valid license in Pulse's proprietary technology and intellectual property.

158.    As a result of Textor's conveyance of Pulse's proprietary technology and intellectual property and his subsequent unlawful use of the same to deceive unwitting investors, the value of Pulses proprietary technology and intellectual property will be further diluted. Accordingly, the Plaintiffs have been and will continue to be irreparably harmed.

V.    **Pulse's Corporate Veil Must Be Pierced**

159.    At all relevant times, as described throughout this Complaint, namely through the acts described as the Bad Faith Practices, Corporate Abuses, Sham Compensation Agreements, and Improper Disbursements, Pulse was created and/or used as the mere instrumentality of Textor

and Eichenberger, who personally exercised complete dominance and control over Pulse and utilized Pulse's corporate form to effectuate fraudulent, unlawful, and wrongful conduct that injured the Plaintiffs.

160. Through their implementation of the Bad Faith Practices, Corporate Abuses, Sham Compensation Agreements and Improper Disbursements, and fraudulent scheme described in this Complaint, Textor and Eichenberger also breached their fiduciary duties as Pulse directors/officers.

161. Textor and Eichenberger's domination and control of Pulse was to such an extent that Pulse's purported distinct corporate form was nonexistent and Textor and Eichenberg had a unity of interest with Pulse and were, in fact, alter egos of Pulse throughout their tenure on Pulse's board of directors and even after.

162. Textor and Eichenberger had complete and unfettered control over Pulse's corporate funds and decision making, and abused Textor's unilateral authority to withdraw money and did withdraw money from Pulse's corporate account for their own personal use.

163. Textor even assigned and/or licensed Pulse's proprietary technology and intellectual property (the sole substantive assets of Pulse) to himself individually in March 2017, without receiving the unanimous approval of Pulse's board of directors as required by Pulse's by-laws, the Holotrack IRA, and the Holotrack Investors' Rights Protections, without Textor giving anything to Pulse in return, and despite the fact that such a license did not further any Pulse business purpose.

164. Textor and Eichenberger entered into contracts on behalf of Pulse without proper corporate formalities and even by-passing officers and directors of Pulse, other than Patterson. They even exercised complete and unfettered power to hire and fire Pulse's employees, consultants

and even officers, for no business reason.

165.   Textor and Eichenberger commingled and used Pulse's funds and resources for personal purposes.

166.   Textor and Eichenberger made a number of unauthorized and improper disbursements of funds and equity to themselves and to entities controlled and owned by them, including without limitation the Improper Disbursements.

167.   By way of providing one representative example of the kinds of misuses of corporate funds effectuated by Textor and Eichenberger through their domination and control of Pulse, from just January to February 2016, Textor and Eichenberger caused Pulse to disburse hundreds of thousands of dollars in cash payments to themselves individually, to the Sham Companies, and to friends and family of Textor and Eichenberger, for no legitimate Pulse business purpose and in bad faith, including without limitation the below wire transfers from Pulse's corporate bank account:

a.   On January 11, 2016, Pulse wired $45,000 to Textor's American Express account;

b.   On January 20, 2016, Pulse wired $29,166.67 to Clematis Properties, a Sham Company owned and controlled by Eichenberger;

c.   On January 26, 2016, Pulse wired $50,000 to Alternative Holdings, a Sham Company owned and controlled by Eichenberger;

d.   On January 29, 2016, Pulse wired $50,000 to Alternative Holdings, a Sham Company owned and controlled by Eichenberger;

e.   On January 29, 2016, Pulse wired $50,000 to Textor Ventures, a Sham Company owned and controlled by Textor that was incorporated by him in 2010;

f.   On February 1, 2016, Pulse wired $50,000 to Textor individually;

g.  On February 3, 2016, Pulse wired $180,000 to Dale O. Lovett,  Textor's mother; and

h.  On February 19, 2016, Pulse wired $25,000 to Textor's E*Trade Account.

168.     Textor and Eichenberger caused Pulse to make the above-listed payments over the period of January to February 2016, in addition to other payments made in 2014, 2015, 2016 and 2017, without obtaining requisite approvals from Pulse's board of directors and in violation of Pulse's by-laws, the Holotrack IRA, and the Holotrack Investors' Rights Protections, among other agreements.

169.     The personal payments described in the couple-week period above—made without any regard to corporate formalities and without any involvement of the board of directors as required by Pulse's by-laws and the Holotrack IRA—were representative of the kinds of personal payments made from Pulse's corporate bank account to Textor and Eichenberger during Textor and Eichenberger's approximately three-year tenure on Pulse's board of directors.

170.     Because of Textor and Eichenberger's fraudulent conduct, Bad Faith Practices, Corporate Abuses, Improper Disbursements Sham Compensation Agreements, Pulse was perpetually undercapitalized and essentially held no cognizable assets.

171.     Overall, Textor and Eichenberger made tens of millions of dollars in the Plaintiffs' and others' loans and investments disappear without anything to show for it, including no corporate revenue and not even one invoice for real Pulse business.

172.     Through Textor and Eichenberger's fraudulent scheme, they caused Pulse to become insolvent and unable to pay its debts, all while embezzling millions of dollars in funds that were deposited in Pulse's bank accounts.

173.     Adherence to the fiction of Pulse's corporate existence separate and apart from

Textor and Eichenberger would sanction a fraud or wrong or otherwise promote an injustice to the Plaintiffs.

174.   The Plaintiffs would be precluded from any reasonable recovery in this case for their claims against Pulse should Textor and Eichenberger not be held personally liable, because Pulse is on the brink of financial collapse and today holds no cognizable assets due to the fraudulent, unlawful, and wrongful misuse of Pulse's corporate funds and undercapitalization by Textor and Eichenberger, and transfer or disposition of Pulse's technology and intellectual property.

175.   Textor's and Eichenberger's conduct damaged and continues to damage the Plaintiffs. The Court should pierce Pulse's corporate veil because Textor and Eichenberger are liable, as alter egos of Pulse, for Pulse's fraudulent, unlawful, and wrongful conduct effectuated against the Plaintiffs.

## COUNT I
### Securities Fraud Against Defendants Textor, Eichenberger, and Pulse
### Violations of Section 10(b) of the Exchange Act
### (15 U.S.C. § 78J, Rule 10b-5, and 17 C.F.R. § 240.10b-5)

176.   The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

177.   Textor, Eichenberger, and Pulse each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5.

178.   During the relevant period described in the Facts section of this Complaint, Textor, Eichenberger, and Pulse (i) employed devices, schemes, and artifices to defraud; (ii) made knowingly untrue statements of material facts and knowingly omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and courses of business which have operated as a

fraud upon the Plaintiffs as purchasers of Pulse's securities.

179.    Textor,  Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described in the Facts section of this Complaint.

180.    In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger, and Pulse fraudulently induced the Plaintiffs to make investments in Pulse, which resulted in the purchase and sale of Pulse securities, based on knowingly false and misleading statements.

181.    In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger, and Pulse engaged in a number of Bad Faith Practices and effectuated the Improper Disbursements and made payments under the Sham Compensation Agreements, which were intended on and did indeed personally enrich Textor and Eichenberger and funded their lavish lifestyles.

182.    Textor, Eichenberger, and Pulse violated the Exchange Act Section 10(b) and Exchange Act Rule 10b-5 because, with the intent to deceive, manipulate, and/or defraud, and/or with severe recklessness, they fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, and the December 2015 Investment, all of which resulted in the purchase and sale of Pulse securities.

183.    Textor,  Eichenberger, and Pulse made the following false and misleading statements and affirmative misrepresentations of material fact upon which the Plaintiffs justifiably relied in making these investments, as described in the Facts section of this Complaint, including

those summarized in the following chart:

## Chart A

| Misrepresentation | ¶ | Nature of Statement(s) | Investment Upon Which Misrepresentation Reasonably Relied |
|---|---|---|---|
| Pulse possessed the Michael Jackson Rights necessary to produce and exhibit the Michael Jackson Project. | ¶¶36-38 | Oral statements by Textor and Eichenberger at the January 2014 Pitch | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶42 | Oral statements by Textor and Eichenberger at the March 2014 Pitch | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶¶45-47 | Oral statements by Eichenberger at the September 2014 Pitch | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶96 | October 2015 PowerPoint | Third Holotrack Investment |
| Pulse intended on using the proceeds of investments primarily for developing the Michael Jackson Project. | ¶¶36-38 | Oral statements by Textor and Eichenberger at the January 2014 Pitch | PB Investment |
| | ¶42 | Oral statements by Textor and Eichenberger at the March 2014 Pitch | PB Investment |
| | ¶¶45-47 | Oral statements by Eichenberger at the September 2014 Pitch | PB Investment |
| Pulse intended on immediately registering with the SEC at least 20% of its shares as to allow those shares to be freely and publicly tradeable | ¶49 | Oral statements by Eichenberger at the September 2014 Pitch | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶50 | Email from Eichenberger sent September 9, 2014 | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶50 | Email from Eichenberger sent September 10, 2014 | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| Pulse would and could file an SEC Form S-1 registration statement by November 1, 2015, Pulse's shares would be registered and freely tradeable "just after year-end", and all other representations made on October 13, 2015 | ¶101 | Email from Textor sent October 13, 2015 | Third Holotrack Investment |

**FIRST AMENDED COMPLAINT – 50**

| | | | |
|---|---|---|---|
| Pulse intended on and was committed to "register eighty percent (80%) of the [shares] held by Holotrack and its affiliates with the U.S. Securities and Exchange Commission (the 'SEC'), by filing a Registration Statement on Form S-1 ('Form S-1') covering such Registrable Shares as soon as possible." | ¶103 | October 2015 Promissory Note | Third Holotrack Investment |
| Pulse intended on uplisting and could realistically meet the financial criteria necessary to uplist its stock to the NASDAQ exchange | ¶49 | Oral statements by Eichenberger at the September 2014 Pitch | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶50 | Email from Eichenberger sent September 9, 2014 | PB Investment, First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶101 | Email from Textor sent October 13, 2015 | Third Holotrack Investment |
| Pulse intended on giving PB Invest most favored nation participation rights with regard to future Pulse investment offerings | ¶49 | Oral statements by Eichenberger at the September 2014 Pitch | PB Investment |
| | ¶50 | Email from Eichenberger sent September 9, 2014 | PB Investment |
| | ¶50 | Letter Agreement dated September 15, 2015 | PB Investment |
| Pulse intended on using the proceeds of an investment by Holotrack exclusively for developing the Elvis Project | ¶¶59-61 | Holotrack HOA dated January 15, 2015 | First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶82 | Oral statements by Textor and Eichenberger at the July 2015 Conference | Second Holotrack Investment, Third Holotrack Investment |
| | ¶94 | Oral statements by Textor and Eichenberger at the October 2015 Meetings | Third Holotrack Investment |
| The exhibition of the Elvis Project could realistically commence by January 2016 | ¶¶59-61 | Holotrack HOA dated January 15, 2015 | First Holotrack Investment, Second Holotrack Investment |
| The exhibition of the Elvis Project could realistically commence by Fall 2016 | ¶96 | October 2015 PowerPoint | Third Holotrack Investment |
| The Elvis Project had reached certain milestones demonstrating the steps that had been completed and its likely completion date | ¶¶86-87 | Elvis Project Production Milestones Chart sent August 20, 2015 | Second Holotrack Investment, Third Holotrack Investment |
| Pulse intended on pledging to Holotrack Pulse's proprietary technology and intellectual property | ¶61 | Holotrack HOA dated January 15, 2015 | First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |

| | | | |
|---|---|---|---|
| Pulse intended on pledging to Holotrack Pulse's production partnership agreement with the estate of Elvis Presley | ¶61 | Holotrack HOA dated January 15, 2015 | First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| Pulse intended on implementing and honoring certain investor rights protections that would provide the Holotrack Investors with decision-making control and oversight over Pulse's business operations | ¶65 | Oral and written statements by Textor and Eichenberger (phone, Skype, and email) during period February 15, 2015 through March 5, 2015 | First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶66 | Holotrack IRA dated March 5, 2015 | First Holotrack Investment, Second Holotrack Investment, Third Holotrack Investment |
| | ¶83 | Oral statements by Textor and Eichenberger at the July 2015 Conference | Second Holotrack Investment, Third Holotrack Investment |
| Pulse possessed the Elvis Rights necessary to produce and exhibit the virtual Elvis Project by 2016 | ¶¶74-75 | April 2015 PowerPoint | Second Holotrack Investment, Third Holotrack Investment |
| | ¶96 | October 2015 PowerPoint | Third Holotrack Investment |
| Pulse had not yet registered and uplisted its shares as previously represented due to the preference of a "significant number of shareholders" and relative expenses involved | ¶78 | Emails from Textor sent April 22, 2015 | Second Holotrack Investment, Third Holotrack Investment |
| Pulse intended on registering with the SEC its shares as to allow those shares to be freely and publicly tradeable | ¶78 | Emails from Textor sent April 22, 2015 | Second Holotrack Investment, Third Holotrack Investment |
| Pulse intended on taking steps to file an amended certificate of designation with the Nevada Secretary of State that was substantially similar in form and substance as the certificate of designation that was filed as part of the First Holotrack Investment and that would continue to protect against the dilution of the Holotrack Investors' shares | ¶98 | Oral statements by Textor and Eichenberger at the October 2015 Meetings | Third Holotrack Investment |
| Pulse intended on immediately, upon receipt of the proceeds of the December 2015 Investment, granting and delivering to Rainbow Home a promissory note in the amount of $500,000, plus interest | ¶114 | Oral statements by Textor and Eichenberger at the December 2015 Meetings | December 2015 Investment |
| Pulse needed an emergency cash infusion from Rainbow Home in order to pay its employees before the Christmas holiday | ¶114 | Oral statements by Textor and Eichenberger at the December 2015 Meetings | December 2015 Investment |

| Pulse intended on using the proceeds of the December 2015 Investment solely and exclusively for to cover employee payroll before Christmas, in furtherance of the continued development of the Elvis Project, as previously represented during negotiations for the First, Second, and Third Holotrack Investments | ¶114 | Oral statements by Textor and Eichenberger at the December 2015 Meetings | December 2015 Investment |

184.    In addition to these affirmative misrepresentations, Textor, Eichenberger (both acting allegedly on behalf of Pulse), and Pulse also effectuated this fraud by knowingly concealing and omitting from their oral and written communications with the Plaintiffs certain material facts, which the Plaintiffs justifiably relied upon in making these investments, including:

   a.   Textor and Eichenberger's Bad Faith Practices, and Corporate Abuses;

   b.   Textor and Eichenberger's existing and/or contemplated Improper Disbursements;

   c.   Textor and Eichenberger's existing and/or contemplated Sham Compensation Agreements;

   d.   that Textor and Eichenberger's primary purpose in soliciting these investments was so that they could thereafter embezzle the proceeds;

   e.   that Textor and Eichenberger did not intend on fully honoring the promises made to the Plaintiffs concerning the disposition of their investments in Pulse from the inception of those promises;

   f.   that Pulse had entered or was about to enter into a number of covert side-agreements with Textor and Eichenberger that would require the payment of so-called consultation and finders fees to Textor and Eichenberger, including entities controlled and owned by them, after Pulse received the proceeds of the Plaintiffs' investments and without any real consideration flowing from them to Pulse;

g.   that at all relevant times Pulse was in a precarious financial position;

h.   that Textor had a rich litigation history which included a lawsuit sounding in fraud that resulted in a stipulated judgment issued against him for $10,000,000; and,

i.   that Pulse had omitted and/or misrepresented material facts in its SEC filings, including but not limited to, Textor's $10,000,000 judgment, the fact that Textor was involved in bankrupting Digital Domain in 2012, and the fact that Pulse had terminated its Chief Financial Officer, on or about January 30, 2015.

185.   For all the investments highlighted in the Facts section of this Complaint, for which Pulse issued shares to Plaintiffs, Textor, Eichenberger and Pulse entered the investment negotiations knowing that the proceeds obtained would be used for purposes other than those represented to the Plaintiffs during those investment negotiations, and would actually be used to personally enrich Textor and Eichenberger.

186.   Textor, Eichenberger and Pulse knew that these statements and omissions of fact were materially false and misleading, because they misrepresented Textor's, Eichenberger's and Pulse's intentions in soliciting those investments from the Plaintiffs, misrepresented how the Plaintiffs' investments would be managed and controlled, misrepresented the scope of the IP rights possessed by Pulse at the time those investments were solicited, misrepresented how the Plaintiffs' investments would be disbursed and appropriated, and misrepresented Textor, Eichenberger, and Pulse's intentions in honoring Pulse's corporate formalities and protocols and their contractual agreements with the Plaintiffs.

187.   Textor, Eichenberger, and Pulse were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to use Pulse's corporate form to personally enrich Textor and Eichenberger, including their friends and family.

188.     Throughout the Plaintiffs' relationship with Textor, Eichenberger, and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse and purchase Pulse securities, and forego enforcing certain contractual rights relating to those investments, including without limitation those contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, and October 2015 Promissory Note, the Plaintiffs reasonably and justifiably relied on the statements and omissions of material fact made to them by Textor, Eichenberger and Pulse.

189.     As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages.

190.     Both the Pulse shares and contractual rights that the Plaintiffs acquired through the investments described above are worthless and, as a result, the Plaintiffs have suffered a complete loss of their entire investments as a direct and proximate result of the Defendants' fraud.

191.     This complete loss in the Plaintiffs' investment was not caused by market forces, but was rather directly and proximately caused by the false and misleading statements and overarching fraudulent scheme that induced the Plaintiff's to make their investments and purchase Pulse securities in the first place; the worthlessness of Pulse's stock and worthlessness of Pulse as a company was concealed by Textor and Eichenberger's fraudulent misrepresentations and omissions of material fact, including without limitation:

a.     concealing the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements, all of which prevented Pulse from ever generating cognizable revenues, turning a profit, or functioning as a legitimate business, thus concealing the fact that Pulse was a sham operation and that its shares were worthless;

b.   misrepresenting Pulse's possession of certain intellectual property rights relating to the production and exhibition of the Michael Jackson Project and Elvis Project, concealing the fact that Pulse would not and could not produce and exhibit those projects as represented and, therefore, that Pulse was a sham operation and that its shares were worthless;

c.   misrepresenting Pulse's intentions on using the proceeds of the Plaintiffs' investments for the production and exhibition of the Michael Jackson Project and Elvis Project, concealing the fact that Pulse would never actually complete either project and, therefore, that Pulse was a sham operation and that its shares were worthless;

d.   concealing the fact that they were embezzling the proceeds of the Plaintiffs' investments, concealing the fact that Pulse would never actually generate revenues or turn a profit and, therefore, that Pulse was a sham operation and that its shares were worthless;

e.   misrepresenting the progress and realistic completion timeline for the production and exhibition of the Elvis Project, concealing the fact that Pulse would not actually complete that project, generate revenues, or turn a profit from that project and, therefore, that its shares were worthless;

f.   misrepresenting Pulse's intentions to register the Plaintiffs' shares, concealing the fact that the Plaintiffs' shares would never be registered or become freely tradeable and, therefore, would be worthless to the Plaintiffs; and

g.   misrepresenting Pulse's intentions to honor and implement the Plaintiffs' Investors' Rights Protections, concealing the fact that Pulse would never allow the Plaintiffs

to avail themselves of the very rights that they believed their shares provided and, therefore, that the Plaintiffs' shares were actually worthless to the Plaintiffs.

192.    The Plaintiffs have been damaged by all of the foregoing, and are entitled to rescission and/or damages, in an amount to be determined at trial and to be no less than the money each Plaintiff paid to buy Pulse's shares, as well as an award of punitive damages and attorneys' fees and costs.

**COUNT II**
**Securities Fraud Against Defendants Textor and Eichenberger**
**Violations of Section 20(a) of the Exchange Act**
**(15 U.S.C. § 78T)**

193.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175, and 183 of this Complaint as if fully set forth herein.

194.    Textor and Eichenberger violated Exchange Act Section 20(a).

195.    During the relevant period as described in the Facts section of this  Complaint, Textor and  Eichenberger had the power, both direct and indirect, to control Pulse and did in fact exercise such control, and were therefore "controlling persons" within the meaning of Section 20(a) of the Exchange Act.

196.  Textor was a control person because:

a.    Textor, throughout the aforementioned relevant period, was the chairman of Pulse's Board of Directors, the highest-level position of power at Pulse;

b.    Textor was Pulse's largest individual shareholder and held a plurality of Pulse's common stock;

c.    Textor directed Pulse's operations and therefore had knowledge of, made, and caused Pulse to make the false and misleading statements and omissions disseminated to the Plaintiffs;

    d.   Textor had the power to influence and control, and did influence and control, the decision-making of Pulse, including the content and dissemination of the false and misleading statements and omissions described in the Facts section and Chart A of this Complaint;

    e.   Textor supervised and directed the day-to-day operations of Pulse;

    f.   Textor had intimate knowledge of the finances of Pulse and the financial statements prepared by Pulse, and  Textor was responsible for communicating with and addressing issues raised by Pulse's outside accountant; and

    g.   Textor implemented the Bad Faith Practices, Improper Disbursements, and fraudulent scheme described in the Facts section of this Complaint.

197.   Eichenberger was a control person because:

    a.   Eichenberger, throughout the relevant period as described in the Facts section of this Complaint, was the vice-chairman of Pulse's Board of Directors, the second-highest-level position of power at Pulse;

    b.   Eichenberger directed Pulse's operations and therefore had knowledge of, made, and caused Pulse to make the false and misleading statements and omissions disseminated to the Plaintiffs;

    c.   Eichenberger had the power to influence and control, and did influence and control, the decision-making of Pulse, including the content and dissemination of the false and misleading statements and omissions described in the Facts section and Chart A of this Complaint;

    d.   Eichenberger supervised and directed the day-to-day operations of Pulse;

    e.   Eichenberger had intimate knowledge of the finances of Pulse and the financial

statements prepared by Pulse, and Eichenberger was responsible for communicating with and addressing issues raised by Pulse's outside accountant; and

    f.   Eichenberger implemented the Bad Faith Practices, Improper Disbursements, and fraudulent scheme described in the Facts section of this Complaint.

198.    Textor and Eichenberger were also "controlling persons" within the meaning of Section 20(a) of the Exchange Act based upon their domination and control of Pulse as described in the Facts section of this Complaint.

199.    Textor and Eichenberger personally participated and aided in both inducing the Plaintiffs to make the investments and purchase Pulse securities and making the sale of Pulse securities to the Plaintiffs, through the PB Invest Investment, the First, Second and Third Holotrack Investments and the December 2015 Investment.

200.    The Plaintiffs have been damaged by Textor and Eichenberger's wrongful and fraudulent conduct through their control of Pulse, which conduct caused the Plaintiffs to invest in Pulse and purchase Pulse securities, make loans to Pulse, lose their money, and forego enforcing a number of contractual rights, including without limitation those contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, the August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, March 2017 Secured Promissory Note, and March 2017 Security Agreement.

201.    As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on Textor and Eichenberger's fraudulent statements and omissions of material fact, made as "controlling persons" of Pulse, the Plaintiffs have suffered damages.

202.    Both the Pulse shares and contractual rights that the Plaintiffs acquired through the

investments described above are worthless and, as a result, the Plaintiffs have suffered a complete loss of their entire investments as a direct and proximate result of Eichenberger and Textor's fraudulent conduct.

203.     This complete loss in the Plaintiffs' investment was not caused by market forces, but was rather directly and proximately caused by the false and misleading statements and overarching fraudulent scheme that induced the Plaintiff's to make their investments and purchase Pulse securities in the first place; the worthlessness of Pulse's stock and worthlessness of Pulse as a company was concealed by Textor and Eichenberger's fraudulent misrepresentations and omissions of material fact, including, without limitation, the misrepresentations and omissions described in the Facts section and Chart A of this Complaint.

204.     As such, Textor and Eichenberger are jointly and severally liable for all damages or losses suffered by the Plaintiffs during the relevant period described in this Count of this Complaint relating to their and Pulse's violations of the Exchange Act.

205.     The Plaintiffs have been damaged by all of the foregoing, and are entitled to rescission and/or damages, in an amount to be determined at trial and to be no less than the money each Plaintiff paid to buy Pulse's shares, as well as an award of punitive damages and attorneys' fees and costs.

## COUNT III
### Securities Fraud Against Defendants Textor, Eichenberger, and Pulse
### Violations of Florida's Securities and Investor Protection Act
### (Fla. Stat. §§ 517.011, *et seq.*)

206.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 and 183 of this Complaint as if fully set forth herein.

207.     Textor, Eichenberger, and Pulse each violated Florida's Securities and Investor Protection Act.

208.     During the relevant period described in this Complaint,  Textor, Eichenberger and Pulse, in connection with the offer, sale, and purchase of Pulse investments and securities in Florida, directly and indirectly (i) employed devices, schemes, and artifices to defraud; (ii) obtained money or property by making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a the Plaintiffs.

209.     Textor,  Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described in the Facts section and Chart A of this Complaint.

210.     In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger, and Pulse fraudulently induced the Plaintiffs to make investments in Pulse, which resulted in the purchase and sale of Pulse securities through the PB Invest Investment, the First, Second and Third Holotrack Investments and the December 2015 Investment, based on knowingly false and misleading statements, including the misrepresentations described in the Facts section and Chart A of this Complaint.

211.     In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger, and Pulse engaged in the Bad Faith Practices and the Improper Disbursements and entering into and making payments under the Sham Compensation Agreements.

212.     Textor, Eichenberger, and Pulse deceived the Plaintiffs and caused them to purchase Pulse securities in reliance on the intentionally deceptive acts and statements described in the Facts section and Chart A of this Complaint.

213.     Textor, Eichenberger, and Pulse violated Florida's Securities and Investor Protection Act because, with the intent to deceive, manipulate, and/or defraud, and/or with severe recklessness, Textor, Eichenberger, and Pulse fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack Investment, and the December 2015 Investment, all of which resulted in the purchase and sale of Pulse securities.

214.     Textor, Eichenberger, and Pulse effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for those investments, that, among other things, intentionally misrepresented how the Plaintiffs' cash investment would be spent, as described in greater detail in the Facts section and Chart A of this Complaint.

215.     The statements and omissions made by Textor and Eichenberger as described in the Facts section and Chart A of this Complaint were purportedly made on behalf of Pulse, and Textor and Eichenberger always represented that they were acting in their capacity as directors of Pulse.

216.     For all of the aforementioned investments, Textor, Eichenberger, and Pulse entered the investment negotiations knowing that the proceeds obtained would be used for purposes other than those represented to the Plaintiffs during those investment negotiations, and would actually be used to personally enrich themselves.

217.     Textor,  Eichenberger, and Pulse knew that these statements and omissions of fact were materially false and misleading, because they misrepresented their intentions in soliciting those investments from the Plaintiffs, misrepresented how the Plaintiffs' investments would be managed and controlled, misrepresented how the Plaintiffs' investments would be disbursed and appropriated, and misrepresented their intentions in honoring Pulse's corporate formalities and protocols and their agreements with the Plaintiffs.

218.    Textor, Eichenberger, and Pulse were motivated to make these statements and omissions in order to perpetuate their overarching fraudulent scheme to use Pulse's corporate form to personally enrich Textor and Eichenberger, including their friends and family.

219.    Throughout the Plaintiffs' relationship with  Textor,  Eichenberger, and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse and purchase Pulse securities, and forego enforcing certain contractual rights relating to those investments, including without limitation those contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, and October 2015 Promissory Note, the Plaintiffs reasonably and justifiable relied on the statements and omissions of material fact made to them by Textor, Eichenberger, and Pulse, as described in the Facts section and Chart A of this Complaint.

220.    As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages.

221.    The Plaintiffs have been damaged by all of the foregoing, and are entitled to rescission and/or damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

222.    Textor and Eichenberger personally participated and aided in both inducing the Plaintiffs to make the aforementioned investments and making the sale of Pulse securities to the Plaintiffs.  As such, Textor and Eichenberger are jointly and severally liable for all damages or losses suffered by the Plaintiffs relating to their and Pulse's violations of Florida's Securities and Investor Protection Act, including without limitation damages in the amount of no less than what each Plaintiff paid to buy Pulse's shares, rescission damages, punitive damages, and attorneys' fees and costs of this action.

## COUNT IV
### Fraud Against Defendants Textor, Eichenberger, and Pulse

223.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 and 183 of this Complaint as if fully set forth herein.

224.     Textor,  Eichenberger and Pulse, by acts of both omission and commission, made false and misleading statements of material facts to the Plaintiffs, which the Plaintiffs relied upon to their detriment and which caused the Plaintiffs to invest in and loan money to Pulse, lose money, and  forego  enforcing  certain  contractual  rights,  including  without  limitation  those  contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, March 2017 Secured Promissory Note, and March 2017 Security Agreement.

225.     Textor,   Eichenberger,  and  Pulse,  individually  and  in  concert,  directly  and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a  continuous  course  of  conduct  to  disseminate  false  and  misleading  information,  as  more  fully described in the Facts section and Chart A of this Complaint.

226.     In addition to the aforementioned misleading information and in furtherance of their unlawful  scheme,  plan,  and  course  of  conduct,   Textor,   Eichenberger  and  Pulse  fraudulently induced the Plaintiffs to make investments in and lend  money to Pulse based on knowingly false and misleading statements, as described in the Facts section of this Complaint, including tose summarized in Chart A and also in the following chart:

### Chart B

| Misrepresentation | ¶ | Nature of Statement(s) | Transaction Upon Which Misrepresentation Reasonably Relied |
| --- | --- | --- | --- |
| Pulse intended on using the proceeds of the September 2016 Loan solely | ¶¶121 and 123 | Oral statements by  Textor and Eichenberger during | September 2016 Loan |

| | | |
|---|---|---|
| and exclusively for financing specific Pulse's business expenses, including employee salaries, payroll taxes, insurance, office rent, and delineated development expenses | investment negotiations in September 2016 | |
| | ¶124 | Email from Textor sent September 22, 2016 | September 2016 Loan |
| | ¶¶125-126 | September 2016 Promissory Note | September 2016 Loan |
| The Pulse collateral to secure the March 2017 Secured Loan, which included among other things Pulse's proprietary technology and intellectual property, was free and clear of any existing security interests, liens, or charges | ¶131 | Oral statements by Textor during investment negotiations in or around the period from February 20, 2017 through March 2, 2017 | March 2017 Secured Loan |
| | ¶132 | March 2017 Secured Promissory Note | March 2017 Secured Loan |
| Pulse intended to "do all acts that may be reasonably necessary to maintain, preserve, and protect the collateral." | ¶134 | March 2017 Security Agreement | March 2017 Secured Loan |

227.   In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger and Pulse engaged in the Bad Faith Practices and Corporate Abuses, effectuating the Improper Disbursements and entering into and making payments under the Sham Compensation Agreements, which were intended on and did indeed personally enrich Textor and Eichenberger.

228.   In addition to these affirmative misrepresentations, Textor, Eichenberger and Pulse also effectuated this fraud by knowingly concealing and omitting from their oral and written communications with the Plaintiffs certain material facts, which the Plaintiffs justifiably relied upon in making these investments and loans, including Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements.

229.   Textor, Eichenberger and Pulse deceived the Plaintiffs and caused them to purchase and Pulse securities, make loans to Pulse, and forego enforcing certain contractual rights, in reliance on the intentionally deceptive acts, statements and through their omissions.

230.   Textor, Eichenberger and Pulse fraudulently induced the Plaintiffs to make the PB Investment, the First Holotrack Investment, the Second Holotrack Investment, the Third Holotrack

Investment, the December 2015 Investment, the September 2016 Loan, and the March 2017 Secured Loan.

231.    Textor, Eichenberger and Pulse effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for those investments, which, among other things, intentionally misrepresented how the Plaintiffs' cash investment would be spent.

232.    Textor, Eichenberger and Pulse knew that these statements and omissions of fact were materially false and misleading.

233.    Throughout the Plaintiffs' relationship withTextor,  Eichenberger and Pulse, including without limitation when the Plaintiffs decided to invest money in Pulse, loan money to Pulse, and forego enforcing certain contractual rights, including without limitation those contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, March 2017 Secured Promissory Note, and March 2017 Security Agreement, the Plaintiffs reasonably and justifiable relied on the statements and omissions of material fact made to them by Textor,  Eichenberger and Pulse.

234.    As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages. Therefore, the Plaintiffs are entitled to damages, in an amount to be determined at trial and no less than the money each Plaintiff invested in and loaned to Pulse, as well as an award of punitive damages and attorneys' fees and costs.  In addition, Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's fraudulent acts under the corporate veil piercing theories of liability discussed above.

## COUNT V
### Aiding and Abetting Fraud Against Defendant Patterson

235.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175, 183 and 226 of this Complaint as if fully set forth herein.

236.     Patterson, a director of Pulse having a fiduciary duty to Plaintiffs, had knowledge of the fraudulent scheme, Bad Faith Practices, Corporate Abuses, Sham Compensation Agreements, and Improper Disbursements committed by Textor, Eichenberger and Pulse.

237.     Patterson substantially assisted Textor, Eichenberger and Pulse in perpetuating those fraudulent and unlawful acts described herein by, among other things:

   a.   Repeatedly approving Textor and Eichenberger directorship despite knowledge of Textor and Eichenberger's fraudulent scheme;

   b.   Approving board resolutions that knowingly effectuated the Improper Disbursements;

   c.   Failing to correct or clarify Textor and Eichenberger's misrepresentations and omissions of material fact regarding the Michael Jackson Project made during the January 2014 Pitch; and

   d.   Failing to remove Textor and Eichenberger from their positions at Pulse despite his personal knowledge of the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and Sham Compensation Agreements.

238.     As a direct and proximate result of Patterson's aiding and abetting, the Plaintiffs were injured and suffered damages.  Therefore, the Plaintiffs are entitled to damages, in an amount to be determined at trial and no less than the money each Plaintiff invested in and loaned Pulse, as well as an award of punitive damages and attorneys' fees and costs.

<u>COUNT VI</u>
**Negligent Misrepresentation Against Defendant Textor, Eichenberger and Pulse**

239.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175, 183 and 226 of this Complaint as if fully set forth herein.

240.    Textor,  Eichenberger and Pulse, by acts of both omission and commission, made false and misleading statements of material facts to the Plaintiffs, which the Plaintiffs relied upon to their detriment and which caused the Plaintiffs to invest in and loan money to Pulse, lose money, and forego enforcing certain contractual rights, including without limitation those contractual rights provided for under the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, October 2015 Promissory Note, September 2016 Promissory Note, March 2017 Secured Promissory Note, and March 2017 Security Agreement.

241.    Textor,   Eichenberger and Pulse,  individually and in concert,  directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to negligently or recklessly disseminate false and misleading information, as more fully described in the Facts section and in Chart A and Chart B of this Complaint, and also negligently and recklessly concealed from the Plaintiffs the Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements.

242.    Textor and Eichenberger, including while being officers/directors of Pulse, and having fiduciary duty to Plaintiffs, and Pulse knew or should have known that these statements and omissions of fact were materially false and misleading.  Having made misrepresentations and omissions of material facts, they had a duty to disclose the whole truth to the Plaintiffs.

243.    As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these negligent misrepresentations and omissions of material fact, the Plaintiffs have suffered damages in an amount to be determined at trial and no less than what each Plaintiff invested in and

loaned to Pulse, as well as an award of attorneys' fees and costs.   In addition, Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's negligent misrepresentations under the corporate veil piercing theories of liability discussed above.

### COUNT VII
**Fraud in the Inducement of Contract**
**Against Defendants Textor, Eichenberger and Pulse**

244.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175, 183 and 226 of this Complaint as if fully set forth herein.

245.     Textor,  Eichenberger and Pulse, by acts of both omission and commission, knowingly made statements of material facts to the Plaintiffs, which the Plaintiffs relied upon to their detriment and which caused the Plaintiffs to invest in and loan to Pulse (through the PB Invest Investment, the First, Second and Third Holotrack Investments, the December 2015 Investment, the September 2016 Loan and the March 2017 Secured Loan) and enter into certain contractual agreements with Pulse, including without limitation the September 2014 Letter Agreement, Holotrack HOA, Holotrack IRA, August 2015 Promissory Note, October Promissory Note, September 2016 Promissory Note, March 2017 Secured Promissory Note and March 2017 Security Agreement.

246.     Textor, Eichenberger, and Pulse did not intend to perform under these contracts since the inception of these contracts and, to the contrary, always intended on breaching the contractual provisions therein since these contracts' formation.

247.     Textor,  Eichenberger, and Pulse, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described in the Facts section and in Chart A and Chart B of this Complaint.

248.     In furtherance of their unlawful scheme, plan, and course of conduct, Textor, Eichenberger, and Pulse fraudulently induced the Plaintiffs to enter into the aforementioned contractual agreements, loans and investments, and the Plaintiffs reasonably relied upon all of the aforementioned misrepresentations.

249.     In addition to these affirmative misrepresentations, Textor, Eichenberger, and Pulse also knowingly concealed and omitted from their oral and written communications with the Plaintiffs certain material facts, which the Plaintiffs justifiably relied upon in making these investments and loans, including the Bad Faith Practices, Corporate Abuses, Improper Disbursements and Sham Compensation Agreements.

250.     As a direct and proximate result of the Plaintiffs' reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, the Plaintiffs have suffered damages. Therefore, the Plaintiffs are entitled to damages, in an amount to be determined at trial and no less than what each Plaintiff invested in and loaned to Pulse, as well as an award of punitive damages and attorneys' fees and costs of this action.  In addition, Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's fraudulent acts under the corporate veil piercing theories of liability discussed above.

## COUNT VIII
### Violations of Florida's Civil Theft Statute
### Conversion by Defendant Pulse
### Veil Piercing Liability by Defendants Textor and Eichenberger
### (Fla. Stat. § 772.11)

251.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

252.     Textor and Eichenberger engaged in a fraudulent scheme, described in the Facts portion of this Complaint, in which they induced the Plaintiffs to deposit cash with Pulse to be

entrusted and earmarked for specific business purposes, based on knowingly false and misleading statements.

253.    Through the guise of investment contracts, Pulse, while being dominated and controlled by Textor and Eichenberger, received from the Plaintiffs the funds invested in and loaned to Pulse through the PB Invest Investment, the First, Second and Third Holotrack Investments, the December 2015 Investment, the September 2016 Loan and the March 2017 Secured Loan.  Those funds went from the Plaintiffs through Pulse into Textor's and Eichenberger's pockets, whether directly of indirectly, and/or into the pockets of their friend and family.

254.    The funds were earmarked to be used for specific business of Pulse.  Those funds were identifiable property of Plaintiffs.

255.    The Defendants converted those earmarked funds entrusted to Pulse when Pulse knowingly obtained and used, and endeavored to obtain and use, these entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both deprive Plaintiffs of their rights to and benefit from that property, and appropriate the Plaintiffs' property for Pulse's own use and for the use of other individuals and entities not entitled to that property.

256.    Pulse induced this investment with the intent to deprive Plaintiffs of their property, and Pulse disbursed these funds without the requisite authorization.  Pulse knew that it induced Plaintiffs to invest in and loan money to Pulse to pursue futile projects.

257.    Pulse's aforementioned misappropriation and conversion of Plaintiffs' funds constitutes criminal theft under Florida law in violation of Fla. Stat. § 812.014.

258.    Pulse temporarily or permanently obtained specific sums of money belonging to Plaintiffs with the intent of depriving them of their use and enjoyment of this money, in violation

of Fla. Stat. § 812.014.

259.     Therefore, Pulse violated Florida's Civil Theft Statute, Fla. Stat. § 772.11.

260.     Textor and Eichenberger are personally liable to Plaintiffs for Pulse's violations of Florida's Civil Theft Statute under the corporate veil piercing theories of liability discussed above.

261.     Plaintiffs have presented to Textor, Eichenberger and Pulse formal, written demands to obtain payment of their money and for the treble damage amount of the value of the converted property.

262.     As of the dates of the filing of this Complaint, Plaintiffs' demands for their money and the treble damage amount of the value of the converted property have gone unfulfilled.

263.     As a direct and proximate result of Textor, Eichenberger, and Pulse's actions, Plaintiffs have suffered damages.

264.     Pursuant to Florida's Civil Theft Statute, Plaintiffs are entitled to recover from Textor, Eichenberger, and Pulse three times the current monetary value in compensatory damages for which Textor, Eichenberger, and Pulse would otherwise be liable, plus the reasonable amount of attorneys' fees and costs of this action.

## COUNT IX
### Violations of Florida's Civil Theft Statute
### Conversion by Defendants Textor and Eichenberger
### (Fla. Stat. § 772.11)

265.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

266.     Textor and Eichenberger, having no contract with Plaintiffs, engaged in a fraudulent scheme, described in the Facts section of this Complaint, in which they induced the Plaintiffs to deposit cash with Pulse to be entrusted and earmarked for specific business purposes, based on knowingly false and misleading statements, after which they embezzled those entrusted

and earmarked funds.

267.   Through the guise of investment contracts, Pulse, while being dominated and controlled by Textor and Eichenberger, received from Plaintiffs funds through the PB Invest Investment, the First, Second and Third Holotrack Investments, the December 2015 Investment, the September 2016 Loan and the March 2017 Secured Loan.  Those funds went from the Plaintiffs through Pulse into Textor's and Eichenberger's pockets, whether directly of indirectly, and/or into the pockets of their friend and family.

268.   The funds were earmarked to be used for specific business of Pulse.  Those funds were identifiable property of Plaintiffs.

269.   The Defendants converted those earmarked funds entrusted to Pulse when Pulse knowingly obtained and used, and endeavored to obtain and use, these entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both deprive Plaintiffs of their rights to and benefit from that property, and appropriate the Plaintiffs' property for Pulse's own use and for the use of other individuals and entities not entitled to that property.

270.   Textor and Eichenberger induced this investment with the intent to deprive Plaintiffs of their property, and Textor and Eichenberger disbursed these funds without the requisite authorization and for the purpose of lining their pockets.

271.   Textor and Eichenberger induced Plaintiffs to invest in and loan money to Pulse, a venture that Textor and Eichenberger knew was futile at the time they solicited the aforementioned investments and loans.

272.   That was a machination on the part of Textor and Eichenberger's through which the two lined their own pockets.

273.   Textor's and Eichenberger's misappropriation, embezzlement, and conversion of

Plaintiffs' aforementioned funds constitutes criminal theft under Florida law in violation of Fla. Stat. § 812.014.

274.    Textor and Eichenberger temporarily or permanently obtained a specific sum of money belonging to the Plaintiffs with the intent of depriving them of their use and enjoyment of this money, in violation of Fla. Stat. § 812.014.

275.    Therefore, Textor and Eichenberger violated Florida's Civil Theft Statute, Fla. Stat. § 772.11.

276.    Plaintiffs have presented to Textor and Eichenberger formal, written demands to obtain payment of their money and for the treble damage amount of the value of the converted property.

277.    As of the dates of the filing of this Complaint, Plaintiffs' demands for their money and the treble damage amount of the value of the converted property have gone unfulfilled.

278.    As a direct and proximate result of Textor's and Eichenberger's actions, Plaintiffs have suffered damages.

279.    Pursuant to Florida's Civil Theft Statute, Plaintiffs are entitled to recover from Textor and Eichenberger three times the current monetary value in compensatory damages for which Textor and Eichenberger would otherwise be liable, plus the reasonable amount of attorneys' fees and costs of this action.

### COUNT X
**Common Law Conversion by Defendant Pulse**
**Veil Piercing Liability by Defendants Textor and Eichenberger**

280.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of the Complaint as if fully set forth herein.

281.    Through the guise of investment contracts, Pulse, while being dominated and

controlled by Textor and Eichenberger, received from Plaintiffs funds through the PB Invest Investment, the First, Second and Third Holotrack Investments, the December 2015 Investment, the September 2016 Loan and the March 2017 Secured Loan. Those funds went from the Plaintiffs through Pulse into Textor's and Eichenberger's pockets, whether directly of indirectly, and/or into the pockets of their friend and family.

282.     The funds were earmarked to be used for specific business of Pulse. Those funds were identifiable property of Plaintiffs.

283.     The Defendants converted those earmarked funds entrusted to Pulse when Pulse knowingly obtained and used, and endeavored to obtain and use, these entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both deprive Plaintiffs of their rights to and benefit from that property, and appropriate the Plaintiffs' property for Pulse's own use and for the use of other individuals and entities not entitled to that property.

284.     Pulse induced these investments with the intent to deprive Plaintiffs of their property, and Pulse disbursed these funds without the requisite authorization. Pulse knew it induced Plaintiffs to invest and loan for futile projects.

285.     Said misappropriation constitutes common law conversion.

286.     Textor and Eichenberger are personally liable to Plaintiffs for Pulse's conversion of Plaintiffs' property under the corporate veil piercing theories of liability discussed above.

287.     As a direct and proximate result of Textor, Eichenberger, and Pulse's actions, Plaintiffs have suffered damages in the amount each Plaintiff invested in and loaned to Pulse, which they are entitled to recover together with punitive damages, attorneys' fees and costs of this action. Plaintiffs have presented to Pulse formal, written demands for the return of the amount of the value of the converted property. As of the dates of the filing of this this Complaint, Plaintiffs'

demands have gone unfulfilled.

<u>COUNT XI</u>
**Common Law Conversion by Defendants Textor and Eichenberger**

288.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

289.    Textor and Eichenberger, having no contract with Plaintiffs, engaged in a fraudulent scheme, described in the Facts section of this Complaint, in which they induced the Plaintiffs to deposit cash with Pulse to be entrusted and earmarked for specific business purposes, based on knowingly false and misleading statements, after which they embezzled those entrusted and earmarked funds.

290.    Through the guise of investment contracts, Pulse, while being dominated and controlled by Textor and Eichenberger, received from Plaintiffs funds throught the PB Invest Investment, the First, Second and Third Holotrack Investments, the December 2015 Investment, the September 2016 Loan and the March 2017 Secured Loan.  Those funds went from the Plaintiffs through Pulse into Textor's and Eichenberger's pockets, whether directly of indirectly, and/or into the pockets of their friend and family.

291.    The funds were earmarked to be used for specific business of Pulse.  Those funds were identifiable property of Plaintiffs.

292.    The Defendants converted those earmarked funds entrusted to Pulse when Pulse knowingly obtained and used, and endeavored to obtain and use, these entrusted and earmarked funds with felonious intent, both temporarily and permanently, to both deprive Plaintiffs of their rights to and benefit from that property, and appropriate the Plaintiffs' property for Pulse's own use and for the use of other individuals and entities not entitled to that property.

293.    Textor and Eichenberger induced this investment with the intent to deprive

Plaintiffs of their property, and Textor and Eichenberger disbursed these funds to themselves without the requisite authorization.

294. Textor and Eichenberger induced Plaintiffs to invest in Pulse, a venture that Textor and Eichenberger knew was futile at the time they solicited the investments.

295. That was a machination on the part of Textor and Eichenberger's through which the two lined their own pockets.

296. Textor's and Eichenberger's aforementioned misappropriation, embezzlement, and conversion of Plaintiffs' funds constitutes common law conversion.

297. Textor and Eichenberger temporarily or permanently obtained a specific sum of money belonging to the Plaintiffs with the intent of depriving them of their use and enjoyment of their money.

298. Plaintiffs have made demands to these Defendants to obtain their funds. As of the date of this Complaint, those demands have gone unfulfilled.

299. As a direct and proximate result of Textor's and Eichenberger's actions, Plaintiffs have suffered damages and are entitled to recover the amounts each Plaintiff invested in and loaned to Pulse together with punitive damages, attorneys' fees and costs of this action.

**COUNT XII**
**Violations of Florida's Uniform Fraudulent Transfer Act (Actual Fraud)**
**Against Defendants Pulse and Textor**
**(Fla. Stat. §§ 726.101, *et seq.*)**

300. The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

301. On or around March 2, 2017, Textor caused Pulse to license and/or transfer to himself individually, or to a sham entity dominated and controlled by him, Pulse's proprietary technology and intellectual property (the "Textor Transfer").

**FIRST AMENDED COMPLAINT – 77**

302.   The Textor Transfer was effectuated through a so-called Technology License Agreement that was drafted by Textor and approved by Textor as a Pulse director.

303.   At the time of the Textor Transfer, Kollros served as the Holotrack Director pursuant to the Holotrack IRA.  Kollros was on Pulse board of directors for about 3 weeks and resigned from such position due to the fact that he was shut out of any and all decisions of Pulse board of directors.

304.   However, because of Textor's Bad Faith Practices and Corporate Abuses, Kollros was effectively shut out from in any way participating in the management of Pulse; despite repeated requests by Kollros to Textor for information regarding Pulse's business and financial dealings around the time of the Textor Transfer, Textor did not respond Kollros's emails or provide the information requested by Kollros, as also required by the Holotrack IRA.

305.   The Textor Transfer was effectuated without Kollros's consent in violation of the Holotrack Investors' Rights Protections of the Holotrack IRA and without any consideration flowing from Textor to Pulse as part of the Textor Transfer.

306.   At the time of the Textor Transfer, the Plaintiffs were and continue to be creditors of Pulse because they have numerous rights to payment by Pulse as described throughout this Complaint, including without limitation rights to payment under the August 2015 Promissory Note, the October 2015 Promissory Note, the September 2016 Promissory Note, and the March 2017 Secured Promissory Note.

307.   Pulse engaged in actual fraud pursuant to the FUFTA, Fla. Stat. § 726.105(1)(a) because the Textor Transfer was made with actual intent to hinder, delay, and defraud the Plaintiffs as Pulse's creditors.

308.   Actual intent to hinder, delay, and defraud may be demonstrated by badges of fraud

stated in the FUFTA, Fla. Stat. § 726.105(2).

309. The Textor Transfer was made with actual intent to hinder, delay, and defraud the Plaintiffs as shown by the following badges of fraud:

    a. The Textor Transfer was made to an insider, Textor, who at the time was a Pulse director and person in control of Pulse;

    b. Pulse retained possession and control of the property after it was transferred;

    c. The Textor Transfer was concealed from the Plaintiffs, even though it was made at around the same time Pulse entered into a March 2017 Security Agreement with PB Invest, in which Pulse promised to "do all acts that may be reasonably necessary to maintain, preserve, and protect the collateral" that was being transferred;

    d. The subject property of the Textor Transfer constituted substantially all of Pulse's assets;

    e. Pulse received no consideration for the Textor Transfer;

    f. Pulse was insolvent at the time of the Textor Transfer, as defined under the FUFTA, because the sum of Pulse's debts was greater than all of Pulse's assets and Pulse was generally not paying its debts as they became due; and

    g. The Textor Transfer occurred on or around the same day that Pulse incurred liability under the March 2017 Secured Loan.

310. The Textor Transfer thus constitutes actual fraud under FUFTA, Fla. Stat. § 726.105(1)(a).

311. Pursuant to the FUFTA, Fla. Stat. § 726.108, the Plaintiffs are entitled to and respectfully request damages including:

    a. Avoidance and invalidation of the Textor Transfer;

b. Monetary damages consisting of the value of any money or property received by Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) derived from the exploitation of the fraudulently transferred property that is the subject of the Textor Transfer;

c. An injunction against further disposition, transfer, or license by or to Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) of the property that is the subject of the Textor Transfer;

d. Punitive damages;

e. Costs and attorneys' fees; and

f. Any other relief the Court deems reasonable and just under the circumstances.

312.   As a direct and proximate result of these Defendants' actions, Plaintiffs suffered damages. Textor is personally liable to the Plaintiffs for Pulse's violations of the FUFTA directly and under the corporate veil piercing theories of liability discussed above.

## COUNT XIII
### Violations of Florida's Uniform Fraudulent Transfer Act (Constructive Fraud)
### Against Defendants Pulse and Textor
### (Fla. Stat. §§ 726.101, *et seq.*)

313.   The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

314.   On or around March 2, 2017, Textor caused Pulse to license and/or transfer to himself individually, or to a sham entity dominated and controlled by him, Pulse's proprietary technology and intellectual property (the "Textor Transfer").

315.   The Textor Transfer was effectuated through a so-called Technology License Agreement that was drafted by Textor and approved by Textor as a Pulse director.

FIRST AMENDED COMPLAINT – 80

316.     At the time of the Textor Transfer, Kollros served as the Holotrack Director pursuant to the Holotrack IRA.

317.     However, because of Textor's Bad Faith Practices and Corporate Abuses, Kollros was effectively shut out from in any way participating in the management of Pulse; despite repeated requests by Kollros to Textor for information regarding Pulse's business and financial dealings around the time of the Textor Transfer, Textor did not respond Kollros's emails or provide the information requested by Kollros, as also required by the Holotrack IRA.

318.     The Textor Transfer was effectuated without Kollros's consent in violation of the Holotrack Investors' Rights Protections of the Holotrack IRA and without any consideration flowing from Textor to Pulse as part of the Textor Transfer.

319.     At the time of the Textor Transfer, the Plaintiffs were and continue to be creditors of Pulse because they have numerous rights to payment by Pulse as described throughout this Complaint, including without limitation rights to payment under the August 2015 Promissory Note, the October 2015 Promissory Note, the September 2016 Promissory Note, and the March 2017 Secured Promissory Note.

320.     Pulse engaged in constructive fraud pursuant to the FUFTA, Fla. Stat. § 726.105(1)(b) because:

> a.   Pulse did not receive from  Textor any consideration for the Textor Transfer, let alone "reasonably equivalent value," and a later Separation and Advisory Agreement that incorporated by reference the earlier Textor Transfer did not even identify any consideration flowing from  Textor to Pulse for the Textor Transfer; and

> b.   Pulse was insolvent at the time of the Textor Transfer, or Pulse knew or reasonably

should have known at the time of the Textor Transfer that it was about to incur a debt, through the March 2017 Secured Loan, that it would not have been able to repay when it came due.

321.   Pulse also engaged in constructive fraud pursuant to the FUFTA, Fla. Stat. § 726.106(1) because:

    a.   The Plaintiffs' claims arose prior to the Textor Transfer;

    b.   Pulse did not receive from Textor any consideration for the Textor Transfer, let alone "reasonably equivalent value," and a later Separation and Advisory Agreement that incorporated by reference the earlier Textor Transfer did not identify any consideration flowing from Textor to Pulse for the Textor Transfer; and

    c.   Pulse was insolvent at that time of the Textor Transfer, as defined under the FUFTA, because the sum of Pulse's debts was greater than all of Pulse's assets and Pulse was generally not paying its debts as they became due.

322.   The Textor Transfer thus constitutes constructive fraud under FUFTA, Fla. Stat. §§ 726.105(1)(b) and 726.106(1).

323.   Pursuant to the FUFTA, Fla. Stat. § 726.108, the Plaintiffs are entitled to and respectfully request damages including:

    a.   Avoidance and invalidation of the Textor Transfer;

    b.   Monetary damages consisting of the value of any money or property received by Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) derived from the exploitation of the fraudulently transferred property that is the subject of the Textor Transfer;

FIRST AMENDED COMPLAINT – 82

    c.   An injunction against further disposition, transfer, or license by or to  Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) of the property that is the subject of the Textor Transfer;

    d.   Punitive damages;

    e.   Costs and attorneys' fees; and

    f.   Any other relief the Court deems reasonable and just under the circumstances.

324.    As a direct and proximate result of these Defendants' actions, Plaintiffs suffered damages.  Textor is personally liable to the Plaintiffs for Pulse's violations of the FUFTA directly and under the corporate veil piercing theories of liability discussed above.

**COUNT XIV**
**Violations of Florida's Uniform Fraudulent Transfer Act (Actual Fraud)**
**Against Defendants Pulse, Textor, and EAI**
**(Fla. Stat. §§ 726.101, *et seq.*)**

325.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

326.    EAI was incorporated by Textor on October 31, 2017.

327.    At some point around October 31, 2017, Pulse licensed and/or transferred to EAI Pulse's proprietary technology and intellectual property (the "EAI Transfer").

328.    In an EAI press release dated October 31, 2017, EAI described itself as a "licensee of Pulse Evolution technology."

329.    At the time of the EAI Transfer, an individual named Norman Hansen ("Hansen") was serving on Pulse's board of directors as the Holotrack Director pursuant to the Holotrack IRA.

330.    Hansen never heard of or voted to approve the EAI Transfer at any time during his tenure on Pulse's board of directors, despite the fact that the EAI Transfer required the unanimous

**FIRST AMENDED COMPLAINT – 83**

approval of Pulse's board of directors in accordance with the Holotrack Investors' Rights Provisions of the Holotrack IRA.

331.    At the time of the EAI Transfer, the Plaintiffs were and continue to be creditors of Pulse because they have numerous rights to payment by Pulse as described throughout this Complaint, including without limitation rights to payment under the August 2015 Promissory Note, the October 2015 Promissory Note, the September 2016 Promissory Note, and the March 2017 Secured Promissory Note.

332.    Pulse engaged in actual fraud pursuant to the FUFTA, Fla. Stat. § 726.105(1)(a) because the EAI Transfer was made with actual intent to hinder, delay, and defraud the Plaintiffs as Pulse's creditors.

333.    Actual intent to hinder, delay, and defraud may be demonstrated by badges of fraud stated in the FUFTA, Fla. Stat. § 726.105(2).

334.    The EAI Transfer was made with actual intent to hinder, delay, and defraud the Plaintiffs as shown by the following badges of fraud:

a.    The EAI Transfer was made to an entity that is the alter ego of Textor, who despite nominally leaving his directorship prior to the EAI Transfer, still controls the management of Pulse as demonstrated by his ability to effectuate the EAI Transfer without the requisite approval of Pulse's board of directors;

b.    Pulse retained possession and control of the property after it was transferred;

c.    The EAI Transfer was made overnight and concealed from Hansen, an agent of the Plaintiffs and whose approval, as Pulse's director, was required in accordance with the Holotrack IRA, and the EAI Transfer was only publicized after its execution in an effort for EAI to raise money using Pulse's misappropriate proprietary

technology and intellectual property;

d.  Before the EAI Transfer was made, the Plaintiffs threatened Pulse and Textor with suit;

e.  The subject property of the EAI Transfer constituted substantially all of Pulse's assets;

f.  Pulse received no consideration for the EAI Transfer;

g.  Pulse was insolvent at the time of the EAI Transfer, as defined under the FUFTA, because the sum of Pulse's debts was greater than all of Pulse's assets and Pulse was generally not paying its debts as they became due; and

h.  The EAI Transfer occurred shortly before this lawsuit was initiated.

335.  The EAI Transfer thus constitutes actual fraud under FUFTA, Fla. Stat. § 726.105(1)(a).

336.  Pursuant to the FUFTA, Fla. Stat. § 726.108, the Plaintiffs are entitled to and respectfully request damages including:

a.  Avoidance and invalidation of the EAI Transfer;

b.  Monetary damages consisting of the value of any money or property received by EAI (including his alter-egos, nominees, and transferees), Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) derived from the exploitation of the fraudulently transferred property that is the subject of the EAI Transfer;

c.  An injunction against further disposition, transfer, or license by or to EAI (including his alter-egos, nominees, and transferees), Textor (including his alter-egos, nominees, and transferees), or Pulse (including its alter-egos, nominees, and

transferees) of the property that is the subject of the EAI Transfer;

    d.   Punitive damages;

    e.   Costs and attorneys' fees; and

    f.   Any other relief the Court deems reasonable and just under the circumstances.

337.    As a direct and proximate result of these Defendants' actions, Plaintiffs suffered damages. Textor is personally liable to the Plaintiffs for Pulse's violations of the FUFTA directly and under the corporate veil piercing theories of liability discussed above.

**COUNT XV**
**Violations of Florida's Uniform Fraudulent Transfer Act (Constructive Fraud)**
**Against Defendants Pulse, Textor, and EAI**
**(Fla. Stat. §§ 726.101, *et seq.*)**

338.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

339.    EAI was incorporated by Textor on October 31, 2017.

340.    At some point around October 31, 2017, Pulse licensed and/or transferred to EAI Pulse's proprietary technology and intellectual property (the "EAI Transfer").

341.    In an EAI press release dated October 31, 2017, EAI described itself as a "licensee of Pulse Evolution technology."

342.    At the time of the EAI Transfer, Hansen was serving on Pulse's board of directors as the Holotrack Director pursuant to the Holotrack IRA.

343.    Hansen never heard of or voted to approve the EAI Transfer at any time during his tenure on Pulse's board of directors, despite the fact that the EAI Transfer required the unanimous approval of Pulse's board of directors in accordance with the Holotrack Investors' Rights Provisions of the Holotrack IRA.

344.    At the time of the EAI Transfer, the Plaintiffs were and continue to be creditors of

FIRST AMENDED COMPLAINT – 86

Pulse because they have numerous rights to payment by Pulse as described throughout this Complaint, including without limitation rights to payment under the August 2015 Promissory Note, the October 2015 Promissory Note, the September 2016 Promissory Note, and the March 2017 Secured Promissory Note.

345.    Pulse engaged in constructive fraud pursuant to the FUFTA, Fla. Stat. § 726.105(1)(b) because:

    a.   Pulse did not receive from EAI any consideration for the EAI Transfer, let alone "reasonably equivalent value," and  Hansen, who was the Holotrack Director serving on Pulse's board of directors at the time of the EAI Transfer had no knowledge of or approved the EAI transfer and is unaware of any consideration flowing from EAI to Pulse for anything, let alone the EAI Transfer; and

    b.   Pulse was insolvent at the time of the EAI Transfer, or Pulse knew or reasonably should have known at the time of the EAI Transfer that it was about to incur debts that it would not have been able to repay when it came due.

346.    Pulse also engaged in constructive fraud pursuant to the FUFTA, Fla. Stat. § 726.106(1) because:

    a.   The Plaintiffs' claims arose prior to the EAI Transfer;

    b.   Pulse did not receive from EAI any consideration for the EAI Transfer, let alone "reasonably equivalent value," and  Hansen, who was the Holotrack Director serving on Pulse's board of directors at the time of the EAI Transfer had no knowledge of or approved the EAI transfer and is unaware of any consideration flowing from EAI to Pulse for anything, let alone the EAI Transfer; and

    c.   Pulse was insolvent at that time of the EAI Transfer, as defined under the FUFTA,

because the sum of Pulse's debts was greater than all of Pulse's assets and Pulse was generally not paying its debts as they became due.

347.    The EAI Transfer thus constitutes constructive fraud under FUFTA, Fla. Stat. §§ 726.105(1)(b) and 726.106(1).

348.    Pursuant to the FUFTA, Fla. Stat. § 726.108, the Plaintiffs are entitled to and respectfully request damages including:

a.  Avoidance and invalidation of the EAI Transfer;

b.  Monetary damages consisting of the value of any money or property received by EAI (including his alter-egos, nominees, and transferees),  Textor (including his alter-egos, nominees, and transferees) or Pulse (including its alter-egos, nominees, and transferees) derived from the exploitation of the fraudulently transferred property that is the subject of the EAI Transfer;

c.  An injunction against further disposition, transfer, or license by or to EAI (including his alter-egos, nominees, and transferees),  Textor (including his alter-egos, nominees, and transferees), or Pulse (including its alter-egos, nominees, and transferees) of the property that is the subject of the EAI Transfer;

d.  Punitive damages;

e.  Costs and attorneys' fees; and

f.  Any other relief the Court deems reasonable and just under the circumstances.

349.    As a direct and proximate result of these Defendants' actions, Plaintiffs suffered damages.  Textor is personally liable to the Plaintiffs for Pulse's violations of the FUFTA directly and under the corporate veil piercing theories of liability discussed above.

## COUNT XVI
### Civil Conspiracy Against Defendants Textor and Eichenberger

350.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

351.     Textor and Eichenberger schemed to implement the Bad Faith Practices, Corporate Abuses, Sham Compensation Agreements, and Improper Disbursements, and use their positions of power at Pulse in order to fraudulently induce the Plaintiffs to invest and lend cash into Pulse's bank accounts, which they would then embezzle for their own personal use.

352.     Textor and Eichenberger agreed and reaffirmed their agreement to effectuate the fraudulent scheme described herein throughout their management and control of Pulse and tenure on Pulse's board of directors.

353.     In furtherance of this conspiracy, Textor and Eichenberger did numerous unlawful acts and lawful acts by unlawful means, including without limitation the Bad Faith Practices, Corporate Abuses, Improper Disbursements, and entering into and making payments under the Sham Compensation Agreements, furthered Textor and Eichenberger's conspiracy to embezzle those funds invested in and loaned to Pulse by the Plaintiffs.

354.     As a result of the Textor and Eichenberger's conspiratorial conduct, the Plaintiffs have been damaged, in an amount to be determined at trial and no less than the amounts each Plaintiff invested in and loaned to Pulse, and are entitled to an award of punitive damages and attorneys' fees and costs of this action.

## COUNT XVII
### Violations of Florida's Deceptive and Unfair Trade Practices Act Against Textor, Eichenberger and Pulse Defendants
### (Fla. Stat. §§ 501.201-501.213)

355.     The Plaintiffs HVC and PB Invest repeat, re-allege, and incorporate by reference

the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

356.    Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect consumers from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

357.    These Plaintiffs are consumers within the meaning of FDUTPA with respect to the transactions reflected in the September 2016 Loan and the March 2017 Secured Loan.

358.    These Defendants engaged in trade and commerce within the meaning of FDUTPA.

359.    While FDUTPA does not define "deceptive" and "unfair," it incorporate by reference the Federal Trade Commission's interpretations of these terms.  The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

360.    As described in the Facts section of the Complaint, these Defendants engaged in deceptive and unfair business practices that harmed these Plaintiffs.

361.    These Defendants fraudulently induced these Plaintiffs into loaning money to Pulse, by disseminating materially false and misleading statements.

362.    These Defendants furthered their fraudulent scheme by effectuating the Improper Disbursements and, in so doing, engaged in unfair and deceptive trade practices.

363.    As a result of these Defendants' improper and unlawful misconduct, the Plaintiffs have suffered damages in the amounts loaned pursuant to the September 2016 Loan and the March 2017 Secured Loan.

364.    Pursuant to FDUTPA, these Plaintiffs are entitled to recover from these Defendants damages, in an amount to be determined at trial and no less than what they loaned, and reasonable

amount of their attorneys' fees and costs of this action.

365.    Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's violations of FDUTPA under the corporate veil piercing theories of liability discussed above.

<u>COUNT XVIII</u>
**Breach of Promissory Notes Against Defendants Textor, Eichenberger, and Pulse**

366.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 43, 73 through 110 and 121 through 175 of this Complaint as if fully set forth herein.

367.    Pulse executed and delivered binding and enforceable promissory notes to the Plaintiffs, including the August 2015 Promissory Note, the October 2015 Promissory Note, the September 2016 Promissory Note, and the March 2017 Secured Promissory Note (collectively as the "Pulse Promissory Notes"), in which Pulse promised to pay the Plaintiffs certain sums of money described in those Pulse Promissory Notes.

368.    The Plaintiffs have fully performed their contractual obligations under the Pulse Promissory Notes.

369.    In accordance with their terms, each of the Pulse Promissory Notes were payable upon demand after certain dates of maturity and/or acceleration.

370.    For each of the Pulse Promissory Notes, the respective Plaintiffs and payees have presented to Textor, Eichenberger, and Pulse formal, written demands for payment in accordance with the terms of the respective Pulse Promissory Notes.

371.    As of the date of the filing of this lawsuit, the Plaintiffs' demands for payment under the Pulse Promissory Notes have gone unfulfilled.

372.    For each of the Pulse Promissory Notes, the dates of maturity and/or acceleration have passed and Pulse has failed to pay.

373.    Therefore, Pulse has breached its contractual obligations and is in default under each of the Pulse Promissory Notes.

374.    No event has occurred that excuses or otherwise absolves Pulse of its failure to pay under the Pulse Promissory Notes.

375.    As a direct and proximate result of Pulse's breaches, the Plaintiffs have suffered damages in an amount to be proven at trial and no less than what they loaned pursuant to each of the Pulse Promissory Notes, plus interests, attorneys' fees and cost of this action.

376.    In addition, Textor and Eichenberger are personally liable to the Plaintiffs for Pulse's breaches of the Pulse Promissory Notes under the corporate veil piercing theories of liability discussed above.

**COUNT XIX**
**Breach of the Holotrack IRA**
**Against Defendants Textor, Eichenberger, and Pulse**

377.    Plaintiffs Holotrack Investors repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 43, 58 through 110, and 140 through 175 of this Complaint as if fully set forth herein.

378.    On March 5, 2015, Pulse and the Holotrack Investors entered into the Holotrack IRA, a binding and valid contract, in which Pulse promised to implement and honor the Holotrack Investors' Rights Protections, among other obligations, in consideration for the First Holotrack Investment.

379.    The Holotrack Investors have fully performed their contractual obligations under the Holotrack IRA.

380.    Pulse breached the Holotrack IRA by, among other things, violating Sections 2, 3, 4, and 5 of that agreement and its contractual promises thereunder to implement and honor the

Holotrack Investors' Rights Protections as stated in the Holotrack IRA.

381.    No event has occurred that excuses or otherwise absolves Pulse of its breaches under the Holotrack IRA.

382.    As a direct and proximate result of Pulse's breaches, the Holotrack Investors have suffered damages in an amount to be determined at trial, but including without limitation attorneys' fees and costs.

383.    In addition, Textor and Eichenberger are personally liable to the Holotrack Investors for Pulse's breaches of the Holotrack IRA under the corporate veil piercing theories of liability discussed above.

**COUNT XX**
**Breach of the Holotrack HOA**
**Against Defendants Textor, Eichenberger, and Pulse**

384.    Plaintiffs Holotrack Investors repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 43, 58 through 110 and 140 through 175 of this Complaint as if fully set forth herein.

385.    On January 15, 2015, Pulse and the Holotrack Investors entered into the Holotrack HOA, a binding and valid contract, in which Pulse promised to:

     a.    Use the proceeds exclusively for developing the Elvis Project;

     b.    Pledge to Holotrack Pulse's proprietary technology and intellectual property; and

     c.    Pledge to Holotrack Pulse's production partnership agreement with the estate of Elvis Presley.

386.     In consideration for these promises, the Holotrack Investors promised to make the payments under the First Holotrack Investment.

387.    The Holotrack Investors have fully performed their contractual obligations under

the Holotrack HOA.

388.   Pulse breached the Holotrack HOA by, among other things:

a.   Failing to use the proceeds from an investment by Holotrack exclusively for developing the Elvis Project;

b.   Failing to pledge to Holotrack Pulse's proprietary technology and intellectual property; and

c.   Failing to pledge to Holotrack Pulse's production partnership agreement with the estate of Elvis Presley.

389.   No event has occurred that excuses or otherwise absolves Pulse of its breaches under the Holotrack HOA.

390.   As a direct and proximate result of Pulse's breaches, the Holotrack Investors have suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

391.   In addition, Textor and Eichenberger are personally liable to the Holotrack Investors for Pulse's breaches of the Holotrack HOA under the corporate veil piercing theories of liability discussed above.

## COUNT XXI
### Breach of the March 2017 Security Agreement
### Against Defendants Textor and Pulse

392.   Plaintiff PB Invest repeats, re-alleges, and incorporates by reference the prior allegations in Paragraphs 13 through 43 and 130 through 175 of this Complaint as if fully set forth herein.

393.   On March 2, 2017, Pulse and PB Invest entered into the March 2017 Security Agreement, a binding and valid contract, in which PB Invest promised to loan Pulse $600,000 and,

in exchange, Pulse promised to grant PB Invest a first priority security interest in certain free and clear Pulse collateral and permit PB Invest to enforce this security agreement upon Pulse's default thereunder.

394.    Pulse also promised to "do all acts that may be reasonably necessary to maintain, preserve, and protect the collateral."

395.    PB Invest has fully performed its contractual obligations under the March 2017 Security Agreement.

396.    Pulse breached its contractual obligations under the March 2017 Security Agreement and is in default thereunder due to, among other things, its failure to make a timely repayment of the March 2017 Secured Promissory Note upon PB Invest's demand under that note.

397.    Pulse also breached its promise to "do all acts that may be reasonably necessary to maintain, preserve, and protect the collateral" through its unauthorized and fraudulent license and/or transfer of Pulse's proprietary technology and intellectual property through the Textor Transfer and EAI Transfer.

398.    Pulse also breached its promise to grant to PB Invest a first priority security interest in free and clear collateral of Pulse.

399.    No event has occurred that excuses or otherwise absolves Pulse of its breaches under the March 2017 Security Agreement.

400.    As a direct and proximate result of Pulse's breaches, PB Invest has suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

401.    Under the March 2017 Security Agreement, PB Invest is also entitled to take a number of actions to enforce its rights thereunder, including without limitation those actions and

remedies stated in Sections 6 and 8 of the March 2017 Security Agreement, which include without limitation transferring the collateral to PB Invest.

402.    In addition, Textor is personally liable to PB Invest for Pulse's breaches of the March 2017 Security Agreement under the corporate veil piercing theories of liability discussed above.

**COUNT XXII**
**Breach of the September 2014 Letter Agreement**
**Against Defendants Textor, Eichenberger, and Pulse**

403.    Plaintiff PB Invest repeats, re-alleges, and incorporates by reference the prior allegations in Paragraphs 13 through 57 and 140 through 175 of this Complaint as if fully set forth herein.

404.    On September 15, 2014, Pulse and PB Invest entered into the September 2014 Letter Agreement, a binding and valid contract, which in consideration for the PB Investment, Pulse granted to PB Invest certain investors' rights.

405.    The September 2014 Letter Agreement granted PB Invest most favored nation status with regard to future sales of Pulse common stock and specifically promised that "PB Invest shall have the right to participate in future private sales of the Company's Common stock … on terms and prices no less favorable than as offered to other third parties in such future private sales of the Company's Common Stock."

406.    PB Invest has fully performed its contractual obligations under the September 2014 Letter Agreement.

407.    Pulse breached its contractual obligations under the September 2014 Letter Agreement and is in default thereunder due to, among other things, its failure to honor PB Invest's most favored nation status with regard to future sales of Pulse common stock.

**FIRST AMENDED COMPLAINT – 96**

408.    No event has occurred that excuses or otherwise absolves Pulse of its breaches under the September 2014 Letter Agreement.

409.    As a direct and proximate result of Pulse's breaches, PB Invest has suffered damages in an amount to be proven at trial, but including without limitation attorneys' fees and costs.

410.    In addition, Textor and Eichenberger are personally liable to PB Invest for Pulse's breaches of the September 2014 Letter Agreement under the corporate veil piercing theories of liability discussed above.

<u>COUNT XXIII</u>
**Unjust Enrichment Against Defendants Textor and Eichenberger**

411.    The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

412.    Plaintiffs have no contract with Textor and Eichenberger.

413.    The Plaintiffs' conferred a benefit in the form of millions of dollars in cash investments on Textor and Eichenberger, who have knowledge of that benefit.

414.    Pulse and Textor and Eichenberger accepted and retained the benefits of the Plaintiffs' cash investments and loans and thereafter disbursed those cash investments and loans to the personal accounts of Textor and Eichenberger or to companies owned or controlled by them or their families and friends.

415.    Under the circumstances and numerous complex investment transactions, it would be inequitable for Textor and Eichenberger to retain the benefits of the Plaintiffs' cash investments and loans.  Plaintiffs do not or may not have full, adequate and expeditious remedy at law.

416.    As a direct and proximate result of Textor's and Eichenberger's unjust enrichment, the Plaintiffs have suffered damages in an amount to be proven at trial, but including without

limitation the money they invested in and loaned to Pulse, plus attorneys' fees and costs of this action.

## COUNT XXIV
### Equitable Accounting Against Defendants Textor, Eichenberger, and Pulse

417.     The Plaintiffs repeat, re-allege, and incorporate by reference the prior allegations in Paragraphs 13 through 175 of this Complaint as if fully set forth herein.

418.     Pulse, including its alter egos Textor and Eichenberger, as Pulse's directors/officers without privity of contract with Plaintiffs, had a fiduciary relationship with the Plaintiffs as investors and shareholders of that company.

419.     Pulse, including its alter egos Textor and Eichenberger, engaged in numerous complex investment transactions with Plaintiffs, as more fully explained in the Facts section of this Complaint.  Additionally, Textor and Eichenberger engaged in numerous complex transactions to embezzle Plaintiffs' money through a web of companies controlled or owned by them or their families and friends.

420.     An accounting of the books and records of Pulse, including its alter egos Textor and Eichenberger, is required to ascertain the full extent of these Defendants' fraud, identify the accounts in which these Defendants improperly disbursed these Plaintiffs' cash investments, and determine whether these Defendants violated other contractual obligations that may give rise to additional claims in this case.

421.     Even if there are contracts between Pulse and Plaintiffs, but not between Textor/Eichenberger and Plaintiffs, extensive and complicated accounts are involved, and Plaintiffs do not or may not have full, adequate and expeditious remedy at law.

### JURY DEMAND

The Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, the Plaintiffs respectfully demand judgment in their favor and against the Defendants as follows:

A.      Awarding damages as described in each of the above counts, in favor of the Plaintiffs and against the Defendants in amounts to be determined at trial.

B.      Awarding punitive damages and/or treble damages in favor of the Plaintiffs and against the Defendants in the amount of $25,000,000, the exact amount to be determined at trial.

C.      Awarding the Plaintiffs pre-judgment and post-judgment interest, and attorneys' fees, costs, and other expenses incurred in this action, as provided by the law and/or by the relevant contracts described in this Complaint.

D.      Preliminary and permanently enjoining Defendants Pulse and Textor from licensing or transferring the Pulse Technology and intellectual property, and Defendants Textor and EAI from using the Pulse technology and intellectual property allegedly transferred or licensed to EAI and/or Textor.

E.      Transferring PB Invest's collateral (made of Pulse's assets) to PB Invest.

F.       Granting the Plaintiffs such other and further relief as this Court deems just and proper.

Dated:  March 6, 2018

Respectfully submitted,


Jason Canales
Florida Bar No. 793981
jcanales@mosessinger.com

MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174
Tel: 212-554-7800
Fax: 212-554-7700

*Attorneys for Plaintiffs*
*Holotrack Ventures Corp., Holotrack*
*AG and PB Invest Schweiz AG*